UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:21-mi-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRIAN KEMP, *Governor of the State of Georgia, in his official capacity,* et al., <br><br> Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Intervenor-Defendants. | CIVIL ACTION NO. 1:21-cv-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, *in his official capacity as the Secretary of State for the State of Georgia,* et al., <br><br> Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Intervenor-Defendants. | CIVIL ACTION NO. 1:21-cv-01259-JPB |

| | |
|---|---|
| THE NEW GEORGIA PROJECT, et al., <br><br>        Plaintiffs, <br><br>   v. <br><br> BRAD RAFFENSPERGER, *in his official capacity as the Georgia Secretary of State,* et al., <br><br>        Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br>        Intervenor-Defendants. | CIVIL ACTION NO. 1:21-cv-01229-JPB |

## ORDER

This matter is before the Court on the Renewed Motions for a Preliminary Injunction filed by the Sixth District of the African Methodist Episcopal Church ("AME") and Georgia NAACP Plaintiffs[1] [Doc. 535] and the New Georgia Project ("NGP") Plaintiffs[2] [Doc. 547].  This Court finds as follows:

---

[1] The AME and Georgia NAACP Plaintiffs represent two plaintiff groups in two cases. They comprise the following:  Sixth District of the AME Church; Georgia Muslim Voter Project; Women Watch Afrika; Latino Community Fund Georgia; Delta Sigma Theta Sorority, Inc.; The Arc of the United States; Georgia ADAPT; Southern Christian Leadership Conference; Georgia Advocacy Office; Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; GALEO Latino Community Development Fund, Inc.; Common Cause; Lower Muskogee Creek Tribe; and the United States of America.

[2] The NGP Plaintiffs include the following groups and individuals:  the NGP; Black Voters Matter Fund; Rise, Inc.; Fannie Marie Jackson Gibbs; Jauan Durbin; and Elbert Solomon.

## I.   INTRODUCTION

Georgia Senate Bill 202 ("S.B. 202") governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021.  The AME and Georgia NAACP Plaintiffs and the NGP Plaintiffs (collectively, "Plaintiffs"), among other plaintiff groups, subsequently filed complaints against Georgia state officials and county government officials[3] challenging various provisions of S.B. 202.  This order refers to both State Defendants[4] and Intervenor Defendants[5] and to both groups together as "Defendants."

At issue is a provision in S.B. 202 that prohibits the distribution of food, drinks and other gifts to voters waiting in line at polling places.  This practice is often called "line warming" or "line relief."  Under O.C.G.A. § 21-2-414(a),

---

[3] The full list of County Defendants is available on the docket.  To briefly review, the AME Plaintiffs named as defendants the boards of elections and registration (as well as members of those boards) from the following counties:  Bibb, Chatham, Clarke, Clayton, Cobb, Columbia, DeKalb, Fulton, Gwinnett, Hall and Richmond.  The Georgia NAACP Plaintiffs sued members of the boards of elections and registration from Fulton, Gwinnett and Cobb counties.  The NGP Plaintiffs sued members of the Brooks, Fulton and Spalding county boards, in addition to Keith Gammage, the Solicitor General of Fulton County, and Gregory W. Edwards, the District Attorney for Dougherty County.  All individuals have been sued in their official capacities.

[4] State Defendants are Brian Kemp, Governor of the State of Georgia, in his official capacity; Brad Raffensperger, Secretary of State of Georgia, in his official capacity; and individual members of the Georgia State Elections Board, in their official capacities.

[5] Intervenor Defendants are the Republican National Committee; the National Republican Senatorial Committee; the National Republican Congressional Committee; and the Georgia Republican Party, Inc.

> [n]o person shall . . . give, offer to give, or participate in the giving of
> any money or gifts, including, but not limited to, food and drink, to an
> elector . . . [or] establish or set up any tables or booths on any day in
> which ballots are being cast.

The Court refers to this portion of the provision as the "Food, Drink and Gift Ban."

The Food, Drink and Gift Ban applies (1) "[w]ithin 150 feet of the outer edge of

any building within which a polling place is established," which this Court calls

the "Buffer Zone," and (2) "[w]ithin 25 feet of any voter standing in line to vote at

any polling place," which this Court terms the "Supplemental Zone."[6]  Id. § 21-2-

414(a).  A violation of the Food, Drink and Gift Ban is punishable as a

misdemeanor.  Id. § 21-2-414(f).  The Court refers to the provision of S.B. 202 that

imposes criminal penalties for violations of the Food, Drink and Gift Ban as the

"Penalty Provision."  In this case, Plaintiffs allege that the Food, Drink and Gift

Ban violates their rights to freedom of speech and expression under the First

Amendment to the United States Constitution.[7]

---

[6] The Food, Drink and Gift Ban also applies within any polling place, see O.C.G.A. § 21-2-414(a), but enforcement of the provision in that location is not at issue here.

[7] This Court provided an extensive factual overview of this case in its August 18, 2022 order; those facts are incorporated by reference herein.  See [Doc. 241, pp. 6–23].

## II.    PROCEDURAL HISTORY

### A.    Previous Preliminary Injunction Motions

Plaintiffs have previously sought preliminary injunctions in this Court.  On May 25, 2022, the AME and Georgia NAACP Plaintiffs moved this Court to preliminarily enjoin all named defendants in their respective cases from enforcing the Penalty Provision for violations of the Food, Drink and Gift Ban.  [Doc. 171]. On June 3, 2022, the NGP Plaintiffs moved for the same relief as to only two named defendants:  Keith Gammage, in his official capacity as the Solicitor General of Fulton County, and Gregory W. Edwards, in his official capacity as the District Attorney of Dougherty County.  [Doc. 185].  The Court held a hearing on both motions on July 18, 2022.  [Doc. 227].

The Court denied the motions on August 18, 2022 (the "2022 Order"). [Doc. 241].[8]  In the 2022 Order, the Court analyzed the Food, Drink and Gift Ban at length.  Specifically, the Court answered five fundamental questions about line relief and about the Food, Drink and Gift Ban:  (1) whether line relief is expressive conduct; (2) whether the Food, Drink and Gift Ban is a content-based regulation of speech; (3) which level of scrutiny applies to the Food, Drink and Gift Ban; (4)

---

[8] The Court cites to the docket of the master case for ease of reference, but the 2022 Order is also available at In re Georgia Senate Bill 202, 622 F. Supp. 3d 1312 (N.D. Ga. 2022).

whether the Food, Drink and Gift Ban, when implemented in the Buffer Zone and

in the Supplemental Zone, passes the applicable level of scrutiny; and (5) whether

injunctive relief was appropriate in light of the upcoming elections at that time.

The Court's answers to these questions directly inform the resolution of the

pending motions and thus merit additional discussion here.

### 1.    Whether Line Relief Is Expressive Conduct

First, the Court considered whether line relief is expressive conduct that is

protected by the First Amendment.  The First Amendment protects expressive

conduct in addition to spoken or written speech.  Texas v. Johnson, 491 U.S. 397,

404 (1989).  In some circumstances, "conduct may be 'sufficiently imbued with

elements of communication to fall within the scope'" of First Amendment

protection.  Id. (quoting Spence v. Washington, 418 U.S. 405, 409 (1974)).  To

determine whether conduct is expressive, a court asks "whether [a] reasonable

person would interpret it as *some* sort of message, not whether an observer would

necessarily infer a *specific* message." Holloman ex rel. Holloman v. Harland, 370

F.3d 1252, 1270 (11th Cir. 2004).  Applying this precedent, the Court determined

that by engaging in line relief, "Plaintiffs intend to convey a message that voting is

important and that voters should remain in line to ensure their participation in the

democratic process."  [Doc. 241, p. 31].  The Court further determined that "voters

'infer' some message from Plaintiffs' efforts."  Id.  Because the record established

that voters interpret Plaintiffs' work as conveying a message, the Court concluded

that Plaintiffs were substantially likely to show that their line relief activities

constitute expressive conduct that is protected by the First Amendment.

### 2.    Whether the Food, Drink and Gift Ban Is a Content-Based Regulation of Speech

Second, the Court analyzed whether the Food, Drink and Gift Ban is a

content-based or a content-neutral restriction on speech.  A content-neutral

restriction is one that "serves purposes unrelated to the content of expression."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  A law is content-based,

on the other hand, if it "applies to particular speech because of the topic discussed

or the idea or message expressed."  Reed v. Town of Gilbert, 576 U.S. 155, 163

(2015).  A facially content-based law "defin[es] regulated speech by particular

subject matter" or "by its function or purpose."  Id.  Importantly, even facially

content-neutral laws may still be considered content-based.  Indeed, regulations

that are facially content-neutral "will be considered content-based regulations of

speech" if they "cannot be 'justified without reference to the content of the

regulated speech'" or if they were adopted by the government "because of

disagreement with the message [the speech] conveys."  Id. at 164 (alteration in

original) (quoting Ward, 491 U.S. at 791).  When determining whether a law is

content-based, the Court looks to the government's purpose in adopting the law as "the controlling consideration." Ward, 491 U.S. at 791.

In the 2022 Order, this Court determined that Plaintiffs were substantially likely to show that the Food, Drink and Gift Ban was a content-based regulation of speech. The Court focused on two points in reaching this conclusion. First, the law's application to polling places was important context. Notably, the Supreme Court of the United States had previously determined that a law restricting speech around a polling place was content-based because the law restricted only a certain *category* of speech. Burson v. Freeman, 504 U.S. 191, 197 (1992). In other words, "[w]hether individuals [could] exercise their free speech rights near polling places depend[ed] entirely" on the content of their speech—specifically, "whether their speech [was] related to a political campaign." Id. Similarly, this Court held that the Food, Drink and Gift Ban "prohibit[ed] a specific category of conduct (offering or providing certain items to voters) around the polling place." [Doc. 241, p. 39]. Consequently, like the Burson plaintiffs, Plaintiffs' ability in this case to exercise their First Amendment rights near polling places hinged entirely on the nature of their conduct and thus on the content of their speech.

Second, the Court looked to the government's purpose in passing the Food, Drink and Gift Ban—which is the "controlling consideration" for determining

whether a law is content-based or content-neutral.  Ward, 491 U.S. at 791.  Two

Supreme Court cases, in particular, informed this Court's analysis:  City of Renton

v. Playtime Theatres, Inc., 475 U.S. 41 (1986), and Boos v. Barry, 485 U.S. 312

(1988).

Renton concerned a zoning ordinance that prohibited adult motion picture

theaters within 1,000 feet of residences and certain establishments.  475 U.S. at 48.

The Supreme Court determined that the ordinance was content-neutral because it

was "aimed not at the *content* of the films shown at 'adult motion picture theatres,'

but rather at the *secondary effects* of such theaters on the surrounding community."

Id.  In other words, the zoning ordinance was "consistent with [the] definition of

'content-neutral' speech regulations as those that 'are justified without reference to

the content of the regulated speech.'"  Id. (quoting Va. Pharmacy Bd. v. Va.

Citizens Consumer Council, 425 U.S. 748, 771 (1986)).

In Boos, the Supreme Court held unconstitutional a statute that prohibited

the display of signs that were offensive to a foreign government within 500 feet of

that government's embassy.  485 U.S. at 315.  The Court found that the statute was

a content-based regulation of speech because whether individuals could picket in

front of an embassy depended entirely on the content of their signs.  Id. at 318–19.

Importantly, the statute was justified based on the "direct" and "emotive" impact of

the speech on its audience; in fact, its justification "focuse[d] *only* on the content of the speech and the direct impact that speech ha[d] on its listeners." Id. at 321.

The Court in Boos distinguished Renton, explaining that "while the regulation in Renton applied only to a particular category of speech, its justification had nothing to do with that speech." Id. at 320. As already stated, the zoning ordinance did not target "[t]he content of the films being shown inside the theaters"; instead, it "was aimed at the '*secondary effects* of such theaters in the surrounding community.'" Id. (quoting Renton, 475 U.S. at 47). But, the Court explained, "[r]egulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects'" that were contemplated in Renton. Id. at 321.

In the 2022 Order, this Court concluded that the justification for the Food, Drink and Gift Ban focused on the direct impact of line relief on voters, including voters' reactions to line relief activities. Specifically, the "impetus" for the statute was primarily "the concern that election officials could not monitor what volunteers were communicating to voters and that line warming activities could constitute or be perceived as improper electioneering, political pressure or intimidation." [Doc. 241, pp. 38–39]. The Court noted that "[t]he preamble of the Food, Drink and Gift Ban . . . justifies the statute on the grounds that it will protect

voters waiting in line from 'improper interference, political pressure, or intimidation.'" Id. at 39 (quoting S.B. 202 § 2, ¶ 13, Reg. Sess. (Ga. 2021)). Accordingly, the Court held that Plaintiffs were substantially likely to show that the Food, Drink and Gift Ban was "a content-based regulation of speech because the government enacted it based on the potential 'direct' and 'emotive' impact of line warming activities on voters." Id. (quoting Boos, 485 U.S. at 321).

### 3.   The Applicable Level of Scrutiny for the Food, Drink and Gift Ban

Third, the Court evaluated the appropriate level of scrutiny for the Food, Drink and Gift Ban.  Content-based regulations are ordinarily subject to the strict scrutiny level of review, and in fact, such regulations "are presumptively unconstitutional." Reed, 675 U.S. at 163–64.  To survive strict scrutiny, a content-based regulation of speech must be necessary to serve a compelling state interest and narrowly tailored to achieve that end. Burson, 504 U.S. at 198.  In Burson, the Supreme Court recognized that some circumstances warrant modifying the strict scrutiny standard. Id. at 208 (finding that a modified standard was appropriate because the "government has such a compelling interest in securing the right to vote freely and effectively").  Under the modified standard, a state need not provide evidence to support the necessity of the challenged law, and a regulation is sufficiently tailored if it is "'reasonable'" and does not "'significantly impinge on

constitutionally protected rights.'"  Id. at 209 (quoting Munro v. Socialist Workers Party, 479 U.S. 189, 195–96 (1986)).

Importantly, this modified analysis applies only to those cases in which "the First Amendment right threatens to interfere with the act of voting itself," such as those "in which the challenged activity physically interferes with electors attempting to cast their ballots." Id. at 209 n.11.  For instance, the Eleventh Circuit Court of Appeals applied the Burson strict scrutiny analysis to a Florida statute that prohibited exit solicitation of voters within 100 feet of a polling place.  Citizens for Police Accountability Pol. Comm. v. Browning, 572 F.3d 1213, 1215 (11th Cir. 2009).  The Eleventh Circuit reasoned that the "commotion tied to exit solicitation is as capable of intimidating and confusing the electorate and impeding the voting process—even deterring potential voters from coming to the polls—as other kinds of political canvassing or political action around the polls."  Id.

The question for this Court was thus whether this case fell into the category of cases in which "the prohibited activity threatens to interfere with the act of voting itself or physically interferes with voters attempting to cast their ballot."  Id. at 1221 n.17.  In the 2022 Order, the Court—having reviewed in full the evidence provided by the parties—determined that conducting line relief activities in and around polling places "evoke[d] images of the kind of commotion at the polls" at

issue in both <u>Burson</u> and <u>Browning</u>.  [Doc. 241, p. 48].  This Court noted that "the concern regarding intimidation and influence appears even greater here than in <u>Browning</u>, where the Eleventh Circuit found that the facts (potential for interference *after* voters cast their ballots) justified using the <u>Burson</u> modified analysis."  <u>Id.</u> at 49.  In this case, by contrast, the potential for interference occurred *before* voters cast their ballots, which further justified applying <u>Burson</u>'s modified strict scrutiny standard.  <u>Id.</u> at 48–49.  The Court thus determined that the modified strict scrutiny analysis was the appropriate standard of review for evaluating whether the Food, Drink and Gift Ban was constitutional.  <u>Id.</u> at 51.

> **4.    Application of the <u>Burson</u> Modified Strict Scrutiny Analysis**

Fourth, the Court applied the <u>Burson</u> modified strict scrutiny standard to the Food, Drink and Gift Ban.  In doing so, the Court recognized that the Food, Drink and Gift Ban applies in two distinct areas—the Buffer Zone and the Supplemental Zone—and analyzed the law's constitutionality as to each.

The Court concluded that when implemented in the Buffer Zone (i.e., within 150 feet of a polling place), the Food, Drink and Gift Ban survived the <u>Burson</u> strict scrutiny standard.  The state's interests in support of the law included "restoring peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity."  [Doc. 241, pp. 51–52].  These were "compelling" interests recognized as such by a litany of prior

cases.  Id. at 52.  Accordingly, the Court determined that the government met its burden of showing that the Food, Drink and Gift Ban was necessary to serve compelling state interests—the first prong of the strict scrutiny analysis.  As to the second prong, the Court reasoned that, consistent with other similar cases, the 150-foot Buffer Zone was not an unreasonable restriction and therefore did not significantly impinge on First Amendment rights.  See id. at 53.

On the other hand, the Court held that the Food, Drink and Gift Ban failed this scrutiny when implemented in the Supplemental Zone.  Id. at 54–55.  Central to this conclusion was the fact that, unlike the Buffer Zone's reasonable 150-foot radius, the Supplemental Zone has no boundary.  S.B. 202 prohibits organizations (such as Plaintiffs) from engaging in line relief activities in the Supplemental Zone, i.e., if they are within twenty-five feet of a voter—even if the organizations are outside the 150-foot Buffer Zone.  Because the Supplemental Zone "is tied to the position of the voter in line and fluctuates based on the location of the voter, it has no fixed line of demarcation and no limit."  Id.  This Court noted that although Burson "did not establish where to draw the line between a restricted zone and one that is an 'impermissible burden,'" the Supreme Court "indicate[d] that a restricted zone becomes unconstitutional at 'some measurable distance from the polls.'"  Id. at 55 (quoting Burson, 504 U.S. at 210).  Applying that reasoning, this Court held

14

that "it [was] improbable that a limitless Supplemental Zone would be permissible"

under <u>Burson</u>'s modified strict scrutiny analysis.  <u>Id.</u>

In sum, the Court found that while Plaintiffs were not substantially likely to

succeed on the merits of their claim as to the Food, Drink and Gift Ban in the

Buffer Zone, they *were* substantially likely to succeed on the merits of their claim

as to the Supplemental Zone.  The Court also found that Plaintiffs met all other

factors of the preliminary injunction test—irreparable harm, balance of the equities

and public interest—with respect to enforcing the Food, Drink and Gift Ban in the

Supplemental Zone.

### 5.    Application of the <u>Purcell</u> Principle

Fifth and finally, the Court considered whether the principle articulated in

<u>Purcell v. Gonzalez</u>, 591 U.S. 1 (2006), counseled against enjoining enforcement

of the Food, Drink and Gift Ban in the Supplemental Zone.  The <u>Purcell</u> principle

is the idea that a court should ordinarily decline to issue an injunction that changes

existing election rules when an election is imminent.  <u>Purcell</u>, 591 U.S. at 5–6.

This principle of restraint recognizes that injunctions issued on the eve of an

election risk confusing voters and decreasing voter turnout.[9]  <u>Id.</u> at 4–5.

---

[9] The <u>Purcell</u> principle is discussed in greater detail in Part III.B, <u>see</u> <u>infra</u>.

When the 2022 Order was issued—on August 18, 2022—early voting for the 2022 midterm elections was scheduled to begin in mid-October, or in approximately two months.  Defendants argued that a late change to the law would lead to voter confusion, harm to the electoral process and inconveniences concerning retraining poll workers and redrafting training manuals.  See [Doc. 241, pp. 66–67].  Plaintiffs countered that an injunction would pose minimal hardship; pointed to the testimony of county officials that implementing a last-minute change to election rules was feasible; and cited evidence that because voters have been accustomed to line relief at the polls, they would not be confused by an injunction allowing those activities to proceed.  Id. at 68–69.

The Court weighed these arguments and concluded that an injunction regarding the Supplemental Zone would affect the mechanics of the then-upcoming elections and would require retraining poll workers, potentially leading to confusion and increased burdens on the Secretary of State.  Id. at 69–70.  This Court was also "mindful of the Eleventh Circuit's caution regarding the unintended consequences of last-minute changes to election laws."  Id. at 70.  As such, the Court determined that although Plaintiffs were otherwise entitled to an injunction

vis-à-vis enforcing the Food, Drink and Gift Ban in the Supplemental Zone,

Purcell precluded the requested relief.[10]

### B.   Instant Preliminary Injunction Motions

On April 24, 2023, the AME and Georgia NAACP Plaintiffs filed a renewed

motion for preliminary injunction.  [Doc. 535].  The NGP Plaintiffs similarly filed

a renewed motion on May 17, 2023.  [Doc. 547].  The AME and Georgia NAACP

Plaintiffs ask this Court to enjoin all named defendants in their respective cases[11]

from enforcing the Penalty Provision for violations of the Food, Drink and Gift

Ban in the Supplemental Zone.  The NGP Plaintiffs seek the same relief but only

as to Gammage and Edwards.  Both motions seek injunctions for the 2024 elections

and until any final relief in this case is granted.[12]  State Defendants and Intervenor

Defendants oppose the motions; County Defendants do not.[13]

---

[10] Notably, when reaching this conclusion, this Court relied on the Purcell analysis in the Eleventh Circuit's opinion in Rose v. Secretary, State of Georgia, No. 22-12593, 2022 WL 3572823, at *2 (11th Cir. Aug. 12, 2022); see [Doc. 241, pp. 65–66, 70].  That opinion—including its application of the Purcell principle—was subsequently vacated by the Supreme Court.  See Rose v. Raffensperger, 143 S. Ct. 58, 59 (2022).

[11] The AME and Georgia NAACP Plaintiffs seek an injunction as to all defendants named in cases 1:21-cv-01284 and 1:21-cv-01259.

[12] Plaintiffs maintain their First Amendment challenge to the Food, Drink and Gift Ban when enforced in the Buffer Zone but do not renew that challenge in the instant motions. See [Doc. 535, p. 3 n.2]; [Doc. 547-1, p. 6 n.1].

[13] County Defendants did not respond to the instant motions.  See N.D. Ga. Civ. R. 7.1(B) ("Failure to file a response shall indicate that there is no opposition to the motion.").

## III.   ANALYSIS

In the renewed motions for preliminary injunctions, Plaintiffs contend that enforcing the Food, Drink and Gift Ban in the Supplemental Zone violates their First Amendment rights.  In the analysis that follows, the Court evaluates whether Plaintiffs are entitled to preliminary injunctive relief before turning to whether the Purcell principle applies to this case.[14]

### A.   Preliminary Injunctive Relief

A plaintiff seeking preliminary injunctive relief must show (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the balance of equities is in his favor; and (4) that an injunction would not be adverse to the public interest.  Sofarelli v. Pinellas County, 931 F.2d 718, 723–24 (11th Cir. 1991).  Because a preliminary injunction "is an extraordinary and drastic remedy," the Court may not issue such relief "unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Granting a preliminary injunction is thus the exception rather than the rule.  See id.

---

[14] The NGP Plaintiffs join and incorporate by reference the arguments presented by the AME and Georgia NAACP Plaintiffs.  See [Doc. 547-1, p. 7].  The Court therefore addresses both motions together unless otherwise noted.

### 1.   Likelihood of Success on the Merits

To obtain a preliminary injunction, a moving party must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  Sofarelli, 931 F.2d at 723.  This factor is generally considered the most important of the four factors, see Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986), and failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, see Siegel, 234 F.3d at 1176.

Plaintiffs assert that implementing the Food, Drink and Gift Ban in the Supplemental Zone impermissibly burdens expressive conduct that is protected by the First Amendment.  To determine whether Plaintiffs are substantially likely to succeed on this claim, the Court must consider whether Plaintiffs' line relief activities implicate the First Amendment; which level of scrutiny applies to the Food, Drink and Gift Ban; and whether the Food, Drink and Gift Ban, when enforced in the Supplemental Zone, passes the appropriate level of scrutiny.

As explained earlier, see supra Part II.A, the Court analyzed these questions extensively in the 2022 Order.  This Court previously determined that Plaintiffs are substantially likely to show that line relief constitutes expressive conduct; that the Food, Drink and Gift Ban is a content-based regulation of speech; that the modified strict scrutiny analysis articulated in Burson applies to the Food, Drink

and Gift Ban; and that, when implemented in the Supplemental Zone, the Food, Drink and Gift Ban fails this scrutiny.

After thorough review of the parties' arguments and the record in this case (which is now even more developed than what was before the Court for the 2022 Order), this Court declines to depart from these findings. The Court will briefly address Defendants' arguments for a different outcome and explain why their contentions are not persuasive.

First, State Defendants argue that Plaintiffs' line relief efforts do not constitute expressive conduct. State Defendants claim that because "the record suggests a muddle of potential messages Plaintiffs may be trying to communicate, . . . there is no basis to conclude that voters would understand being handed something of value in line to impart *any* message." [Doc. 578, p. 18]. State Defendants seem to contend that because multiple messages may be perceived from Plaintiffs' line relief activities, those efforts cannot be considered expressive conduct. This contention is at odds with binding precedent holding that conduct is expressive where a "reasonable person would interpret [the conduct] as *some* sort of message," not where "an observer would necessarily infer a *specific* message." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004).

The record here shows that reasonable persons would interpret Plaintiffs' line relief efforts as expressing some sort of message.  Plaintiffs themselves state that their line relief activities convey messages about community support, voter dignity and the importance of political participation.  See [Doc. 535-10, p. 4]; [Doc. 535-11, p. 3]; [Doc. 547-7, p. 2].  The record also shows that voters perceive these messages from Plaintiffs' conduct:  Plaintiffs provided testimony from a voter who explained that Plaintiffs' line relief efforts conveyed a "message of support" that "lifted [his] spirits" and "strengthened [his] resolve to persevere through adversity."  [Doc. 547-9, p. 2].  Additionally, the mere fact that an act may convey more than one message does not render it outside the realm of expressive conduct; in fact, the Supreme Court expressly clarified that "a narrow, succinctly articulable message is not a condition of constitutional protection."  Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 569 (1995).  For these reasons, the Court maintains its conclusion that Plaintiffs are substantially likely to show that line relief constitutes expressive conduct that is protected by the First Amendment.

Second, State Defendants assert that the Food, Drink and Gift Ban is not a content-based regulation of speech.  State Defendants claim that the Food, Drink and Gift Ban addresses only secondary effects, "which include undermining the

efficiency of elections, creating a perception of voter intimidation, and forcing voters to accept unwanted interactions while waiting to vote." [Doc. 578, p. 22]. Therefore, according to State Defendants, because the Food, Drink and Gift Ban targets only the secondary effects of Plaintiffs' conduct, it is necessarily content-neutral.

As this Court explained in the 2022 Order, however, the Food, Drink and Gift Ban does not address only the secondary effects of line relief. Instead, the regulation targets the direct effect of Plaintiffs' speech on voters. Ryan Germany, General Counsel for the Secretary of State, testified that the Secretary of State's Office was concerned about perceptions of political influence from organizations distributing food and water around polling places and that S.B. 202 responded to these concerns. [Doc. 535-3, p. 4]. As this testimony demonstrates, the regulation was prompted by the notion that voters would perceive line relief as improper electioneering or political pressure. Moreover, the very preamble of S.B. 202 justifies the legislation on the grounds that it protects voters from the potential effects of Plaintiffs' speech. Importantly, "reactions to speech are not the type of 'secondary effects'" that are ordinarily relevant for content-neutral regulations. Boos, 485 U.S. at 321.

Insofar as State Defendants cite concerns about election efficiency, the record does not support their position.  County officials provided testimony that they have easily enforced the Food, Drink and Gift Ban in the Buffer Zone and have not received complaints about line relief activities in the Supplemental Zone. [Doc. 535-5, p. 3]; [Doc. 535-6, pp. 2–3].  Consequently, the Court is not persuaded by State Defendants' arguments and concludes once more that Plaintiffs are substantially likely to show that the Food, Drink and Gift Ban is a content-based regulation of speech.

Finally, Defendants assert that when implemented in the Supplemental Zone, the Food, Drink and Gift Ban survives the applicable level of scrutiny.[15]  In particular, Defendants argue that the state's interests in the Food, Drink and Gift Ban are just as compelling within the Supplemental Zone as they are in the Buffer Zone and that implementing the Food, Drink and Gift Ban in the Supplemental Zone meets Burson's narrow tailoring requirement.

---

[15] The parties disagree about the appropriate level of scrutiny.  Plaintiffs appear to concede that Burson's modified strict scrutiny standard applies.  See [Doc. 535-1, p. 9]; [Doc. 547-1, pp. 9–10].  State Defendants, contending that Plaintiffs' activities are not expressive conduct, would apply Anderson-Burdick review.  [Doc. 578, p. 24]. Intervenor Defendants seem to claim that the appropriate level of review is either strict scrutiny; the more relaxed scrutiny used for content-neutral time, place and manner restrictions; or, agreeing with State Defendants, the Anderson-Burdick standard.  [Doc. 579, p. 4 n.1].  In any event, this Court sees no reason to depart from its prior finding that Burson is the appropriate standard of review.

As to the nature of the state's interests, the justifications for the Food, Drink and Gift Ban—maintaining peace and order around the polling place, protecting voters from political pressure and supporting election integrity—are undoubtedly compelling.  See Citizens for Police Accountability Pol. Comm. v. Browning, 572 F.3d 1213, 1219 (11th Cir. 2009) (recognizing that "protecting voters from confusion and undue influence" and "preserving the integrity of the election process" are compelling interests).  This Court, however, cannot overlook the Supreme Court's clear holding that a regulation "become[s] an impermissible burden" at "some measurable distance from the polls."  Burson v. Freeman, 504 U.S. 191, 210 (1992).  The compelling nature of the state's interests does not mean that the Food, Drink and Gift Ban necessarily satisfies the second prong of Burson's modified strict scrutiny standard.

As to the second prong, the narrow tailoring requirement, Defendants argue that the Food, Drink and Gift Ban is narrowly tailored when it is implemented in the Supplemental Zone.  This part of the Burson analysis asks if the regulation is "reasonable" and whether it "significantly impinge[s] on constitutionally protected rights."  Browning, 572 F.3d at 1218 (quoting Burson, 504 U.S. at 209).  First, State Defendants contend that the Food, Drink and Gift Ban "merely institutes a narrow restriction on conduct in the immediate vicinity of a polling location" and is

therefore "sufficiently tailored to satisfy any level of scrutiny." [Doc. 578, p. 32] (emphasis added). When implemented in the Supplemental Zone, however, the Food, Drink and Gift Ban is plainly *not* narrowly tailored: it does not apply only in the immediate vicinity of the polling location and instead applies no matter the distance from the polls so long as a voter is present. Because the Supplemental Zone is tied to the location of a voter, it has no fixed boundary and thus no limit. To illustrate, if a voting line extends 1,000 feet past the Buffer Zone, the Supplemental Zone also extends 1,000 feet. The Supreme Court has upheld a "restricted zone" around a polling place that imposed a "minor geographic limitation." Burson, 504 U.S. at 208, 210. But the Supplemental Zone is neither restricted nor limited in its geographic application. As such, it is not narrowly tailored.

Second, Intervenor Defendants argue that the Supplemental Zone is narrowly tailored because the state's interests in enforcing the Food, Drink and Gift Ban concern *voters*, not polling places. In other words, according to Intervenor Defendants, the fact that the Supplemental Zone extends no matter a voter's distance from the polls is irrelevant because the state's interests are in protecting the voter, not in protecting "buildings." [Doc. 579, p. 6]. Plaintiffs respond that if this were true, the state would not have enacted the Buffer Zone in

the first instance—that is, the state would not have explained the Food, Drink and Gift Ban's areas of application by reference to buildings at all.

In the Court's view, Intervenor Defendants overlook a nuance in the applicable precedent.  The Supreme Court has recognized states' interests in peace and order around *polling places*—not around buildings per se—with a view toward protecting the unique activity (voting) that occurs at those specific locations (the polls).  See Burson, 504 U.S. at 208 ("[W]e hold that *some* restricted zone *around the voting area* is necessary to secure the [s]tate's compelling interest." (second emphasis added)); id. at 211 ("A long history, a substantial consensus, and simple common sense show that some restricted zone *around polling places* is necessary to protect th[e] fundamental right [to cast a ballot in an election free from the taint of intimidation and fraud]." (emphasis added)).  The state's interests, therefore, necessarily diminish in importance as the distance from the polling place increases.  This logic explains Burson's guidance that regulations become "impermissible burdens" at "some measurable distance from the *polls*"—not at some measurable distance from "*voters*."  Id. at 210.  The Court is therefore unpersuaded by Intervenor Defendants' characterization of the state's interests in this case or by

Defendants' arguments that enforcing the Food, Drink and Gift Ban in the Supplemental Zone satisfies Burson's narrow tailoring requirement.

As set forth above, Plaintiffs are substantially likely to show that implementing the Food, Drink and Gift Ban in the Supplemental Zone is not narrowly tailored and that it places an impermissible burden on the exercise of constitutional rights.  For the foregoing reasons, the Court thus finds that Plaintiffs are substantially likely to succeed on the merits of their claim that, when implemented in the Supplemental Zone, the Food, Drink and Gift Ban infringes Plaintiffs' First Amendment rights.

### 2.    Irreparable Harm

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'" Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can show a substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  Id.; see also City of Jacksonville, 896 F.2d at 1285 (declining to address all elements of the preliminary injunction test because "no showing of irreparable injury was made").  Irreparable injury "must be neither remote nor speculative, but actual and imminent."  Siegel, 234 F.3d at 1176 (quoting City of Jacksonville, 896 F.2d at 1285).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).  Both the Supreme Court and the Eleventh Circuit have reiterated this principle on numerous occasions.  See Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020); see also Otto v. City of Boca Raton, 981 F.3d 854, 870 (11th Cir. 2020) (concluding that enforcing statutes "for even minimal periods of time" that penalize protected speech "constitutes a per se irreparable injury" (quoting Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983))); FF Cosms. FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury."); KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir. 2006) (noting that it is "well established" that the loss of First Amendment freedoms, even if temporary, embodies irreparable harm).

In the 2022 Order, this Court determined that Plaintiffs established irreparable harm because the Food, Drink and Gift Ban chilled the exercise of their First Amendment rights.  Importantly, "[t]he record shows that the Food, Drink and Gift Ban has already deterred Plaintiffs and other organizations from engaging in line warming activities," and "the lost opportunity for expression cannot be remedied after the fact."  [Doc. 241, p. 59].  The Court has reviewed the parties'

arguments and the record on this issue and concludes once more that Plaintiffs
have established irreparable harm.  See White v. Baker, 696 F. Supp. 2d 1289,
1312–13 (N.D. Ga. 2010) ("Plaintiffs that show a chilling effect on free expression
have demonstrated an irreparable injury.").  Defendants argue that Plaintiffs cannot
show irreparable injury for three reasons.  Although the Court finds these
arguments unavailing, the Court discusses them below.

First, State Defendants argue that long lines are not likely to persist in the
2024 elections.  Without long lines, according to State Defendants, Plaintiffs'
inability to provide line relief to waiting voters occasions no irreparable injury.
The record contains evidence from both parties about the issue of lines at the polls.
Plaintiffs assert that their line relief activities remain important because voters
continue to face the risk of long lines.  Joseph Blake Evans, the Director of
Elections with the Secretary of State's Office, testified that long lines persisted in
the December 2022 elections.  [Doc. 535-15, pp. 2–3].  A 30(b)(6) representative
of the Cobb County Board of Elections testified that lines in the December 2022
elections extended beyond the Buffer Zone.  [Doc. 535-16, p. 3].  The Fulton
County Board of Elections provided testimony that for the 2022 general election,
wait times were over an hour for advanced voting (but not on Election Day).  [Doc.
535-17, p. 2].

Plaintiffs also provided evidence about wait times for early voting on the Friday before the December 2022 runoff.  On that day, all of Fulton County's twenty-four voting locations had a line of at least thirty minutes, and twenty-one had lines over one hour.  [Doc. 535-18, p. 35].  All eleven of Gwinnett County's early voting sites reported wait times of at least forty-five minutes.  Id.  In DeKalb County, wait times at eleven of its sixteen early voting locations exceeded thirty minutes.  Id.  Finally, Dr. Stephen Pettigrew, Plaintiffs' expert on the issue of long voting lines in Georgia, testified that long lines tend to be worst in presidential election years.  [Doc. 590-3, p. 2].

State Defendants assert that long lines will not pose a challenge for voters in upcoming elections.  To support this assertion, State Defendants provided evidence that wait times on Election Day for the November 2022 elections varied from zero to ten minutes,[16] [Doc. 578-9, p. 30], while the average wait time on Election Day for the December 2022 runoff was one minute and forty-five seconds, [Doc. 578-3, p. 5].

The Court finds that the evidence in the record does not support State Defendants' position.  Plaintiffs provided evidence that voters faced long lines in

---

[16] The data provided by State Defendants on this particular point "reflect only in-person Election Day voting, which may have shorter average wait times than in-person early voting."  [Doc. 578-9, p. 30].

the 2022 elections.  Although State Defendants offered counter evidence about short wait times, their evidence concerned wait times for *different* elections and during *different* voting periods than the information presented by Plaintiffs. Plaintiffs also introduced expert testimony that wait times in presidential election years—e.g., 2024—are likely to be worse compared to other election years.  After reviewing the record and the parties' arguments, the Court finds that the issue of long lines is sufficiently likely to continue in the 2024 elections such that Plaintiffs will suffer irreparable injury absent an injunction.

Second, State Defendants contend that the NGP Plaintiffs rely only on speculation to establish irreparable injury.[17]  According to State Defendants, the

_____

[17] In a footnote, State Defendants additionally contend that the NGP Plaintiffs' motion should be denied for requesting "untenable relief." [Doc. 578, p. 36 n.11].  State Defendants argue that enjoining two county prosecutors, but not others, raises constitutional concerns.  First, this argument is not fully developed; it consists of two sentences in a single footnote.  See Asociacion de Empleados del Area Canalera v. Panama Canal Comm'n, 453 F.3d 1309, 1316 n.7 (11th Cir. 2006) (holding that an issue was waived when it "appear[ed] only in a footnote and [was] unaccompanied by any argument").  Second, the Court is unconvinced that State Defendants' cited authority is on point.  State Defendants rely on Bush v. Gore, 531 U.S. 98 (2000), for the proposition that "arbitrary and disparate treatment . . . in . . . different counties" poses constitutional concerns, [Doc. 578, p. 36 n.11] (alterations in original) (quoting Bush, 531 U.S. at 107). But Bush concerned arbitrary and disparate treatment of *voters' ballots* in the context of the Supreme Court's "one-vote jurisprudence." 531 U.S. at 107.  Stated another way, a state may not arbitrarily treat the ballots of voters in one county differently from those of voters in another county.  See id.; see also, e.g., Moore v. Ogilvie, 314 U.S. 814, 819 (1969) ("The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.").  State Defendants have not explained how a case concerning one-vote jurisprudence applies to a

NGP Plaintiffs have not identified "any pending or threatened enforcement of the law" and instead rely only on "hypothetical concerns." [Doc. 578, p. 36]. However, the irreparable harm identified by NGP Plaintiffs is not the potentially speculative risk of criminal penalties. It is the impact of that risk on the NGP Plaintiffs' ability to exercise their First Amendment rights. And that injury *is* actual and imminent: the NGP Plaintiffs have stated that S.B. 202 has already impacted their line relief programs and will continue to do so unless an injunction is issued. See [Doc. 547-6, p. 3] ("As long as the [Food, Drink and Gift Ban] remains in place, NGP cannot freely express its message of support and solidarity to encourage these voters to persevere even when faced with difficult conditions, or convey that participating in elections is an important and highly valued act of democracy."). The Court therefore finds that the NGP Plaintiffs have sufficiently shown actual and imminent irreparable injury.

Third and finally, Defendants assert that Plaintiffs cannot show irreparable harm because they unreasonably delayed in filing the instant motions.[18]

───────────────

case about line relief. The Court is therefore unpersuaded by State Defendants' argument on this issue.

[18] At the July 18, 2022 hearing on the initial preliminary injunction motions, the Court asked counsel whether it would be permissible to enter an injunction as to future elections, but not as to the then-imminent November 2022 election, to avoid Purcell concerns. See [Doc. 234, pp. 33–34, 39]. State Defendants argued that the Court should not enter an injunction as to future elections and that instead the Court should have an expedited trial. Id. at 34. Intervenor Defendants also objected to an injunction because

Defendants contend that Plaintiffs improperly waited nine months to file their motions after initially seeking preliminary injunctive relief.  It is true that "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."  Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016).  This is because obtaining preliminary injunctive relief "requires showing 'imminent' irreparable harm."  Id. (quoting Siegel, 234 F.3d at 1176–77).

In the Court's view, Plaintiffs did not unreasonably delay in filing their motions.  To show irreparable injury sufficient for a preliminary injunction, Plaintiffs must establish that the harm is *imminent*.  Yet in the context of an election, Plaintiffs are constrained by the Purcell principle, which limits the window in which Plaintiffs may seek to enjoin election-related regulations.  See infra Part III.B.  As such, Plaintiffs filed their motions in April 2023—nearly one year before the next elections.  Had Plaintiffs filed their motions earlier, their

---

"irreparable harm would not be shown for an election so far in advance."  Id. at 40.  Even though Intervenor Defendants previously argued that Plaintiffs would be unable to show irreparable harm for elections too far in the future, they now contend that Plaintiffs unreasonably delayed in bringing the instant motions.

prospective harms would not have been imminent, but had they filed any later, their relief may have been barred by Purcell.

Moreover, the Eleventh Circuit held that a delay "*militates against* a finding of irreparable harm"—not that it precludes such a finding entirely.  Wreal, 840 F.3d at 1248.  Thus, even if this Court determined that Plaintiffs delayed in bringing the instant motions, the Court would still need to weigh that finding against the Court's prior conclusion that Plaintiffs established irreparable injury in the loss of First Amendment freedoms.  And because such a loss "unquestionably constitutes irreparable injury," Elrod, 427 U.S. at 373, it is unlikely that any delay in filing these motions—particularly considering the context of this case as one concerning election-related relief—would "militate against a finding of irreparable harm," Wreal, 840 F.3 at 1248.  Consequently, the Court finds that Plaintiffs have established irreparable injury sufficient to support preliminary injunctive relief.

### 3.   Balance of the Equities and Public Interest

The final two factors of the test for a preliminary injunction are the balance of the equities and the public interest.  Swain v. Junior, 958 F.3d 1081, 1090 (11th Cir. 2020).  The Court combines its analysis of these factors because "where the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." Id. at 1091.  Evaluating together the balance of the equities and the public interest makes sense in the context of an election because

"the real question posed" is "how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast." Curling v. Kemp, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018).

To conduct this analysis, the Court must consider whether Plaintiffs established the following: (1) that their threatened injury outweighs any potential damage to State Defendants that would be caused by the proposed injunction; and (2) that an injunction would not be adverse to the public's interests, which, here, merge with those of the state. Sofarelli v. Pinellas County, 931 F.2d 718, 724 (11th Cir. 1991). Importantly, the Eleventh Circuit has stated that "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury" and that the government "has no legitimate interest in enforcing an unconstitutional [statute]." KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir. 2006). The public likewise "has no interest in enforcing an unconstitutional [statute]," and an injunction in that instance "plainly is not adverse to the public interest." Id.

In the 2022 Order, this Court reasoned that "[a]n infringement of First Amendment rights balances the equities in Plaintiffs' favor, and neither Defendants nor the public have a legitimate interest in enforcing an unconstitutional statute."

[Doc. 241, p. 61].  Nothing in the record before the Court compels a different finding.

State Defendants contend that an injunction would harm the state and the public by impairing the state's ability to address confusion related to election processes.  On this point, State Defendants primarily repeat their arguments about the state's interests in the Food, Drink and Gift Ban, contending that Plaintiffs will suffer little harm without an injunction because their First Amendment rights are not implicated here.  This Court concluded above and in the 2022 Order that Plaintiffs are substantially likely to show that the Food, Drink and Gift Ban (when enforced in the Supplemental Zone) infringes their First Amendment rights.  This Court has also weighed the state's interests against the reasonableness of the restriction and found that the Food, Drink and Gift Ban fails this scrutiny when implemented in the Supplemental Zone.  For these reasons, State Defendants' arguments on the balance of the equities and the public interest are unconvincing.  Plaintiffs have thus established that the balance of equities weighs in their favor and that an injunction would not be adverse to the public interest.

### B.   Application of the **Purcell** Principle

The Purcell principle, first enunciated in Purcell v. Gonzalez, 549 U.S. 1 (2006), is the proposition that "lower federal courts should ordinarily not alter the

election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020).  This general rule recognizes that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." Purcell, 549 U.S. at 4–5.  When a court is asked to enter an injunction on the eve of an election, that court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures."  Id. at 4.  When Purcell applies to a request for an injunction, "the party seeking injunctive relief has a 'heightened' burden." League of Women Voters of Fla., Inc. v. Fla. Sec'y of State, 32 F.4th 1363, 1372 (11th Cir. 2022).

The Purcell principle applies only when an election is "sufficiently 'close at hand.'"  Id. (quoting Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring)).  Although the Supreme Court has not squarely addressed precisely when Purcell applies, it has stayed an injunction for an election that was four months away.  See id. (citing Merrill, 142 S. Ct. at 879).  In other words, under the facts of that case, the Supreme Court determined that an election in four months was sufficiently "close at hand" that Purcell applied.

Similarly, the Eleventh Circuit found that an injunction that "implicate[d]
voter registration"—which was already in progress—for an election that was less
than four months away was within <u>Purcell</u>'s "outer bounds."  <u>Id.</u>  However, the
Eleventh Circuit declined to stay an injunction issued "five months prior to the
elections for a single county," concluding that "[a]pplying <u>Purcell</u> to [that] case
would extend the 'eve of an election' farther than [the court had] before."
<u>Jacksonville Branch of NAACP v. City of Jacksonville</u>, No. 22-13544, 2022 WL
16754389, at *2 (11th Cir. Nov. 7, 2022).  The first question for this Court is
therefore whether Plaintiffs' requested relief falls within the ambit of <u>Purcell</u>.

Plaintiffs contend that <u>Purcell</u> is not implicated because the elections at issue
will not occur until next year, with the earliest election in March 2024.  Plaintiffs
assert that if <u>Purcell</u> were to apply in this circumstance, "it would cease to be an
election-timing principle and become, in practice, an all-out ban on changes to
election rules."  [Doc. 535-1, p. 14].  Defendants argue that <u>Purcell</u> applies and that
it precludes relief.

At this time, the earliest elections in Georgia are over six months away.[19]
The Court finds that <u>Purcell</u> does not apply here.  <u>E.g.</u>, <u>GRACE, Inc. v. City of</u>

---

[19] The Court notes that the instant motions were filed almost ten months before the
election.  Because of several extensions, which Plaintiffs opposed (citing <u>Purcell</u>
concerns), the motions became ripe on July 6, 2023.

Miami, No. 1:22-CV-24066, 2023 WL 4602774, at *2 (S.D. Fla. June 7, 2023)

(declining to apply Purcell "nearly six months prior to an election"). As previously

noted, the Eleventh Circuit has declined to stay an injunction on Purcell grounds

for an election that was five months away. See Jacksonville Branch of NAACP,

2022 WL 16754589, at *2. Consequently, the Court concludes that Plaintiffs are

not held to Purcell's heightened standard and that, as a result, Purcell does not bar

the requested relief.

## IV.   CONCLUSION

For the reasons explained above, the Renewed Motions for a Preliminary

Injunction [Doc. 535] [Doc. 547] are **GRANTED**.

Until further order of this Court, Keith Gammage, Gregory W. Edwards and

all named defendants in cases 1:21-cv-01284 and 1:21-cv-01259 are **HEREBY**

**ENJOINED** from enforcing the Penalty Provision, initiating criminal prosecutions

or otherwise imposing criminal penalties for violations of the Food, Drink and Gift

Ban in the Supplemental Zone.

**SO ORDERED** this 18th day of August, 2023.

_____

**J. P. BOULEE**
United States District Judge