No. 23-13095

In the

# United States Court of Appeals
## for the Eleventh Circuit

In re: Georgia Senate Bill 202

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-mi-55555 — J.P. Boulee, *Judge*

# APPENDIX OF DEFENDANT-APPELLANTS GOVERNOR OF GEORGIA, GEORGIA SECRETARY OF STATE, GREGORY W. EDWARDS, GEORGIA STATE ELECTION BOARD & BOARD MEMBERS VOL. II of V

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Ross W. Bergethon
  *Principal Deputy
  Solicitor General*
James E. Barrett
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellants*

# INDEX OF APPENDIX

| **Volume I** | **Docket / Tab #** |
|---|---|
| Docket Sheet | Docket |
| Docket Sheet 1:21-cv-01284 | 1:21-cv-01284 Docket |
| Docket Sheet 1:21-cv-01259 | 1:21-cv-01259 Docket |
| Docket Sheet 1:21-cv-01229 | 1:21-cv-01229 Docket |
| Order granting Plaintiffs' Renewed PI Motion | Doc. 614 |

| **Volume II** | **Docket / Tab #** |
|---|---|
| Order denying Plaintiffs' Initial PI Motion | Doc. 241 |
| Answer (AME Church) | Doc. 54 |

| **Volume III** | **Docket / Tab #** |
|---|---|
| Amended Complaint (AME Church) | 1:21-cv-01284 Doc. 83 |
| Complaint (AME Church) | 1:21-cv-01284 Doc. 1 |

| **Volume IV** | **Docket / Tab #** |
|---|---|
| Answer (NAACP) | Doc. 56 |
| Amended Complaint (NAACP) | 1:21-cv-01259 Doc. 35 |
| Complaint (NAACP) | 1:21-cv-01259 Doc. 1 |

| **Volume V** | **Docket / Tab #** |
|---|---|
| Answer (New Georgia Project) | Doc. 57 |
| Amended Complaint (New Georgia Project) | 1:21-cv-01229 Doc. 39 |
| Complaint (New Georgia Project) | 1:21-cv-01229 Doc. 1 |

# Doc. 241

Order denying Plaintiffs'
Initial PI Motion

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO.<br>1:21-mi-55555-JPB |
| THE NEW GEORGIA PROJECT, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al.,<br><br>       Defendants. | CIVIL ACTION NO.<br>1:21-cv-01229-JPB |

GEORGIA STATE CONFERENCE
OF THE NAACP, et al.,

       Plaintiffs,

     v.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State for the State of Georgia, et al.,

       Defendants.

CIVIL ACTION NO.
1:21-cv-01259-JPB

SIXTH DISTRICT OF THE
AFRICAN METHODIST
EPISCOPAL CHURCH, et al.,

       Plaintiffs,

     v.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity, et
al.,

       Defendants.

CIVIL ACTION NO.
1:21-cv-01284-JPB

| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., et al., | |
|---|---|
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 1:21-cv-01728-JPB |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., | |
| Defendants. | |

## ORDER

Before the Court are motions for a preliminary injunction filed by the plaintiffs in the above-captioned cases (collectively "Plaintiffs"). ECF Nos. 171, 185. After due consideration of the briefs, accompanying evidence and oral argument, the Court finds as follows:

## I.   BACKGROUND

### A.   Procedural History

Georgia Senate Bill 202 ("S.B. 202") governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021.  Plaintiffs thereafter filed complaints against Georgia state and county government officials

seeking a permanent injunction to prevent enforcement of multiple provisions of the bill.

State government defendants are hereinafter referred to as "State Defendants,"[1] and county government defendants are hereinafter referred to as "County Defendants."[2]  The Court permitted the Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc. (collectively "Intervenor Defendants") to intervene in this action.  On December 9, 2021, the Court denied State Defendants' and Intervenor Defendants' (collectively "Defendants") motions to dismiss the complaints.  Discovery opened thereafter and is ongoing.

The plaintiff groups led by the Sixth District of the African Methodist Episcopal Church (the "AME Church") (No. 1:21-cv-01284) and the Georgia State Conference of the NAACP ("Georgia NAACP") (No. 1:21-cv-01259) (collectively the "AME/NAACP Plaintiffs") filed a joint motion for preliminary injunction seeking to enjoin a single provision of S.B. 202.  ECF No. 171.  The plaintiff group led by the Concerned Black Clergy of Metropolitan Atlanta, Inc. (No. 1:21-cv-

---

[1] This list includes Brad Raffensperger, in his official capacity as the Georgia Secretary of State, and the members of the State Elections Board.
[2] The complaints name election officials in fourteen Georgia counties.  The master docket contains a complete list of County Defendants.

07128) joined the AME/NAACP Plaintiffs' motion.  ECF No. 173.  The plaintiff

group led by the New Georgia Project (No. 1:21-cv-01229) (the "NGP Plaintiffs")

filed a separate motion for preliminary injunction that referred to and incorporated

the AME/NAACP Plaintiffs' arguments.[3]  ECF No. 185.  For ease of reference, the

Court will address both motions collectively (the "Motions") and will not

distinguish between the evidence, witnesses or arguments each offers.  The Court

will use "Plaintiffs" generally when referring to evidence, witnesses or arguments

advanced by both Motions and use the specific plaintiff group's descriptor when an

argument is advanced by only one plaintiff group.

     In the Motions, Plaintiffs ask the Court to enjoin a specific provision of S.B.

202 that prohibits them from distributing food, drinks and other gifts to voters

waiting in line at a polling station.  This practice is commonly referred to as "line

warming" or "line relief."  First Am. Compl. ¶ 24, *Ga. State Conf. of the NAACP v.*

*Raffensperger*, No. 1:21-cv-01259 (N.D. Ga. May 28, 2021); First Am. Compl. ¶

310, *Sixth Dist. of the African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-

01284 (N.D. Ga. May 24, 2021).

---

[3] The NGP Plaintiffs also request an injunction preventing the district attorneys of
Fulton and Dougherty counties from criminally enforcing the challenged provision.
*See* ECF No. 185-1 at 7.

State Defendants and individual Defendant Gregory W. Edwards filed a joint response to the Motions.  ECF No. 197.  Intervenor Defendants filed a separate response that joined State Defendants' opposition.  ECF No. 194.  County Defendants filed a joint opposition.  ECF No. 195.  Individual Defendant Keith Gammage did not respond to the Motions.  Honest Elections Project, with the permission of the Court, filed an amicus brief in support of Defendants.  ECF No. 224.  The Court heard oral argument and evidence regarding this matter on July 18, 2022.[4]

## B.    Plaintiffs

Plaintiffs are nonprofit organizations whose work includes fostering participation in the democratic process.  Plaintiffs' efforts in this regard range from voter education and registration to get-out-the-vote drives.  *See, e.g.*, ECF No. 185-5 at 1 (The New Georgia Project ("NGP") "is dedicated to helping Georgians become more civically active through voter education and engagement."); ECF

---

[4] The AME/NAACP Plaintiffs filed their motion on May 25, 2022, and the NGP Plaintiffs filed their motion on June 3, 2022.  State Defendants thereafter sought an extension of their briefing deadline.  ECF No. 180 at 2.  Plaintiffs took no position on the extension, so long as it was not later used as a reason to preclude relief under the doctrine articulated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006).  *See* ECF No. 180 at 2. The Court found that good cause existed to grant State Defendants' motion and thus extended the briefing schedule to July 5, 2022.  The hearing on the Motions was initially scheduled for July 7, 2022, but was subsequently rescheduled to July 18, 2022, due to a scheduling conflict of State Defendants' lead counsel.

No. 185-3 at 2 (Rise, Inc. is a student-led organization that "runs statewide advocacy and voter mobilization programs in Georgia and on a number of campuses nationwide."); ECF No. 171-4 at 3 (Delta Sigma Theta Sorority, Inc.'s work includes "voter registration, education, and mobilization efforts; monitoring legislation at the national, state, and local level; and encouraging [its] members to run for elected office."); ECF No. 171-9 at 3 (The AME Church's Operation Voter Turnout "is a voter mobilization program organized . . . to make sure that every eligible member [of the church] registers and casts a ballot in elections."); ECF No. 171-27 at 3 (The Georgia NAACP "works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote . . . efforts, election protection, and census participation.").

### C.    Line Warming Activities

Prior to the enactment of S.B. 202, Plaintiffs engaged in line warming activities that included providing food, water and other aid, such as chairs, to voters waiting in line to encourage them to stay in line.[5]  ECF No. 185-3 at 4.  The

---

[5] While line warming was not specifically prohibited, the previous versions of Georgia's election code prohibited giving or receiving money or gifts for the purpose of registering to vote or voting, *see* O.C.G.A. § 21-2-570; electioneering or soliciting votes within a polling place, *see id.* § 21-2-414(d); displaying

specific form of line warming activities varied based on the organization.  For example, NGP provided water, snacks, ponchos, umbrellas, fans, books and phone chargers to individuals waiting to vote.[6]  ECF No. 185-5 at 2–3.  The Georgia 55 Project partnered with local restaurants to provide food and water to voters waiting in line.  ECF No. 171-3 at 3.  It "aim[ed] to increase voter turnout" by connecting voting to "the positive experiences people often associate with food."  *Id.*  The organization also provided other conveniences to voters, such as coloring books for children accompanying voters and lactation pods for voters who were nursing.  *Id.* at 3–4.

Some organizations offered entertainment and intangible assistance.  Groups like the Greater Augusta's Interfaith Coalition played music for those waiting in line in addition to providing refreshments.  ECF No. 185-7 at 2.  NGP sent mariachi bands, circus performers and other entertainers to polling stations.  ECF No. 185-8 at 2–3.  The Georgia Muslim Voter Project and Asian Americans Advancing Justice-Atlanta offered translation services.  *See* ECF No. 171-1 at 17.

---

campaign materials or soliciting signatures within a specified area around a polling station, *see id.* § 21-2-414(a); and intimidating voters, *see id.* § 21-2-567.

[6] The Court reviewed the numerous affidavits that accompanied the parties' briefs but cites only a small subset of those affidavits in this opinion in the interest of brevity.

Organizations assisted voters irrespective of their political persuasion.  *See, e.g.*, ECF No. 185-7 at 2.

Plaintiffs and the organizations who submitted affidavits in support of the Motions frame their purpose in conducting line warming in different ways. However, their reasoning can be summarized as a belief that voters have an important role to play in the political process and should be supported when they encounter long lines at polling stations.  For example, Delta Sigma Theta testified that it conducts line warming activities because its members, and Black voters in general, experience fatigue and hunger while waiting in long lines at polling locations.  ECF No. 171-4 at 8–10.  Delta Sigma Theta explained that long lines present other challenges, including missed time from work and difficulty in meeting family obligations such as childcare pickup.  *Id.* at 10.

According to Delta Sigma Theta, "[l]ine relief is about being intimate" and "close to the voter," which provides an opportunity "to pat them on the back, to nod, to encourage, to hand them very closely a cup—a bottle of water or a snack." Tr. 50:2–5, ECF No. 234.  "By providing voters with necessary supplies, [Delta Sigma Theta volunteers] encourage [voters] to stay in line and remind them of the importance of casting a ballot to make sure their voices are heard . . . ."  ECF No. 171-4 at 9.

Additionally, Delta Sigma Theta asserts that line warming is "part of a rich tradition of Black political activism" and that food has played a central role in the Black community's social justice and civil rights endeavors.  *Id.* at 11.  Delta Sigma Theta maintains that the provision of food ensures that members of the community "have enough sustenance to fight for their political rights, whether through civil rights marches or through the simple act of casting a ballot."  *Id.*  As such, Delta Sigma Theta believes that the communities in which it assists voters waiting in line would likely understand that those activities "encompass more than simply handing out free food and water."  *Id.*  Indeed, Delta Sigma Theta contends that the communities would understand that Delta Sigma Theta's activities "convey deeper principles and messages" related to political activism.  *Id.*

The AME Church testified that line warming activities have been a major priority of the church, "[g]iven the historical barriers to the ballot box that Black voters have faced."  ECF No. 171-9 at 3.  The AME Church underscored that "[b]ecause of the storied tradition of the AME Church's participation in civil rights . . . and the connection of food and protest in Black Southern traditions, many Black Georgians would likely understand that [the AME Church's] line relief activities . . . stand for deeper principles."  ECF No. 171-10 at 6.

Plaintiffs describe their voter assistance activities as "political acts," ECF No. 171-1 at 14, and explain that "[a]dvocating for voting, including by celebrating and supporting voters waiting in line, is . . . core political expression at the heart of the First Amendment," *id.* at 28; *see also* ECF No. 185-1 at 8, 15–16 (contending that line warming activities constitute "political expression" and are acts of "'political solidarity meant to convey [NGP's] message'" (citation omitted)).

The record shows that beneficiaries of Plaintiffs' line warming activities understand the general purpose and message underlying Plaintiffs' efforts. One voter testified that during the November 2020 general election, she waited in line to vote at the Merle Manders Conference Center in Stockbridge with her husband and children for over six hours. ECF No. 171-6 at 3. The line at that polling location wrapped around the building and crossed the sidewalk. *Id.* That voter accepted water and a banana from line warming volunteers. *Id.* at 4. In the voter's view, line warming activities meant that "somebody understood" the importance of voting and that she had been in line for a long time and was "tired" and "hot." *Id.*

Another voter testified that over the course of an eight-hour wait in line (from 7:00 PM until 2:45 AM) to vote at a polling location in College Park, he accepted three apples, a cookie and two bottles of water from line warming volunteers. ECF No. 171-8 at 3. He understood the volunteers' efforts to convey a

message that voting is important, and he asserted that such efforts can make a "real difference" in whether a voter remains in line.  *Id.* at 3–4.  These sentiments were echoed by other voters who submitted affidavits in support of Plaintiffs' Motions.[7]

### D.    Issues With Line Warming and the Impetus for Changes to the Law

A 2010 amendment to Georgia's election code provided for a restricted zone around polling locations that extended "150 feet of the outer edge of any building within which a polling place is established" (the "Buffer Zone") and "25 feet of any voter standing in line to vote at any polling place" (the "Supplemental Zone"). § 22, H.B. 540, Act 632, Reg. Sess. (Ga. 2010); *see also* O.C.G.A. § 21-2-414(a)(1), (a)(3).  Within both the Buffer and Supplemental Zones, the following was prohibited on election day:  solicitation of votes or signatures, distribution of campaign literature and execution of exit or opinion polls.  *See* § 22, H.B. 540; O.C.G.A. § 21-2-414(a).

---

[7] Defense witnesses noted that Georgia law already provides accommodations that address some of the issues that Plaintiffs seek to address with their activities.  For example, the law encourages polling stations to provide water receptacles that voters can access, Tr. 207:3–208:11, ECF No. 234, and elderly or disabled voters are authorized to move to the front of the line, *id.* 189:2–14.  Poll workers also receive specific instructions on how to accommodate voters with disabilities, including to place chairs or benches along a waiting area.  ECF No. 197-2 at 55.

While the Buffer Zone is fixed (150 feet from the outer edge of the building in which voting takes place), the Supplemental Zone is fluid.  The Supplemental Zone is tied to the location of each voter standing in line and therefore fluctuates based on the specific position of the voter.  For example, if the voter's position in the line is 600 feet away from the outer edge of the polling station, then the Supplemental Zone associated with the voter extends up to 625 feet from the edge of the building.  The Supplemental Zone adjusts as the voter moves through the line to always maintain a 25-foot bubble around the voter.

In the latter part of the 2010 decade, the Georgia Secretary of State observed an increase in the number of organizations engaging in line warming activities, including those setting up tables inside the Buffer Zone.  ECF No. 197-2 at 8.  In response, the state passed legislation in 2017 that prohibited organizations from setting up tables or booths within the Buffer Zone and authorized election officials to manage the number of persons allowed in a polling place.  *Id.* at 8–9.

After this update to the law, organizations began sending representatives to approach voters in line and offer them items.  *Id.* at 9.  Election officials received numerous complaints questioning the motives of those representatives, including

whether they had partisan aims.[8]  *Id.* at 10.  The following is a discussion of the types of line warming activities that raised concerns.

First, officials were concerned that line warming personnel could be perceived as advancing a specific political agenda and that poll staff lacked the capacity to monitor what was being communicated to voters who were approached in line.  ECF No. 197 at 11–12.  For example, Matthew Mashburn ("Mashburn"), a Georgia State Elections Board member, testified that he learned of a social media campaign in October 2020 urging voters to wear colors representing their party to the polls.  Tr. 193:6–8, ECF No. 234.  Mashburn later observed a group of people wearing blue shirts at a polling location in Cobb County.  *See id.* 193:8–12.  A catering table was set up within the Buffer Zone of that polling location (in violation of Georgia law), *see id.* 199:5–16, and one of the people dressed in blue was delivering tacos from the table to voters waiting in line, *see id.* 200:13. Mashburn determined that the person was affiliated with "the Democratic side." *See id.* 200:9.  This person eventually began handing out forms to voters, which is the responsibility of poll workers.  *See id.* 202:22–25.  A voter at that polling station asked Mashburn whether the Democratic Party was managing the polling

---

[8] One voter also complained that representatives of a certain organization were perceived by older voters as intimidating.  ECF No. 197-2 at 11.

station. *Id.* 193:13–15.  Mashburn thereafter complained to the Secretary of State's office that while "Georgia has always turned a compassionate blind eye to people delivering water and food to people in line," the practice had become more "worrisome."  ECF No. 197-2 at 18.  He pointed out that people dressed in "clearly identifiable campaign clothing and colors" were setting up tables and food stations within the Buffer Zone.  *Id.*  Another example, also from October 2020, is an email complaint submitted to the Secretary of State's office.  That complaint concerned a woman (and two children) dressed in "political attire" who parked a van "covered in political paraphernalia" in front of the Roswell Fulton County Library polling station and began to distribute water and snacks to voters waiting in line.[9]  *See* Defs.' Ex. 44, Prelim. Inj. Hr'g.

Officials were also concerned that refreshments or other items could be used or perceived as a pretext for electioneering (prohibited by Georgia law within the Buffer and Supplemental Zones), Tr. 194:4–16, ECF No. 234, or as a reward for voting (likewise prohibited under Georgia law), ECF No. 197-2 at 11.  Mashburn gave the example of a group that was campaigning at a DeKalb County polling

---

[9] Mashburn also related a more egregious example from an earlier election cycle where he witnessed voters being handed a card with instructions regarding for whom they should vote.  Tr. 188:17–189:1, ECF No. 234.  After voting, those voters were rewarded with a ticket to obtain food in a tent across the street.  *Id.*

location during early voting in 2010.  Tr. 187:20–188:5, ECF No. 234.  He stated that after the group was told that campaigning was prohibited at the polling station, the group circumvented the rule by returning to distribute water to voters.  *Id.*  In a case before the State Elections Board, a candidate was observed giving pizza to voters waiting in line at the Cross Keys precinct in DeKalb County.  *Id.* 193:17–25.  The candidate claimed his actions were altruistic, but he provided pizza only at the precinct where he was on the ballot.  *See id.*  Another complaint involved a person who offered lottery tickets for a rifle to individuals who voted.  *See id.* 194:12–16.  Similarly, an organization at a Lawrenceville polling station offered free hot meals to voters who presented a voting sticker.  Defs.' Ex. 38, Prelim. Inj. Hr'g.

Further, the Secretary of State's General Counsel, Ryan Germany ("Germany"), testified that his office received many complaints from voters who were not personally approached by line warming representatives but who nonetheless expressed concern regarding interactions they witnessed between representatives and other voters.  Tr. 108:14–24, ECF No. 234.  Additionally, the Secretary of State's office fielded many questions from poll workers regarding what type of line warming activities were permissible.  *Id.* 97:6–16.  For example, election officials in Terrell and Chatham counties inquired whether organizations could distribute water and food and whether that would be considered

electioneering.  Defs.' Exs. 40, 41, Prelim. Inj. Hr'g.  An official in Bryan County

asked whether the Bryan County Democratic Committee could provide water,

snacks and chairs to voters waiting in line.  Defs.' Ex. 42, Prelim. Inj. Hr'g.  There

were also numerous questions regarding where to draw the line in terms of the

value of items provided.  ECF No. 197-2 at 12.  Countless complaints and

questions regarding food trucks were also submitted to the Secretary of State's

office.  In one instance, the complaint involved a food truck that was parked within

the Supplemental Zone of a Cobb County polling site.  *Id.* at 29.  The complaint

included a copy of a fundraising email distributed by Vote.org, which solicited

funds to send food trucks to Georgia voting sites with long lines during the January

2021 runoff elections.  *Id.*  The Vote.org email noted that the food trucks would be

the organization's "last chance to reach Georgians before they vote[d]," *id.*, and

that the election had "the potential to determine control of the U.S. Senate," *id.* at

30.

      The numerous questions and complaints regarding line warming activities

led the Secretary of State's office to issue an Official Election Bulletin ("OEB")

regarding this topic on October 26, 2020.[10]  *Id.* at 11.  The OEB advised that

---

[10] OEBs are generally issued "when an issue has been the source of many
complaints or questions."  ECF No. 197-2 at 11.  The bulletins are disseminated to
all county election directors.  Tr. 100:8–13, ECF No. 234.

"voters cannot receive anything of value in exchange for voting" and that deciding where to draw the line is a fact-dependent inquiry. *Id.* at 23. By way of example, that OEB explained that refreshments such as bottles of water, crackers and peanuts are "reasonable," but "fancier" items could be perceived as a reward for voting. *Id.* at 24. The OEB reminded election officials to "[m]aintain fairness and consistency" when making those determinations and to consider that polling places "are meant to be a sanctuary from political influence." *Id.* To that end, the OEB opined that it was "better to sacrifice some refreshments than to allow a perception of political influence from any group." *Id.*

Following the November 2020 general election and in anticipation of the January 2021 runoff elections, the Secretary of State's office continued to receive "questions" and "allegations" about line warming. Tr. 103:18–23, ECF No. 234. Thus, only two months after its last OEB on the topic, the Secretary of State's office issued yet another OEB on December 28, 2020, regarding line warming activities. That OEB stated:

> [w]hat started as a simple and restrained practice of offering water to voters waiting in the heat to vote has become, in some places, an atmosphere where food and drink and other things of value are being offered to voters who vote, and in some cases, might be offered as an inducement to vote in violation of O.C.G.A. [§] 21-2-570.

Defs.' Ex. 39, Prelim. Inj. Hr'g.  The OEB noted that "[t]he appearance of [f]ood

[t]rucks, doughnuts, free coffee, snacks, and other items of value being given to

voters (even beyond the 150' distance limit) have the possibility of being seen as

rewarding people who vote in violation of the . . . law." *Id.*  The OEB concluded

that "[o]ffers of anything of value, including food and drinks that could be

considered a 'reward' for voting or an inducement to vote . . . are not proper or

legal and do very little to preserve [the] atmosphere of serenity and noninterference

for voters waiting to cast their votes." *Id.*

Like the OEBs, Mashburn observed that line warming activities had become

more sophisticated, changing from "one little wagon of water into a full-service

taco bar." Tr. 198:23–24, ECF No. 234.  His impression was that the state had

"completely lost control of the precincts." *Id.* 190:22–23.  Another election

official described the atmosphere around the polls during the January 2021 runoff

elections as "wide open." *Id.* 151:24–152:2.

Mashburn testified that "when the voters see that the poll workers have lost

control, that makes them very nervous for their own safety, and it makes them

nervous that somebody's cheating." *Id.* 190:23–191:1.  Germany reasoned that

approaching a voter in line can "undermine" the serenity of the voting area because

"one person's helping is another person's interference." *Id.* 105:19–25.

### E.   Plaintiffs' Counter Evidence Regarding Line Warming Issues

Affidavits from voters who benefitted from Plaintiffs' and other organizations' line warming efforts indicate that those voters appreciated the support they received in the face of long lines and were not frightened by line warming volunteers.  *See, e.g.*, ECF Nos. 171-6 at 4; 171-11 at 5; 171-13 at 4; 171-15 at 5; 171-19 at 3.  One voter testified that she "never felt intimidated or threatened by any of the volunteers handing out food and water."  ECF No. 171-6 at 4.  She stated that "[v]oters are accustomed to the full line relief activities that volunteers have been conducting at the polls for years."  *Id.* at 5.  Plaintiffs also assert that they have not personally received any complaints regarding their line warming activities.  *See, e.g.*, ECF No. 171-11 at 5 ("[The Georgia Muslim Voter Project] has never received any complaints about [its] participation in line relief activities from staff members, volunteers, voters, poll workers, or anyone else.").

Some election officials who provided affidavits in support of Plaintiffs' Motions reported that they have not received line warming complaints from the public.  For example, a member of the Bartow County Board of Elections testified that he has not received any complaints regarding line warming activities in the six years that he has served on the board.  ECF No. 216-2 at 4.  A Douglas County election official similarly testified that his office has not received any complaints

about line warming activities.  ECF 171-24 at 4.  Conversely, a Fulton County election official, whom Plaintiffs called to testify, acknowledged that there were complaints at a polling location in Fulton County.  Tr. 67:14–19, ECF No. 234.

### F.      The Food, Drink and Gift Ban

S.B. 202 changed Georgia law regarding third parties' engagement with voters waiting in line at polling stations.  The legislative findings in the text of S.B. 202 state that the "sanctity of the [voting] precinct was . . . brought into sharp focus in 2020, with many groups approaching electors while they waited in line."  S.B. 202 § 2, ¶ 13, Reg. Sess. (Ga. 2021).  The legislature further found that "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote is of paramount importance to protecting the election system and ensuring elector confidence."  *Id.*  The goal, according to Mashburn, was to pass a bright-line rule that would be simple to implement and would further these aims.[11]  Tr. 194:17–195:6, ECF No. 234.

The new rule provides that

> [n]o person shall . . . give, offer to give, or participate in the giving of
> any money or gifts, including, but not limited to, food and drink, to an
> elector . . . [or] establish or set up any tables or booths on any day in
> which ballots are being cast [(the "Food, Drink and Gift Ban")]:  (1)

---

[11] Mashburn testified that this rule was necessary because the counties were "unclear . . . as to where they draw the line," and there was "a lot of confusion." Tr. 201:3–6, ECF No 234.

> Within 150 feet of the outer edge of any building within which a
> polling place is established; (2) Within any polling place; or (3)
> Within 25 feet of any voter standing in line to vote at any polling
> place.

O.C.G.A § 21-2-414(a).[12]  As the statutory text reflects, the Food, Drink and Gift

Ban applies to the same Buffer Zone and Supplemental Zone that were established

by the 2010 amendment.  Under this update to the law, organizations are still

permitted to approach voters anywhere in line and verbally encourage them to stay

in line.[13]

---

[12] S.B. 202 also established measures to address the issue of long lines at polling
stations, including a mandate that counties reduce the size of precincts and monitor
the length of lines for future adjustments.  O.C.G.A. § 21-2-263.  This provision
built on State Defendants' previous efforts to address the issue.  ECF No. 197-2 at
5.  State Defendants assert that those efforts resulted in an average wait time of
three minutes on election day in November 2020, *id.*, and almost no lines during
the May 2022 primary election, "despite record voter turnout," *id.* at 7.  Germany
also stated that lines typically do not extend beyond the Buffer Zone.  Tr. 88:14–
16, ECF No. 234.  However, Plaintiffs' expert, Dr. Stephen Pettigrew, opined that
the average wait time for Georgia voters is 15.4 minutes.  ECF No. 216-5 at 2.
State Defendants ask the Court to reject Dr. Pettigrew's opinions as invalid under
applicable standards for expert testimony.  *See* ECF No. 197 at 39–41.  Because
the arguments regarding the validity of Dr. Pettigrew's opinions have not been
adequately developed for the Court, the Court declines to decide this issue.  The
Court considers Dr. Pettigrew's opinions only for the purpose of deciding these
Motions.

[13] In this regard, Georgia's law is more permissive than an equivalent Minnesota
statute, which prohibits line warming volunteers altogether from entering the
Buffer Zone.  *See* Minn. Stat. § 204C.06(1) (prohibiting anyone other than election
officials, individuals waiting to vote or register to vote or individuals conducting
exit polling from standing "within 100 feet of the building in which a polling place
is located").

### G.    The Impact of the Food, Drink and Gift Ban

Many Plaintiffs and organizations that have conducted line warming activities in the past testified that they have ceased such activities due to the Food, Drink and Gift Ban.  *See, e.g.*, ECF Nos. 171-4 at 12; 171-7 at 3; 185-3 at 7.  For example, the Georgia Muslim Voter Project now refrains from all line warming activities due to the threat of criminal penalty.  ECF No. 171-11 at 6.

The AME Church, NGP and the Arc of the United States ("Arc") have modified their programs or are contemplating adjustments to comply with the Food, Drink and Gift Ban.  The AME Church shared that it is "trying to decide how to continue to support voters waiting in line," ECF No. 171-9 at 6, and it is "thinking about how [it] can do more to educate voters through pamphlets and through [its] website," ECF No. 171-14 at 5.  NGP asserted that S.B. 202 has "forced [it] to adapt its programs," and it now hosts "public events" where it "offers food and water to anyone who passes and wishes to take it, regardless of whether they are heading to the polling place to vote."  ECF No. 185-5 at 5.  Arc stated that it has "expend[ed] significant staff time to determine how to restructure [its] line relief efforts so that its volunteers are not threatened with criminal penalties."  ECF No. 171-16 at 4.

## II.   <u>DISCUSSION</u>

### A.   Preliminary Injunction Standard

A plaintiff seeking preliminary injunctive relief must show the following:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 723-24 (11th Cir. 1991) (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983)).  "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Granting a preliminary injunction is thus the exception rather than the rule.  *See id.*

### 1.   Likelihood of Success on the Merits

A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  *Sofarelli*, 931 F.2d at 723.  This factor is generally considered the most important of the four factors, *see Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986), and

24

failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, *see Siegel*, 234 F.3d at 1176.

Because Plaintiffs contend that the Food, Drink and Gift Ban infringes on their freedom of speech and expression, the Court begins its analysis of this prong with a general overview of available First Amendment protections.  The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances."[14]  U.S. Const. amend. I.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

The United States Supreme Court has created a "rough hierarchy" of available protections for specific categories of speech.[15]  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992).  "Core political speech occupies the highest, most protected position" in the hierarchy, while obscenity and fighting words receive the

---

[14] The First Amendment was made applicable to the states through the Fourteenth Amendment.  *See Meyer v. Grant*, 486 U.S. 414, 420 (1988).
[15] This Court's reference to "speech" generally refers to First Amendment speech and expression.

least protection.  *See id.*  Other categories of speech rank somewhere between these

poles.  *See id.*

Importantly, First Amendment protections exist against the reality that

"[s]tates may, and inevitably must, enact reasonable regulations of parties,

elections, and ballots to reduce election- and campaign-related disorder."  *Timmons*

*v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Burdick v.*

*Takushi*, 504 U.S. 428, 433 (1992) (recognizing that "'there must be a substantial

regulation of elections if they are to be fair and honest and if some sort of order,

rather than chaos, is to accompany the democratic processes'" (quoting *Storer v.*

*Brown*, 415 U.S. 724, 730 (1974))).  Thus, elections "inevitably affect[]" First

Amendment rights.  *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

When election regulations are in tension with constitutional rights, the

Supreme Court requires lower courts to balance the character and magnitude of the

asserted injury against the state's justifications for imposing the election rule.  *See*

*Anderson*, 460 U.S. at 789.  This approach is commonly referred to as the

"*Anderson-Burdick*" framework, named after *Anderson* and *Burdick*, where the

Supreme Court reiterated and refined the standard it enunciated in *Anderson*.

The *Anderson-Burdick* framework is, however, inapplicable where the

election statute directly regulates core political speech and does not merely

26

"control the mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). Under those circumstances, courts must employ whatever level of scrutiny corresponds to the category of speech. *See id.* at 345–46. If a court finds that the challenged statute fails the appropriate level of scrutiny, the court must then determine whether a principle the Supreme Court outlined in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), precludes relief. Under *Purcell*, a court may decline to enjoin an unconstitutional statute if an election is imminent and if a late change to the state's election rules would lead to voter confusion and otherwise burden the election process. *Id.* at 5–6.

In accordance with the foregoing principles, the Court must evaluate whether line warming activities constitute protected speech under the First Amendment; if so, what level of scrutiny applies; and whether the Food, Drink and Gift Ban passes muster under the applicable level of scrutiny. Therefore, the Court finds it helpful to structure its analysis around these questions.

### a.   Whether Line Warming Activities Constitute Protected Expression Under the First Amendment

The parties dispute whether line warming activities are inherently expressive and consequently protected by the First Amendment. Although the First Amendment, on its face, forbids only the abridgment of "speech," the Supreme Court has recognized that "conduct may be 'sufficiently imbued with elements of

communication to fall within the scope'" of First Amendment protection.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).  To make this determination, the Supreme Court looks at whether the plaintiff intended "'to convey a particularized message'" and whether it is likely that "'the message would be understood by those who viewed it.'"  *Id.* (quoting *Spence*, 418 U.S. at 410–11).

Applying the test above, the Supreme Court has classified a range of activities as expressive conduct.  *See, e.g.*, *Spence*, 418 U.S. at 409 (superimposing a peace sign on a flag to convey the message that America stood for peace); *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966) (engaging in a sit-in demonstration to protest segregation); *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (contributing funds to a political campaign).  While "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), Supreme Court precedent is clear that First Amendment protection extends only to conduct that is "inherently expressive," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006).

Indeed, the Supreme Court has rejected the view that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *United States v. O'Brien*, 391

28

U.S. 367, 376 (1968).  The Court explained in *Rumsfeld* that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."  547 U.S. at 66.

*Rumsfeld* involved a challenge to a statute that penalized schools for refusing to allow United States military recruiters to interview on their campuses due to the military's policy on homosexuals serving in the military.  *Id.* at 51.  The Supreme Court found that the schools' exclusion of military recruiters was not inherently expressive conduct because an observer would not know whether the recruiters were interviewing off campus due to personal preference, lack of space or some other innocuous reason.  *Id.* at 66.  The Court pointed out that the necessity of "explanatory speech" to elucidate why military recruiters were absent from campus was "strong evidence" that the speech was not "so inherently expressive" as to qualify for First Amendment protection.  *Id.*  In other words, the "expressive component of [the] . . . school's actions [was] not created by the conduct itself but by the speech that accompanie[d] it."  *Id.*

By contrast, the Eleventh Circuit Court of Appeals, in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*FLFNB*"), found that a charity's distribution of food in a public park constituted expressive conduct because a

reasonable person would view such conduct as conveying "*some* sort of message." 901 F.3d 1235, 1242 (11th Circuit 2018) (quoting *Hollomon ex rel Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)).  That court focused on the context of the charity's food-sharing events, which aimed to convey a message "that [] society can end hunger and poverty if . . . collective resources [were redirected] from the military and war and that food is a human right."  *Id.* at 1238 (first alteration in original) (citation omitted).

The *FLFNB* court found the following facts instructive:  (i) the event occurred at a park, which is a traditional public forum; (ii) the charity set up tables and banners and distributed literature in the park, which distinguished the event from a social gathering of friends and family; (iii) the event was open to anyone present in the park, which the court found had social implications "in and of itself," *id.* at 1242; (iv) the charity's message concerned an issue of concern in the community (homelessness), which had attracted attention from city officials and local media; and (v) the use of food as a means to convey a message had specific significance and "date[d] back millennia," *id.* at 1243.  These surrounding circumstances, although not individually dispositive, together compelled the court to conclude that the charity's food-sharing events belonged "on the expressive side of the ledger."  *Id.* at 1242.  In sum, the court found that the charity had

demonstrated an intent to express an idea through activity and that a reasonable observer would interpret the events as conveying that message.  *Id.* at 1243–44.

The *FLFNB* court distinguished the *Rumsfeld* opinion on the grounds that unlike in *Rumsfeld*, explanatory speech was not necessary to convey the charity's message regarding hunger and poverty.  *Id.* at 1243.  Rather, the surrounding circumstances allowed the message to be understood without the need for speech. *Id.* at 1244.  The court noted that conduct does not lose its expressive nature simply because it is accompanied by other speech (banners and literature in the *FLFNB* case) and reiterated that the "critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct."  *Id.*

Here, as detailed above, the record contains substantial evidence that Plaintiffs intend to convey a message that voting is important and that voters should remain in line to ensure their participation in the democratic process.  The evidence is also clear that voters infer "some" message from Plaintiffs' efforts. Even though the voter affidavits frame that message in somewhat different ways, the common thread is that voters understand that line warming activities are intended to support and encourage voters who have chosen to exercise their right to vote.

The Court disagrees with Defendants' arguments that line warming organizations must articulate their message in an identical manner or that voters must perceive a unified message for line warming activities to warrant constitutional protection.  As the Supreme Court confirmed in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, "a narrow, succinctly articulable message is not a condition of constitutional protection."  515 U.S. 557, 569 (1995).  Instead, a court must "ask whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message."  *Holloman*, 370 F.3d at 1270; *see also FLFNB*, 901 F.3d at 1245 (dismissing the argument that expressive conduct must convey a particularized message).  It is thus sufficient that voters infer "*some* sort of message" from Plaintiffs' activities.  *Holloman*, 370 F.3d at 1270.

Moreover, the context of the activities in this case largely mirrors the context of the food-sharing events in *FLFNB*.  For example, Plaintiffs' activities occur in a traditional public forum;[16] resources are offered to all who wish to access them, irrespective of the recipient's political persuasion; Plaintiffs' message relates to an

---

[16] *See Burson v. Freeman*, 504 U.S. 191, 196 (1992) (referring to the area outside a polling place, including parks, streets and sidewalks, as a "quintessential public forum[]"); *CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365, 1368 (S.D. Fla. 2006) (describing the area outside a polling place as a "quintessential public forum[]").

issue of community concern (long lines at polling stations) that the legislature has acknowledged and is now attempting to address; and, as Plaintiffs explain, food has specific historical and cultural significance in the context of civil rights activities.  This context matters and supports Plaintiffs' argument that voters perceive Plaintiffs' activities as more than just the distribution of food and water. *See Spence*, 418 U.S. at 409–10 (finding that "the nature of [the defendant's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression").  In short, the evidence demonstrates that Plaintiffs' line warming activities convey a message regarding the importance of voting that is understood by the reasonable observer.

Based on the foregoing analysis, the Court finds that Plaintiffs have shown that their line warming activities constitute expressive conduct protected by the First Amendment.  Accordingly, the Court must now determine what level of scrutiny applies to the evaluation of whether the Food, Drink and Gift Ban is constitutional.

### b.    What Level of Scrutiny Applies to the Food, Drink and Gift Ban

As the Supreme Court explained in *Clark v. Community for Creative Non-Violence*, a decision that an activity constitutes expressive conduct and is therefore

protected by the First Amendment is only the first step in determining whether a statute regulating such activity is constitutional.  468 U.S. 288, 293 (1984).

As a baseline, a statute that regulates expressive conduct is subject to "the most exacting scrutiny." *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)).  However, the applicable level of scrutiny shifts depending on the content and purpose of the statute.  For example, restrictions that are facially content-based or those that are justified only by reference to the content of the regulated speech are subject to strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).  On the other hand, a content-neutral statute that imposes only time, place or manner restrictions warrants an intermediate level of scrutiny.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994).

An additional consideration is whether "the exercise of free speech rights conflicts with another fundamental right," such as the right to vote, and what level of review applies in that context.  *See Burson v. Freeman*, 504 U.S. 191, 211 (1992).  In *Burson*, which involved a content-based restriction on speech around a polling place, the Supreme Court amended the traditional strict scrutiny analysis to allow for a modified burden of proof on the narrow tailoring prong of the analysis.  *Id.* at 209–10.  Under this standard, the government was required to show only that

the restriction was "'reasonable'" and did not "'*significantly impinge*'" on

constitutional rights.  *Id.* at 209 (quoting *Munro v. Socialist Workers Party*, 479

U.S. 189, 195–96 (1986)).

In light of the foregoing authority, the applicable level of scrutiny depends

on (i) whether the Food, Drink and Gift Ban is a content-based restriction on

speech and (ii) whether the modified burden articulated in *Burson* applies.

### i.   Whether the Food, Drink and Gift Ban Is a Content-Based Restriction on Speech

Under Supreme Court precedent, "[g]overnment regulation of speech is

content based if a law applies to particular speech because of the topic discussed or

the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163

(2015).  "The government's purpose is the controlling consideration."  *Ward v.

Rock Against Racism*, 491 U.S. 781, 791 (1989).  Therefore, a court assessing the

constitutionality of a statute that regulates speech must "consider whether [the]

regulation of speech 'on its face' draws distinctions based on the message [the]

speaker conveys."  *Reed*, 576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564

U.S. 552, 566 (2011)).

In *Reed*, the statute at issue prohibited the display of outdoor signs without a

permit but provided exemptions and different parameters for certain categories of

signs.  *Id.* at 159.  For example, the statute treated ideological signs communicating

a message for noncommercial purposes most favorably, including by allowing them to be placed without time limits. *Id.* at 159–61. On the other hand, temporary signs directing the public to an event were treated less favorably and were restricted as to the allowable size of the sign, the number of signs that could be placed at one time and the length of time during which the sign could be displayed. *Id.* Because the statute applied to a particular sign based "entirely on the communicative content of the sign," the Supreme Court found that the statute was "content based on its face." *Id.* at 164.

In evaluating whether a statute is content-based, "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* at 163. Both types of regulations are content-based because they are premised on "the message a speaker conveys." *Id.* at 164; *see also Burson*, 504 U.S. at 197 (finding that a statute that prohibited the solicitation of votes and distribution of campaign materials within 100 feet of the entrance to a polling place was content-based because "[w]hether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign").

Additionally, the Supreme Court has recognized that facially content-neutral laws can nevertheless be content-based if they "cannot be 'justified without reference to the content of the regulated speech'" or if they "were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (alteration in original) (quoting *Ward*, 491 U.S. at 791); *see also Ward*, 491 U.S. at 791 (finding that government regulation of expressive activity is content-based if it is justified with reference to the content of the regulated speech).

In *Boos v. Barry*, the challenged statute prohibited the display of a sign that was offensive to a foreign government within 500 feet of that government's embassy. 485 U.S. 312, 315 (1988). The statute also prohibited the congregation of three or more persons within that zone. *Id.* The Supreme Court found that the statute was content-based because "[w]hether individuals may picket in front of a foreign embassy depend[ed] entirely upon whether their picket signs [were] critical of the foreign government." *Id.* at 318–19. The Court underscored that one category of speech was completely prohibited (derogatory speech) while other categories (e.g., favorable speech) were permitted. *Id.* at 319. Further, the statute was justified based on the "direct" and "emotive" impact of the speech on its

audience.  *Id.* at 321.  In other words, the statute "regulate[d] speech due to its

potential primary impact" on the listener.  *Id.*

   The Supreme Court distinguished its conclusion in *Boos* from that in *City of

Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986), where it found that a

zoning ordinance that prohibited adult motion picture theaters within 1,000 feet of

residences and certain establishments was not content-based.  The Court explained

that the justification for the ordinance in *Renton* "had nothing to do with . . .

speech" and "did not aim at the suppression of free expression."  *Boos*, 485 U.S. at

320.  In *Renton*, "[t]he content of the films being shown inside the theaters was

irrelevant and was not the target of the regulation.  Instead, the ordinance was

aimed at the '*secondary effects* of such theaters in the surrounding community,'"

such as crime and a decrease in property values.  *Id.* (quoting *Renton*, 475 U.S. at

47).  Conversely, the statute in *Boos* regulated speech specifically based on its

content and its impact on the intended audience.  *Id.* at 321.

   In this case, the Food, Drink and Gift Ban prohibits a specific category of

speech or conduct around a polling place—offering or giving items to voters

waiting in line.  The impetus for the legislation was largely the concern that

election officials could not monitor what volunteers were communicating to voters

and that line warming activities could constitute or be perceived as improper

electioneering, political pressure or intimidation.  The preamble of the Food, Drink and Gift Ban thus justifies the statute on the grounds that it will protect voters waiting in line from "improper interference, political pressure, or intimidation." S.B. 202 § 2, ¶ 13, Reg. Sess. (Ga. 2021).  This stated purpose is the "controlling consideration" in evaluating the constitutionality of the Food, Drink and Gift Ban. *See Ward*, 491 U.S. at 791.

As an initial matter, the Food, Drink and Gift Ban in this case is similar to the statute in *Burson*, which the Supreme Court held was content-based.  504 U.S. at 197.  There, the Court reasoned that the restriction on speech around the polling place hinged on whether the speech was related to a political campaign.  *Id.*  In the same way, the Food, Drink and Gift Ban prohibits a specific category of conduct (offering or providing certain items to voters) around the polling place. Accordingly, the Food, Drink and Gift Ban is content-based under *Burson*.

Moreover, the Court concludes that the Food, Drink and Gift Ban is a content-based regulation of speech because the government enacted it based on the potential "direct" and "emotive" impact of line warming activities on voters.  *See Boos*, 485 U.S. at 321.  In other words, the statute is justified in reference to the potential effect of the speech it seeks to prohibit.

The Court is not persuaded by Defendants' arguments that the Food, Drink and Gift Ban is content-neutral because it applies to anyone wishing to offer food or water to voters in line.  As Plaintiffs point out, the Food, Drink and Gift Ban prohibits expression that offers to provide or actually provides items to voters in line, while it allows other forms of expression to those same voters that do not offer or provide such items.  For example, individuals may approach voters in line for commercial solicitation.

And even if, as Defendants contend, the statute is facially neutral, the Supreme Court has cautioned that some facial distinctions are less obvious and that a facially neutral statute is nevertheless content-based if it regulates speech based on its "function or purpose."  *See Reed*, 576 U.S. at 163.  Defendants do not dispute that the preamble to the statute justifies the law by reference to the assumed content or function of the speech that it seeks to regulate.  Nor do they provide a response to the argument that the statute is content-based for this reason.

The opinion in *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464, 1476 (2022), which found that a sign ordinance that made distinctions based on geographical location was content-neutral, does not require a different result.  As the Supreme Court reiterated in that case, it is well-settled that if, as is the case here, "there is evidence that an impermissible purpose or

justification underpins a facially content-neutral restriction, . . . that restriction may be content based." *Id.* at 1475.

Based on the foregoing analysis, the Court finds that the Food, Drink and Gift Ban is a content-based regulation of speech. The Court must now determine what level of scrutiny to apply in deciding whether the statute is constitutional.

### ii.    What Level of Scrutiny Applies

It is well-settled that content-based regulations of speech are subject to the strict scrutiny level of review.[17]  *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (stating that laws that are justified with reference to the content of the regulated speech are content-based and must satisfy strict scrutiny review); *Otto v.*

---

[17] In some cases, the Supreme Court has referred to "exacting scrutiny" while describing the standard for evaluating a content-based regulation of speech. However, those opinions use language associated with the strict scrutiny standard. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798, 800 (1988) (referring to "exacting First Amendment scrutiny," which requires the government to show "compelling necessity" and a means that is "precisely tailored"); *United States v. Alvarez*, 567 U.S. 709, 724, 729 (2012) (stating that the Supreme Court has applied the "'most exacting scrutiny'" to content-based regulations of speech and explaining that those circumstances require the government to show that it has compelling interests, that the regulation is necessary and that the regulation presents the "'least restrictive means among available, effective alternatives'" (citations omitted)); *see also Burroughs v. Corey*, 92 F. Supp. 3d 1201, 1208 n.12 (M.D. Fla. 2015) (observing that the Supreme Court has used the term "'exacting scrutiny' rather than 'strict scrutiny'" in evaluating content-based restrictions on speech, "but the phrases appear to mean the same thing" (quoting *Alvarez*, 567 U.S. at 724)).  Either way, the appropriate level of review is heightened, and the bar to survive review is high.

*City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (explaining that content-based regulations are analyzed under the strict scrutiny standard).

Content-based regulations "are presumptively unconstitutional." *Reed*, 576 U.S. at 163; *see also Otto*, 981 F.3d at 868 (noting that strict scrutiny review is a "'demanding standard'" and that courts are "'properly skeptical'" of the government's ability to regulate speech (first quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799–800 (2011), then quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017))).  Under strict scrutiny review, content-based regulations are "justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 164; *see also Otto*, 981 F.3d at 868 (emphasizing that the government must show that the regulation furthers a compelling interest and is narrowly tailored to that effect).  Narrow tailoring requires the government to employ the least restrictive alternative to further its interests.  *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).  Given these stringent requirements, "it is the rare case in which . . . a law survives strict scrutiny." *Burson*, 504 U.S. at 211; *see also Playboy*, 529 U.S. at 818 ("It is rare that a regulation restricting speech because of its content will ever be permissible.").

In *Burson*, however, the Supreme Court modified its strict scrutiny analysis of a content-based regulation of speech.  In that case, the Court considered the constitutionality of a Tennessee statute that imposed a 100-foot buffer zone around a polling place, inside which the display and distribution of campaign materials and the solicitation of votes were prohibited.  504 U.S. at 193.  The Supreme Court found that strict scrutiny review was appropriate because the statute was a content-based regulation of speech.  *Id.* at 197–98.  However, the Court modified its application of that standard.  *Id.* at 209–10.  Specifically, the Court lowered the narrow tailoring requirement.  *Id.*

The *Burson* Court concluded that it was not appropriate to require the state to show narrow tailoring because the long history of voter intimidation, dating back to the colonial period, and the consensus among all fifty states demonstrated that some buffer was necessary.  *Id.* at 208–10.  In the Court's view, a narrow tailoring requirement "'would necessitate that [the state's] political system sustain some level of damage before the legislature could take corrective action.'"  *Id.* (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986)).  The Court emphasized that legislatures "'should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.'"  *Id.* (quoting *Munro*, 479 U.S. at 195–96).  Consequently, the Supreme Court held that

the state was required to show only that its response to the problem of voter intimidation and fraud was "'reasonable'" and did not "'*significantly impinge* on constitutionally protected rights.'"  *Id.* (quoting *Munro*, 479 U.S. at 195–96).  The Court ultimately deemed the statute to be constitutional because the geographic limitation prescribed by the statute (the 100-foot buffer zone) was "minor" and therefore did not significantly impinge on the plaintiff's First Amendment rights. *Id.* at 210.

However, the Supreme Court instructed that "[a]t some measurable distance from the polls, . . . governmental regulation of vote solicitation could effectively become an impermissible burden."  *Id.*  The Court also clarified that the modified strict scrutiny analysis would not "apply to all cases in which there is a conflict between First Amendment rights and a [s]tate's election process."  *Id.* at 209 n.11. Rather, it would apply "only when the First Amendment right threatens to interfere with the act of voting itself."  *Id.*  This includes cases involving voter confusion from overcrowded ballots and cases "in which the challenged activity physically interferes with electors attempting to cast their ballots."  *Id.*

In *Citizens for Police Accountability Political Committee v. Browning*, the Eleventh Circuit considered a Florida statute that prohibited exit solicitation of voters within 100 feet of a polling place.  Exit solicitation was defined as seeking

44

voters' signatures on a petition after they had voted and exited the polling place. 572 F.3d 1213, 1215 (11th Cir. 2009). Even though exit solicitation occurred *after* voters had already voted, the court found that it "threaten[ed] to interfere with the act of voting itself or physically interfere[d] with voters attempting to cast their ballot." *Id.* at 1221 n.17. The court explained that the "commotion tied to exit solicitation is as capable of intimidating and confusing the electorate and impeding the voting process—even deterring potential voters from coming to the polls—as other kinds of political canvassing or political action around the polls." *Id.* at 1219. The court therefore found that the *Burson* modified strict scrutiny analysis applied.

Echoing the reasoning set forth in *Burson*, the *Browning* court further noted that a state "need not wait for actual interference or violence or intimidation to erupt near a polling place . . . to act." *Id.* at 1220. To the contrary, the state is authorized to "take precautions to protect and to facilitate voting." *Id.* The court also determined that the history regarding the need for a zone of protection around polling places was broad enough to support the prohibition of exit solicitation. *Id.* at 1221. Ultimately, the *Browning* court concluded that the statute was reasonable and did not significantly impinge on the right to speech because the restricted zone was identical in size to the one established by the statute in *Burson*. *Id.* at 1221.

The court was not persuaded by the plaintiffs' characterization of exit solicitation as "a peaceful, non-disruptive activity targeting only those voters who ha[d] already voted" and their attempt to distinguish it from "the more intimidating, violent, and unsavory behavior" described in *Burson*.  *Id.*  It reasoned that the "commotion" tied to the exit solicitation was equally capable of intimidating voters and deterring them from coming to the polls.

Further, the court accorded significant deference to the state's desire for "peace and order around its polling places" and its desire to preserve "the integrity and dignity of the voting process" and to "encourage[] people to . . . vote." *Id.* at 1220.  Thus, the court stated that the suggestion that

> election officials can police the polls to ensure that exit solicitation remains peaceful and targets only voters who have already voted . . . places too great a burden on those officials to make split-second decisions on who is being solicited, on how they are being solicited, and about what they are being solicited:  an invitation to controversy and more disturbances then and there.

*Id.*

The Court must therefore decide whether Plaintiffs' line warming activities fall within the purview of *Burson* and *Browning*.  The record in this case shows that line warming activities increased significantly in the latter part of the 2010 decade through the 2021 runoff elections and led to numerous complaints to the Secretary of State's office regarding suspicion of improper motive and

electioneering.  That office was also inundated with questions from election officials regarding how to manage line warming activities.  A State Elections Board member asserted that the state had lost control of the precincts.

Evidence of these issues include:  organizations using food trucks to reach electors before they voted and offering rewards to those who voted; candidates campaigning in the restricted zones under the pretext of line warming; line warming personnel dressed in colors associated with a specific political party and informing voters about the positions of candidates and for whom to vote; perceived intimidation by certain groups; live entertainment from artists, including mariachi bands and circus performers; significant confusion among election officials regarding what activities were acceptable and where they could draw the line; and concern from officials that they were not equipped to monitor what was transpiring around the polling stations.  Additionally, "intimate," close contact from line warming volunteers, even if it took the form of a friendly pat of encouragement on the back, could be unwelcome and could interfere with the voting process.[18]  Tr. 105:19–25, ECF No. 234.  The Court can also envision circumstances where close

---

[18] *See Browning*, 572 F.3d at 1221 n.17 (observing that *Burson* applies where "the prohibited activity threatens to interfere with the act of voting itself or physically interferes with voters attempting to cast their ballots").

contact from groups associated with controversial issues could deter some voters from going to the polls.

In all, these facts evoke images of the kind of commotion at the polls that convinced the *Burson* and *Browning* courts to uphold the restricted zones in those cases. *See Burson*, 504 U.S. at 193 (recognizing the state's "'power to regulate conduct in and around the polls in order to maintain peace, order and decorum'" (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966))); *Browning*, 572 F.3d at 1220 (noting that "it takes little foresight to envision polling places awash" with third parties competing for the attention of voters and voters refraining from participating in the election process "to avoid the resulting commotion"). Indeed, State Defendants contend that Plaintiffs' activities interfere with the serenity of the polling place and diminish voters' confidence in the election process. *See Burson*, 504 U.S. at 210 (finding that it is not an "unconstitutional choice" when a state decides that the "last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible").

Under *Burson*, a state need not wait for damage to its election system to implement corrective measures. Georgia is therefore permitted to take remedial action in the face of activities that could interfere with electors waiting to cast their ballots. Notably, the potential interference in this case occurs *before* electors have

cast their ballots and could involve physical contact.  Therefore, the concern

regarding intimidation and influence appears even greater here than in *Browning*,

where the Eleventh Circuit found that the facts (potential for interference *after*

voters cast their ballots) justified using the *Burson* modified analysis.

The Court is not convinced by Plaintiffs' attempt to distinguish *Browning* on

the grounds that their nonpartisan activities simply support voters and do not

advocate for a political proposal or candidate.  For many organizations who

conduct line warming activities, the distinction between nonpartisan line relief and

partisan engagement in the voting process is a blurry one.[19]  *See Burson*, 504 U.S.

---

[19] For example, Delta Sigma Theta's Chair of Strategic Partnership Task Force is
also the Secretary/Treasurer of Delta for Women in Action ("Delta for
Women").  While Delta Sigma Theta describes itself as a nonpartisan organization,
Delta for Women is an admittedly partisan organization that attempts to influence
elections, including by endorsing candidates and taking a position on controversial
public policy issues.  Tr. 59:9–60:24, ECF No. 234.  When testifying during the
hearing, Delta Sigma Theta's representative admitted that she sent out tweets in
October 2020, one regarding Delta for Women's endorsement for President and
Vice-President and another with the organization's full slate of endorsed
candidates for the 2020 general election.  *Id*. 59:24–60:8.  This representative was
the only representative of a plaintiff group to testify at the hearing on the Motions,
which begs the question of whether other Plaintiffs have similar connections that
are not apparent from the record.

Moreover, the record shows that Delta Sigma Theta is well known in the
community, and members of the community know what Delta Sigma Theta "stands
for."  *Id*. 53:20–54:10.  Delta Sigma Theta's line warming volunteers dress in
Delta Sigma Theta clothing and identify themselves as Delta Sigma Theta
members.  *Id*. 53:20–25.  Thus, Delta Sigma Theta's line warming activities could
easily be perceived as advocating for a specific candidate or position or as

at 207 (differentiating between "'the most blatant and specific attempts'" to

influence an election and "undetected or less than blatant acts" (quoting *Buckley v.*

*Valeo*, 424 U.S. 1, 28 (1976))). Plaintiffs, themselves, describe their line warming

work as "political acts" and "political activism." *See, e.g.*, ECF No. 171-1 at 14.

Such activity is akin to "political action around the polls" that the *Browning* court

deemed "capable of intimidating and confusing the electorate" and interfering with

the act of voting. 572 F.3d at 1219.

---

attempting to influence the outcome of the election. This is particularly the case
when some of its members—such as the representative who testified at the
hearing—also participate in parallel organizations that do have partisan aims.

Additionally, other line warming organizations directly participate in
political action. One example is Rise, whose mission "is to fight for free higher
education by eliminating tuition and fees at public colleges and universities, end
college student housing and food insecurity, and increase voting access for college
students." ECF No. 185-3 at 2. It seems, then, that no clear boundary exists
between Rise's purpose in conducting line warming and its advocacy for policy
goals. In the same vein, voters may be confused by receiving food, drink or gifts
from an organization whose founder or leader is also on the ballot. *See, e.g.*, ECF
No. 171-3 (explaining that the co-founder of the Georgia 55 Project is "currently
running to represent Senate District 38 in the Georgia General Assembly").

Another related issue involves the "nonpartisan voter guides" that were
sometimes distributed along with food, water and other items; these guides stated
candidates' positions on various issues, including whether a candidate was "tough
on crime." ECF No. 171-15 at 3. The voter guides themselves are not in evidence,
but it is not difficult to imagine how such guides—even if labeled "nonpartisan"—
could be abused. Altogether, these observations merely illustrate how some voters
may perceive line warming activities to be something other than nonpartisan.

Accordingly, both *Burson* and *Browning* require this Court to apply the modified strict scrutiny analysis to the question of whether the Food, Drink and Gift Ban is constitutional.

### iii. Evaluation of the Food, Drink and Gift Ban Under the *Burson* Modified Strict Scrutiny Analysis

The modified *Burson* standard did not change the traditional strict scrutiny requirement of proof that (i) the regulation is necessary to serve compelling state interests and that (ii) it is narrowly tailored for that purpose. The difference lies in the way the Supreme Court conducted the strict scrutiny analysis. First, the Court did not require the government to provide evidence regarding the necessity of the restricted zone, given the long and well-documented history of voter intimidation around the polls. Second, although the second prong of the traditional strict scrutiny test requires the government to implement the least restrictive means to achieve its goal, *see United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), the *Burson* Court upheld the Tennessee statute based on the less stringent requirement that the statute be "'reasonable'" and not "'*significantly impinge* on constitutionally protected rights,'" *Burson*, 504 U.S. at 209 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986)).

Here, the interests that State Defendants offer in support of the Food, Drink and Gift Ban are similar to those proffered in *Burson* and *Browning*: restoring

51

peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity.  Courts routinely recognize these interests as compelling.  *See, e.g.*, *id.* at 198–99 (finding that a state "obviously" has compelling interests "in protecting the right of its citizens to vote freely for the candidates of their choice" and "in an election conducted with integrity and reliability"); *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) ("It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal."); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (stating that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society"); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (noting that a state "'indisputably has a compelling interest in preserving the integrity of its election process'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006))).  Therefore, State Defendants have made the requisite showing of compelling interests.

Furthermore, even though Defendants were not required to do so,[20] State Defendants offered ample evidence of necessity.  *See supra* Section I.D.  The court thus finds that the record of complaints and confusion and the potential for

---

[20] The *Burson* and *Browning* courts did not require such evidence.  *See Burson*, 504 U.S. at 208; *Browning*, 572 F.3d at 1221.  In fact, the *Browning* court expressly noted that evidence of necessity is not essential under the modified *Burson* analysis.  *See Browning*, 572 F.3d at 1220 n.14.

intimidation and improper influence demonstrate the need for a restricted zone around polling stations.  Therefore, the Court concludes that the government has satisfied its burden on the first prong of the strict scrutiny test:  the statute is necessary to serve compelling state interests.

Although the 150-foot Buffer Zone in this case is larger than the 100-foot zones in *Burson* and *Browning*, the extra area represents just a few extra seconds-walk from the entrance of the polling station.[21]  Drawing the line at this point does not impose an unreasonable restriction on the exercise of First Amendment rights. *See, e.g.*, *Schirmer v. Edwards*, 2 F.3d 117, 122 (5th Cir. 1993) (upholding a 600-foot buffer zone).

Moreover, as State Defendants point out, nothing on the face of the statute prevents Plaintiffs from continuing to engage in the following activities inside the Buffer Zone:  verbally encouraging voters to stay in line; assisting elderly and disabled voters to the front of the line; and directing voters to water receptacles where available.  And Plaintiffs can still, outside the Buffer Zone, provide food and water directly to voters and set up tables that voters can approach of their own

---

[21] The Supreme Court in *Burson* observed that it takes approximately fifteen seconds to walk seventy-five feet.  *See* 504 U.S. at 210.

accord.[22]  These facts show alternative avenues for expression.  In other words,

enforcing the Food, Drink and Gift Ban in the Buffer Zone represents a reasonable

resolution of the tension between the right to free speech and the right to cast a

ballot without improper influence.  As the *Burson* opinion counseled, the

government should be allowed to implement such reasonable measures to balance

competing constitutional considerations.  504 U.S. at 209 (stating that because "the

remedy for a tainted election is an imperfect one," the legislature must be allowed

to implement a reasonable prophylactic measure).

For these reasons, the Court finds that when implemented in the Buffer

Zone, the Food, Drink and Gift Ban is reasonable and does not significantly

impinge on Plaintiffs' constitutional rights.  As such, the second prong of the strict

scrutiny test is satisfied.  Because the Food, Drink and Gift Ban—when applicable

to the Buffer Zone—satisfies both prongs of the strict scrutiny analysis, it is

therefore a constitutional regulation of expressive conduct.

Enforcing the Food, Drink and Gift Ban in the Supplemental Zone presents a

different issue.  Because that zone is tied to the position of the voter in line and

fluctuates based on the location of the voter, it has no fixed line of demarcation and

---

[22] This is the case, of course, only to the extent that the area outside the Buffer
Zone does not overlap with the Supplemental Zone.

no limit.  In practice, the Supplemental Zone could easily extend thousands of feet away from the polling station (and across private property) given the documented hours-long lines that voters at some polling locations have experienced.

Although the *Burson* Court did not establish where to draw the line between a restricted zone that is reasonable and one that is an "impermissible burden," the Court did indicate that a restricted zone becomes unconstitutional at "some measurable distance from the polls." *Id.* at 210.  Applying this reasoning here, it is improbable that a limitless Supplemental Zone would be permissible.  *See Anderson v. Spear*, 356 F.3d 651, 658 (6th Cir. 2004) (finding that a 500-foot buffer zone was unconstitutional where the state's evidence was "glaringly thin . . . as to why the legislature . . . ultimately arrived at a distance of 500 feet"); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1053 (6th Cir. 2015) (rejecting a 300-foot buffer zone because the state "did not present any evidence . . . justifying a no-speech zone nine times larger than the one previously authorized by the Supreme Court [in *Burson*] and offer[ed] no well-reasoned argument" for a restricted area of that size); *cf. Schirmer*, 2 F.3d at 122 (approving a 600-foot buffer zone because it was implemented only after the legislature's implementation of a 300-foot limitation failed to remedy the identified issues).

For these reasons, the Court finds that imposing the Food, Drink and Gift Ban in the Supplemental Zone is unreasonable and significantly impinges on Plaintiffs' constitutional rights.  Therefore, when applied in this manner, the Food, Drink and Gift Ban fails the second prong of the strict scrutiny test and is an unconstitutional regulation of expressive conduct.

Based on the foregoing analysis, the Court concludes that Plaintiffs are not substantially likely to succeed on the merits of their claim that the Food, Drink and Gift Ban is unconstitutional within the Buffer Zone but that they are substantially likely to succeed on the merits of their claim as to the Supplemental Zone.[23]

In light of this conclusion, the Court will address the irreparable injury, balance of the equities and public interest prongs only with respect to the Food, Drink and Gift Ban in the Supplemental Zone.  *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (stating that a preliminary injunction may not be granted unless the movant clearly establishes "each of the four prerequisites").

---

[23] The current record does not support Defendants' argument that Plaintiffs' facial challenge to the Food, Drink and Gift Ban is improper.  Defendants have not addressed whether the Food, Drink and Gift Ban is constitutional in the Supplemental Zone and have not responded to Plaintiffs' arguments in this regard. As a result, the Court declines to find that Plaintiffs' facial challenge is invalid at this time.

## 2.   Irreparable Harm

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'"
*Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors v.
City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can
show a substantial likelihood of success on the merits, "the absence of a substantial
likelihood of irreparable injury would, standing alone, make preliminary injunctive
relief improper."  *Id.*; *see also City of Jacksonville*, 896 F.2d at 1285 (declining to
address all elements of the preliminary injunction test because "no showing of
irreparable injury was made").

The irreparable injury sufficient to satisfy the burden "must be neither
remote nor speculative, but actual and imminent."  *Siegel*, 234 F.3d at 1176
(quoting *City of Jacksonville*, 896 F.2d at 1285).  In the context of constitutional
claims, it is well-settled that "[t]he loss of First Amendment freedoms, for even
minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.
Burns*, 427 U.S. 347, 373 (1976); *see also City of Jacksonville*, 896 F.2d at 1285–
86 (noting that an ongoing violation of First Amendment rights constitutes
irreparable injury); *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir.
2020) ("Because the ordinances are an unconstitutional 'direct penalization' of
protected speech, continued enforcement, 'for even minimal periods of time,'

constitutes a per se irreparable injury." (quoting *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983))).

In *Cate*, the Eleventh Circuit explained that "one reason for such stringent protection of First Amendment rights . . . is the intangible nature of the benefits flowing from the exercise of those rights." 707 F.2d at 1189. The court was also concerned that "if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Id.*

The parties did not devote much time to this prong of the preliminary injunction test either in the briefs or during the hearing. Plaintiffs contend that a violation of their First Amendment rights constitutes a per se irreparable injury and that no other remedy can restore the lost opportunity for expression that would result from allowing the continued enforcement of the Food, Drink and Gift Ban. The NGP Plaintiffs also point out that they are already suffering harm because they have ceased all line warming activities as a result of the Food, Drink and Gift Ban's threat of criminal penalty.

State Defendants respond that Plaintiffs' delay in bringing these Motions confirms that they will not suffer irreparable injury absent an injunction. State Defendants further contend that the NGP Plaintiffs cannot show irreparable harm

because they have not provided evidence of threatened enforcement of the Food, Drink and Gift Ban.[24]

Applying the above precedent here, the Court finds that Plaintiffs have carried their burden to show that they would suffer irreparable harm should the Court preclude enforcement of the Food, Drink and Gift Ban in the Supplemental Zone. The record shows that the Food, Drink and Gift Ban has already deterred Plaintiffs and other organizations from engaging in line warming activities. Because the lost opportunity for expression cannot be remedied after the fact, the Court concludes that the irreparable harm factor of the preliminary injunction test is satisfied as to the Food, Drink and Gift Ban in the Supplemental Zone.

---

[24] County Defendants argue that Plaintiffs cannot show a likelihood of success on the merits of their claim or irreparable harm because they lack standing to bring their claims. Specifically, County Defendants argue that the traceability and redressability requirements of the standing analysis are not met here because County Defendants are not responsible for enforcing the criminal penalties of the Food, Drink and Gift Ban. However, as the Court explained in its prior orders denying County Defendants' motions to dismiss, County Defendants must enforce S.B. 202 and "are 'responsible for the day-to-day operations of running elections' in their respective counties." *E.g.*, *Sixth Dist. of the African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1272 (N.D. Ga. 2021) (citation omitted). Therefore, County Defendants' traceability and redressability arguments lack merit. Since the Court already evaluated and rejected County Defendants' standing arguments, it will not address them a second time.

### 3.    Balance of the Equities and the Public Interest

The Court combines its analysis of the final two factors of the preliminary injunction test—balance of the equities and the public interest—because "where the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).  Further, in the context of an election, the balance of the equities and the public interest factors are considered in tandem because "the real question posed . . . is how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018); *see also*, *e.g.*, *id.* (merging the analysis of the third and fourth prongs of the preliminary injunction test); *Black Voters Matter Fund v. Raffensperger*, No. 1:20-cv-1489, 2020 WL 2079240, at *2 (N.D. Ga. Apr. 30, 2020) (same); *Martin v. Kemp*, No. 1:18-cv-4776, 2018 WL 10509489, at *3 (N.D. Ga. Nov. 2, 2018) (same).

Under the third and fourth factors of the preliminary injunction test, a court must weigh (i) whether State Defendants' interests in conducting an orderly and efficient election and generally preserving the integrity of the electoral process outweigh the threat of injury to Plaintiffs and (ii) whether an injunction would be

adverse to the public's interests, which merge with those of the state.  *See Sofarelli*, 931 F.2d at 723–24.  Importantly, the Eleventh Circuit has stated that "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury" and that the government "has no legitimate interest in enforcing an unconstitutional [statute]."  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  The public likewise "has no interest in enforcing an unconstitutional [statute]," and an injunction in that instance "plainly is not adverse to the public interest."  *Id.*

As discussed previously, Plaintiffs are substantially likely to show that the Food, Drink and Gift Ban is unconstitutional within the Supplemental Zone.  An infringement of First Amendment rights balances the equities in Plaintiffs' favor, and neither Defendants nor the public have a legitimate interest in enforcing an unconstitutional statute.  The Court thus finds that, regarding the Food, Drink and Gift Ban within the Supplemental Zone, Plaintiffs have satisfied their burden as to the third and fourth prongs of the preliminary injunction test.

However, the Court's analysis does not end there.  Plaintiffs' Motions were filed during an election cycle, and the general election is just a few months away.  The Court must therefore determine whether the *Purcell* doctrine militates against

enjoining the enforcement of the Food, Drink and Gift Ban in the Supplemental Zone at this time.

### 4.    Whether the *Purcell* Doctrine Precludes Relief

While the Supreme Court has recognized that it would be "the unusual case" in which a court would not act to prevent a constitutional violation, "under certain circumstances, such as where an impending election is imminent and a [s]tate's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief."  *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  The election in *Reynolds* was not imminent, and that case does not necessarily have broad application to cases like the one at bar, but *Reynolds* helped explain the principle of exercising judicial restraint where an injunction could hamper the electoral process.

In subsequent opinions, the Supreme Court identified specific factors that could weigh against granting election-related injunctive relief close to election day. For example, in *Fishman v. Schaffer*, the Court focused on factors such as unnecessary delay in commencing a suit and relief that "would have a chaotic and disruptive effect upon the electoral process" as grounds for denying a motion for injunctive relief close to an election.  429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers).

This principle of restraint has continued to develop over the years, and the Supreme Court's opinion in *Purcell v. Gonzalez* is now frequently cited for the proposition that a court should ordinarily decline to issue an injunction that changes existing election rules when an election is imminent.  549 U.S. 1, 5–6 (2006).  The *Purcell* Court reasoned that such a change could be inappropriate because it may result in "voter confusion and [the] consequent incentive to remain away from the polls."  *Id.* at 4–5.

The Supreme Court has reiterated this directive on many occasions.  *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.").  The Eleventh Circuit also routinely enforces the *Purcell* principle to stay relief when an election is imminent and the injunction would impact the election process.  *See, e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (staying an injunction entered "at the last minute" because it would "violate *Purcell*'s well-known caution against federal courts mandating new election rules").

In February of 2022, Justice Kavanaugh stated in a concurring opinion in *Merrill v. Milligan* that *Purcell* concerns can be overcome if the plaintiff can "at least" establish that:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff;
> (ii) the plaintiff would suffer irreparable harm absent the injunction;
> (iii) the plaintiff has not unduly delayed bringing the complaint to
> court; and (iv) the changes in question are at least feasible before the
> election without significant cost, confusion, or hardship.

142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in the decision to stay an

injunction of a state's election law).[25]

Considering the reasoning in *Purcell* and Justice Kavanaugh's concurring

opinion in *Merrill*, the Eleventh Circuit recently stayed an injunction in *League of

Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1375

(11th Cir. 2022).[26]  The court's decision relied in part on the fact that voting in the

_____

[25] Although the Court is not bound by Justice Kavanaugh's concurring opinion in *Merrill*, *see Schwab v. Sec'y, Dep't of Corrs.*, 507 F.3d 1297, 1301 (11th Cir. 2007), that opinion nevertheless provides helpful guidance regarding the application of the *Purcell* doctrine.  Moreover, the Eleventh Circuit relied on the *Merrill* opinion in two recent stay opinions involving injunctions against election laws:  *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1375 (11th Cir. 2022), and *Rose v. Georgia Secretary of State*, No. 22-12593, slip op. at 3–4 (11th Cir. Aug. 12, 2022).  In both cases, the Eleventh Circuit analyzed certain factors articulated in the *Merrill* concurrence in deciding whether it was appropriate to stay the injunctions.  As with the *Merrill* concurrence, the Court recognizes that the *League* and *Rose* opinions do not constitute precedent.  *See League*, 32 F.4th at 1369 n.1.  The Court therefore does not apply them as binding authority here but considers them as valuable insight into the Eleventh Circuit's thinking regarding the scope and application of the *Purcell* doctrine.
[26] *League* concerned a statutory provision that broadly applied to third parties' ability to engage with voters waiting in line.  *See League of Women Voters of Fla., Inc. v. Lee*, No. 4:21-CV-186, 2022 WL 969538, at *6 (N.D. Fla. Mar. 31, 2022)

next election was set to begin in less than four months and that the injunction implicated aspects of the election machinery that were already underway.  *Id.* at 1371.  The court also found that the merits of that case were not "'entirely clearcut.'"  *Id.* at 1374 (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)).  It cautioned that "[e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences."  *Id.* at 1371 (alteration in original) (quoting *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring)).

Even more recently, in *Rose v. Georgia Secretary of State*, the Eleventh Circuit similarly stayed an injunction issued three months before a scheduled election.  No. 22-12593, slip op. at 3–4 (11th Cir. Aug. 12, 2022).  The court reasoned that:  (i) the election was "sufficiently close at hand under . . . [its] recent precedent," *id.* at 3; (ii) while "the mechanics of implementing the injunctive relief [were] relatively straightforward," *id.*, the injunction "'fundamentally alter[ed] the nature' of the upcoming elections," *id.* at 4 (quoting *Republican Nat'l Comm.*, 140 S. Ct. at 1207); and (iii) "the permanent injunction was issued too close to [the

---

(noting that the statutory provision at issue "can be read to prohibit 'line warming' activities"), *appeal filed*, No. 22-11143 (11th Cir. Apr. 11, 2022).

election] date to allow for meaningful appellate review of the district court's [order]," *id.* The court underscored that the *Purcell* principle should be interpreted broadly and applied it in that case, even though the defendants conceded that the injunction would not affect the mechanics of the election and rather would affect only voter confidence. *Id.* at 6.

In short, a review of Eleventh Circuit case law regarding the *Purcell* doctrine indicates that the standard to allow a voting-related injunction to take effect close to election day is high. Indeed, in *League*, the court observed that it would be an "'extraordinary' case where an injunction—despite its issuance on the eve of the election—might be proper." 32 F.4th at 1372 n.7.

Here, Defendants argue that the Court should withhold relief under the *Purcell* doctrine and the Eleventh Circuit's application of that doctrine in *League* because in-person early voting for the general election will begin in mid-October, and a late change to the law will pose a significant risk of voter confusion and harm to the electoral process. Through Germany's testimony, Defendants provided evidence that a late change to election laws can have "negative and unforeseen consequences" on the election process. Tr. 111:12, ECF No. 234. In particular, Germany explained that the poll manual, which has already been used to train poll workers, will need to be updated, and poll workers who were trained in

connection with the recent primary elections will need to retrained. *See id.* 112:15–25. He further stated that the poll manual is available online and used by third parties, *id.* 111:25–112:25, and that it would be difficult to reach a large number of people and ensure that they are aware that the poll manual has changed, *id.* 113:1–10. Germany believes that this could lead to confusion regarding what activities are permissible. *Id.* 113:24–114:1. Intervenor Defendants build on these arguments and contend that an injunction would diminish confidence in the election process because voters who were aware of the Food, Drink and Gift Ban would question the resumption of line warming activities at polling stations. Furthermore, a former director of elections for Richmond County, Lynn Bailey, underscored that last-minute changes to election rules are challenging to implement with great confidence because it is difficult to provide poll workers with proper training close to an election. *See id.* 159:12–14.

Germany further testified that since a primary election has already occurred this year, changing the rules for the subsequent general election in the same election cycle would result in confusion. ECF No. 197-2 at 15. He explained that the Secretary of State's office would have to field additional questions due to such confusion, Tr. 113:11–114:5, ECF No. 234, and election officials would be forced to spend more resources monitoring line warming activities to ensure volunteers

are not electioneering or engaging in otherwise prohibited behavior, ECF No. 197-2 at 14.  In addition to these election-related burdens, Defendants also argued that Plaintiffs cannot show irreparable harm because they unduly delayed in bringing their Motions.

Plaintiffs, on the other hand, assert that Defendants have not identified any election administration burden that would result from an injunction against the enforcement of the Food, Drink and Gift Ban.  In Plaintiffs' view, an injunction would require only that election officials "*passively* allow the provision of food and water to voters—[a] common practice in Georgia for decades."  ECF No. 171-1 at 35.  Similarly, the NGP Plaintiffs contend that the injunction would impose "virtually no hardship" on Defendants because the NGP Plaintiffs seek an order enjoining only the district attorneys of Fulton and Dougherty counties from enforcing the Food, Drink and Gift Ban.  ECF No. 185-1 at 22.

With respect to the concern regarding a change in rules close to an election, Plaintiffs direct the Court to the testimony of Dwight Brower ("Brower"), former Fulton County Chief of Elections.  He testified that Georgia possesses the infrastructure to implement complex changes to election rules close in time to an election.  ECF No. 216-3 at 5.  As to the election change at issue in this case,

Brower opined that the change could be implemented one day before early voting. Tr. 72:24–73:15, ECF No. 234.

Plaintiffs also provided evidence that voters would not be confused by an injunction applicable to the current law.  Specifically, one of Plaintiffs' witnesses testified that voters at polling locations where line warming activities have been historically conducted would not be confused by an injunction against the Food, Drink and Gift Ban because voters are accustomed to line warming activities, and many are not even aware of the Food, Drink and Gift Ban's impact on those activities.  ECF No. 171-6 at 4–5.

As demonstrated by the arguments above, one of the key issues here is whether an order enjoining the enforcement of the Food, Drink and Gift Ban within the Supplemental Zone at this stage of the current election cycle would cause voter confusion and disrupt the election process.  Significantly, S.B. 202 is already the law, and an injunction with respect to the Supplemental Zone would not merely preserve the status quo.  It would affect the mechanics of the election by requiring a different set of rules than what was applicable during the primary elections that occurred just a few months ago.

Further, poll workers were recently trained that offering any item of value, including food and water, to voters waiting in line was prohibited within both the

Buffer and Supplemental Zones.  An injunction with respect to the Supplemental Zone would thus require the government to go back and retrain workers that those activities are now permissible in the Supplemental Zone but still prohibited in the Buffer Zone.  *See Rose*, No. 22-12593, slip op. at 32 (Rosenbaum, J., dissenting) (noting that the *League* court's *Purcell* analysis deemed retraining poll workers to be a burden, whereas no such burden existed in *Rose*).  This would create confusion for election officials who previously struggled greatly with how to manage line warming activities.[27]  Confused election officials translate into a burden on the Secretary of State's office, which has fielded incessant questions in the past regarding the appropriate boundaries for line warming activities.

Finally, the Court is mindful of the Eleventh Circuit's caution regarding the unintended consequences of last-minute changes to election laws.  While the implementation of an injunction only as to the Supplemental Zone may appear comparatively straightforward, it may also lead to issues that the Court is not equipped to anticipate.

---

[27] This burden, similar to the burden on election officials outlined in *Browning*, includes making "split-second decisions" regarding what is being distributed, by whom and for what purpose, which could lead to controversy at the polls.  572 F.3d at 1220.

Based on the foregoing analysis, the Court finds that the *Purcell* doctrine precludes the issuance of an injunction at this time.[28]

The Court further notes that Plaintiffs have failed to show at least two of the *Merrill* factors.  *See Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (stating that a plaintiff would need to show "at least" all four factors to overcome a *Purcell* bar).  As to the first *Merrill* factor, it is questionable whether the merits of Plaintiffs' case are "entirely clearcut."  *Id.*  Although the Court concluded herein that Plaintiffs have demonstrated that they are substantially likely to succeed on the merits of their claim as to the Supplemental Zone, the Court interprets the entirely clearcut standard to require even more.  *See Clear-cut*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/clear-cut (last visited Aug. 18, 2022)

---

[28] The Court acknowledges that an injunction (as sought by the NGP Plaintiffs) preventing the criminal prosecution of the Food, Drink and Gift Ban might not implicate, to the same degree, concerns about voter confusion and election administration as one enjoining the enforcement of the law altogether.  However, enjoining just the prosecution of the provision (only as to the Supplemental Zone and only in Dougherty and Fulton counties) may very well burden the orderly administration of elections.  For example, Mashburn testified that in his experience, police are unlikely to respond to an issue at the polls if their response will not result in a prosecution.  *See* Tr. 211:2–5, ECF No. 234.  Enjoining the criminal prosecution of the Food, Drink and Gift Ban is thus likely to leave poll workers without an important resource—the police—in the management of polling places.  *See id.* 211:6–11.  In light of these additional burdens on poll workers, the Court's *Purcell* analysis thus applies with equal force to the injunction sought by the NGP Plaintiffs.

("free from ambiguity or uncertainty").  For these reasons, the Court cannot say that this prong of the *Merrill* analysis is satisfied.

The above discussion regarding voter confusion and the burden on election administrators bears on the fourth prong of the *Merrill* analysis, too.  Accordingly, Plaintiffs have not shown that compliance with an injunction would be "feasible . . . without significant cost, confusion, or hardship."  *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).  Because Plaintiffs cannot satisfy the first and fourth factors of the *Merrill* analysis, the Court finds that the *Merrill* concurrence provides additional support for the conclusion that the *Purcell* doctrine bars relief here.

Plaintiffs' characterization of the effect of a potential injunction as only "*passively*" allowing line warming activities to resume, with minimal impact on voters and the election process, does not provide the full picture.  *See* ECF No. 171-1 at 35.  Although there is some evidence in the record that an order enjoining the enforcement of the Food, Drink and Gift Ban within the Supplemental Zone would perhaps not be the most complex change election officials have had to implement close to an election, there is significant evidence that an injunction would impair the state's interests in avoiding voter confusion, maintaining a smooth and orderly election process and promoting confidence in that process.

Plaintiffs' attempt to distinguish the *League* opinion is not persuasive.[29] They argue that *League* does not address whether *Purcell* applies to criminal statutes and that the *Purcell* doctrine was applied in *League* because the injunction "largely" implicated ongoing voter registration and local elections.  ECF No. 216 at 9.  However, a line warming provision was also at issue in that case, and Plaintiffs likewise seek relief in the middle of an election cycle.  *League* is therefore relevant here.

The Court agrees with Plaintiffs that the *Purcell* doctrine does not function as a bright-line test and that the *Purcell* considerations are arguably less significant in this case as compared to, perhaps, a redistricting case.  The Court also agrees that Plaintiffs did not unduly delay in bringing their complaints.  The complaints in this case were filed soon after the passage of S.B. 202, and the timing of Plaintiffs' Motions is reasonable in the context of ongoing discovery and the procedural posture of this case.  These points are, however, not sufficient to move the needle in Plaintiffs' favor on the *Purcell* analysis.  The Court therefore finds that the *Purcell* doctrine precludes the issuance of an injunction in this case.

---

[29] The *Rose* opinion was issued after briefing closed and after this Court heard oral argument on Plaintiffs' Motions.  Therefore, the parties do not address it.

### III. <u>CONCLUSION</u>

For all the reasons set forth in this opinion, Plaintiffs have not satisfied their burden to show that they are substantially likely to succeed on the merits of their claim that the Food, Drink and Gift Ban is unconstitutional within the Buffer Zone. Consequently, the Court finds that a preliminary injunction regarding that provision is not warranted.

Plaintiffs have, however, established each of the preliminary injunction factors as to the Food, Drink and Gift Ban within the Supplemental Zone. Notwithstanding this conclusion, policy considerations under the *Purcell* doctrine weigh against issuing an injunction at this time.[30]

Accordingly, Plaintiffs' Motions (ECF Nos. 171, 185) are **DENIED** in all respects.

**SO ORDERED** this 18th day of August, 2022.

J. P. BOULEE
United States District Judge

---

[30] This opinion concerns only the upcoming November 2022 general elections and any related early voting period and runoff elections.

# Doc. 54

Answer (AME Church)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*,<br><br>*Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>*Intervenor-Defendants*. | Civil Action No.:<br>1:21-CV-01284-JPB |

**STATE DEFENDANTS' ANSWER TO
PLAINTIFFS' FIRST AMENDED COMPLAINT**

**INTRODUCTION**

SB 202 updates Georgia's reasonable, nondiscriminatory election rules in response to lessons learned from challenges to the 2018 and 2020 elections. And SB 202 provides procedural safeguards of the type necessary to restore confidence in the integrity of Georgia elections for voters on all sides of the political spectrum. The reforms are also designed to streamline the process of conducting elections in Georgia and reduce the burdens on elections officials. Contrary to the First Amended Complaint, SB 202 expands ballot access beyond previous statutory limits.

Ignoring this expanded access created by SB 202, the First Amended Complaint asks the Court to make permanent various emergency practices that were temporarily permitted by the State during the 2020 and 2021 elections due to the COVID-19 pandemic. Yet there is no basis to do so, as Georgia's election laws, as amended by SB 202, expand every voter's access to voting.

Tellingly, the First Amended Complaint focuses largely on practices most susceptible to abuse, such as the solicitation and harvesting of absentee ballots, and claims that regulation of those practices is "discriminatory." But there is nothing discriminatory about restricting practices that are widely recognized to undermine ballot integrity. Moreover, the claim of

discrimination rests on the *false* assumption that demographic groups Plaintiffs claim to represent are either less competent or less honest than other demographic groups in the Georgia electorate.

Plaintiffs also complain about past long lines and polling place closures. But those resulted from decisions in the Democrat-dominated counties where those problems occurred and have nothing to do with SB 202's reforms, which are designed to reduce similar problems in the future.

In short, Plaintiffs' claims should be rejected because this Court's role "does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020). That is surely so when the alternative is judicial enactment of Plaintiffs' partisan policy goals.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim upon which relief may be granted because, among other things, SB 202 does not have a discriminatory purpose or intent.

### Second Affirmative Defense

Plaintiffs lack standing to bring this action.

## Third Affirmative Defense

Plaintiffs' claims are barred by sovereign immunity and the Eleventh Amendment to the United States Constitution.

## Fourth Affirmative Defense

Plaintiffs have not been subjected to the deprivation of any right, privilege, or immunity under the Constitution or laws of the United States.

## Fifth Affirmative Defense

Plaintiffs failed to join necessary and indispensable parties.

## Sixth Affirmative Defense

Plaintiffs' requested relief is barred by the *Purcell* principle.

## Seventh Affirmative Defense

Plaintiffs' Voting Rights Act Section 2 claims are barred because there is no private right of action under Section 2.

## Eighth Affirmative Defense

State Defendants reserve the right to amend their defenses and to add additional ones, including lack of subject matter jurisdiction based on the mootness or ripeness doctrines, as further information becomes available in discovery.

## RESPONSES

State Defendants respond to the separately numbered paragraphs and prayer for relief contained in the First Amended Complaint below. To the extent that any allegation is not expressly admitted herein, it is denied. Moreover, to the extent that the First Amended Complaint refers to or quotes from external documents, statutes, or other sources, State Defendants may refer to such materials for their accurate and complete contents; however, State Defendants' references are not intended to be, and should not be construed to be, an admission that the cited materials: (a) are correctly cited or quoted by Plaintiffs; (b) are relevant to this, or any other, action; or (c) are admissible in this, or any other, action.

On those understandings, State Defendants answer as follows:

## INTRODUCTION[1]

1.    Paragraph 1 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and

---

[1] For ease of reference, State Defendants refer hereafter to Plaintiffs' headings and titles, but to the extent those headings and titles could be construed to contain factual allegations, those allegations are denied.

accurate statement of its contents and deny any allegations inconsistent therewith.

2.      State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 2 and deny them on that basis.

3.      State Defendants admit the importance of the right to vote.  By way of further response, State Defendants aver that SB 202 was passed for the purpose of protecting that important right.

4.      State Defendants deny the allegations contained in Paragraph 4.

5.      Paragraph 5 contains Plaintiffs' characterization of population data, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the relevant population data for a full and accurate statement of their contents and deny any allegation inconsistent therewith.

6.      State Defendants deny the allegations contained in Paragraph 6.

7.      State Defendants deny that there were barriers to vote in the 2020 General Election and 2021 Runoff Elections. State Defendants admit the remaining allegations contained in Paragraph 7.

8.      Paragraph 8 contains Plaintiffs' characterization of voter turnout data, not allegations of fact, to which no response is required.  By way of further

response, State Defendants respectfully refer the Court to the relevant turnout data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

9.      Paragraph 9 contains Plaintiffs' characterization of voter turnout data, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the relevant turnout data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

10.     State Defendants admit that the 2020 elections and 2021 runoff elections took place in a global pandemic. This remaining allegations in Paragraph 10 contain Plaintiffs' characterization of voter turnout and epidemiological data, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant turnout data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

11.     State Defendants deny the allegations contained in Paragraph 11.

12.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 12 and deny them on that basis.

13.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 13 and deny them on that basis.

14.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 14 and deny them on that basis.

15.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 15 and deny them on that basis.

16.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 16 and deny them on that basis.

17.     State Defendants admit the allegations contained in Paragraph 17.

18.     Paragraph 18 contains Plaintiffs' legal conclusions and characterizations of election results, legal action, and uncited statements, not allegations of fact, to which no response is required.   By way of further response, Defendants respectfully refer the Court to the referenced election results, legal actions, and statements for a full and accurate statement of their outcomes and contents and deny any allegation inconsistent therewith.

19.     Paragraph 19 contains Plaintiffs' characterization of voting activity, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the voting activity for a full and accurate description of its results and deny any allegations inconsistent therewith.

20.     State Defendants deny the allegations contained in Paragraph 20.

21.     State Defendants deny the allegations contained in Paragraph 21.

22.     State Defendants deny the allegations contained in Paragraph 22 and further state that the provisions of SB 202 speak for themselves.

23.     State Defendants deny the allegations contained in the first two sentence of Paragraph 23.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

24.     State Defendants deny the allegations contained in the first two sentences of Paragraph 24.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

25.     State Defendants deny the allegations contained in Paragraph 25.

26.     Paragraph 26 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.  To the extent a response is deemed necessary, State Defendants deny the allegations contained in this paragraph.

27.   Paragraph 27 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.  To the extent a response is deemed necessary, State Defendants deny the allegations contained in this paragraph.

28.   Paragraph 28 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.  To the extent a response is deemed necessary, State Defendants deny the allegations contained in this paragraph.

29.     Paragraph 29 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required. State Defendants deny the remaining allegations in this paragraph.

30.     Paragraph 30 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

31.    Paragraph 31 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.  To the extent a response is deemed necessary, State Defendants deny the allegations contained in this paragraph.

## PARTIES

### Plaintiffs

32.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 32 and deny them on that basis.

33.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 33 and deny them on that basis.

34.    State Defendants deny the allegations contained in Paragraph 34.

35.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 35 and deny them on that basis.

36.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 36 and deny them on that basis.

37.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 37 and deny them on that basis.

38.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 38 and deny them on that basis.

39.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 39 and deny them on that basis.

40.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 40 and deny them on that basis.

41.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 41 and deny them on that basis.

42.     State Defendants deny the allegations regarding the effects of SB 202.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 42 and deny them on that basis.

43.     State Defendants deny the allegations regarding the effects of SB 202.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 43 and deny them on that basis.

44.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 44 and deny them on that basis.

45.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 45 and deny them on that basis.

46.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 46 and deny them on that basis.

47.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 47 and deny them on that basis.

48.     State Defendants deny the allegations regarding the effects of SB 202.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 48 and deny them on that basis.

49.     State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 49 and deny them on that basis.

50.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 50 and deny them on that basis.

51.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 51 and deny them on that basis.

52.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 52 and deny them on that basis.

53.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 53 and deny them on that basis.

54.     State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 54 and deny them on that basis.

55.     State Defendants deny the allegations regarding the effects of SB 202.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 55 and deny them on that basis.

56.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 56 and deny them on that basis.

57.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 57 and deny them on that basis.

58.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 58 and deny them on that basis.

59.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 59 and deny them on that basis.

60.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 60 and deny them on that basis.

61.     State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 61 and deny them on that basis.

62.     State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 62 and deny them on that basis.

63.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 63 and deny them on that basis.

64.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 64 and deny them on that basis.

65.     State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 65 and deny them on that basis.

66.     State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to

form a belief as to the truth of the remaining allegations contained in Paragraph 66 and deny them on that basis.

67.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 67 and deny them on that basis.

68.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 68 and deny them on that basis.

69.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 69 and deny them on that basis.

70.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 70 and deny them on that basis.

71.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 71 and deny them on that basis.

72.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 72 and deny them on that basis.

73.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 73 and deny them on that basis.

74.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 74 and deny them on that basis.

75.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 75 and deny them on that basis.

76.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 76 and deny them on that basis.

77.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to

form a belief as to the truth of the remaining allegations contained in Paragraph 77 and deny them on that basis.

78.   State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 78 and deny them on that basis.

79.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 79 and deny them on that basis.

80.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 80 and deny them on that basis.

81.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 81 and deny them on that basis.

82.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 82 and deny them on that basis.

83.   State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to

form a belief as to the truth of the remaining allegations contained in Paragraph 83 and deny them on that basis.

84.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 84 and deny them on that basis.

85.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 85 and deny them on that basis.

86.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 86 and deny them on that basis.

87.    State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 87 and deny them on that basis.

88.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 88 and deny them on that basis.

89. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 89 and deny them on that basis.

90. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 90 and deny them on that basis.

91. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 91 and deny them on that basis.

92. State Defendants deny the allegations regarding the effects of SB 202. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 92 and deny them on that basis.

### Defendants

93. State Defendants admit the allegations contained in Paragraph 93.

94. State Defendants admit that Brad Raffensperger is the Secretary of State, that his office issues non-binding guidance to county election officials, and that he is named in his official capacity. The remaining allegations are

legal conclusions to which no response is required, and State Defendants deny all remaining allegations in Paragraph 94.

95. State Defendants admit the allegations contained in Paragraph 95. By way of further response, State Defendants aver that local county election officials are responsible for implementing many election statutes and procedures.

96. State Defendants admit the allegations contained in Paragraph 96, except that the current members of the State Election Board are Sara Tindall Ghazal, Janice Johnston, Edward Lindsey, and Matthew Mashburn. Because this is an official-capacity suit, they are automatically substituted.

97. State Defendants admit that the Fulton County Board of Registration and Elections is responsible for the administration of elections in Fulton County. The remaining allegations in Paragraph 97 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

98. This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 98.

99.     This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 99 and deny them on that basis.  The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

100.    State Defendants admit that the DeKalb County Board of Registration and Elections is responsible for the administration of elections in DeKalb County.   The remaining allegations in Paragraph 100 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

101.    This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 101.  By way of further response, Defendants

102.    This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth

of the allegations contained in Paragraph 102 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

103. State Defendants admit that the Gwinnett County Board of Registration and Elections is responsible for the administration of elections in Gwinnett County. The remaining allegations in Paragraph 103 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

104. This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 104.

105. This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 105 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the

Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

106.   State Defendants admit that the Cobb County Board of Elections and Registration is responsible for the administration of elections in Cobb County.  The remaining allegations in Paragraph 106 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

107.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 107.

108.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 108 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

109.   State Defendants admit that the Hall County Board of Elections and Registration is responsible for the administration of elections in Hall

County.  The remaining allegations in Paragraph 109 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

110.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 110.

111.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 111 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

112.  State Defendants admit that the Clayton County Board of Elections and Registration is responsible for the administration of elections in Clayton County.   The remaining allegations in Paragraph 112 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and

accurate statement of their contents and deny any allegations inconsistent therewith.

113.  This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 113.

114.  This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 114 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

115.  State Defendants admit that the Richmond County Board of Elections is responsible for the administration of elections in Richmond County.  The remaining allegations in Paragraph 115 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

116.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 116.

117.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 117 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

118.   State Defendants admit that the Bibb County Board of Elections is responsible for the administration of elections in Bibb County.   The remaining allegations in Paragraph 118 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

119.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 119.

120.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 120 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

121.   State Defendants admit the allegations contained in Paragraph 121.

122.   State Defendants admit the allegations contained in Paragraph 122.

123.   State Defendants admit that the Chatham County Board of Elections is responsible for the administration of elections in Chatham County. The remaining allegations in Paragraph 123 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

124.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 124.

125.   State Defendants admit the allegations contained in Paragraph 125.

126.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 126.

127.   State Defendants admit that the Clarke County Board of Elections and Registration is responsible for the administration of elections in Clarke County.  The remaining allegations in Paragraph 127 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

128.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 128.

129.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 129 and deny them on that basis. The remaining allegations are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the

Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

130.   State Defendants admit that the Columbia County Board of Elections is responsible for the administration of elections in Columbia County. The remaining allegations in Paragraph 130 are legal conclusions to which no response is required. By way of further response, State Defendants respectfully refer the Court to the relevant statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

131.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 131.

132.   State Defendants admit the allegations contained in Paragraph 132.

133.   This answer is filed on behalf of the State Defendants, who lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 133.

## JURISDICTION AND VENUE

134.   State Defendants admit that this Court has federal-question jurisdiction for claims arising under the Voting Rights Act. State Defendants deny the remaining allegations in Paragraph 134.

135.   Paragraph 135 sets forth legal conclusions to which no response is required, and State Defendants therefore deny them. State Defendants deny the remaining allegations in this Paragraph.

136.   Paragraph 136 sets forth legal conclusions to which no response is required, and State Defendants therefore deny them. State Defendants deny the remaining allegations in this Paragraph.

137.   State Defendants admit the allegations in Paragraph 137.

138.   To the extent the Court has jurisdiction over this matter, State Defendants admit that venue is proper in this Court. State Defendants deny the remaining allegations in Paragraph 138.

## FACTUAL ALLEGATIONS

**A.   Georgia has a long history and ongoing record of racial discrimination in voting.**

139.   State Defendants deny the allegations contained in the first sentence of Paragraph 139.  The remaining portions of this paragraph contain Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

140.   Paragraph 140 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.   By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.   But State Defendants deny any implication that these events are relevant to the claims brought in this action.

141.   State Defendants admit the allegations contained in Paragraph 141 but deny any implication that these events are relevant to the claims brought in this action.

142.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegation that certain electoral results in the 1800s were "due primarily to the support of Black voters."  State Defendants admit the remaining allegations contained in Paragraph 142 but deny any implication that these events are relevant to the claims brought in this action.

143.   Paragraph 143 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.   By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.   But State Defendants

deny any implication that these events are relevant to the claims brought in this action.

144.   Paragraph 144 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.  By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.  But State Defendants deny any implication that these events are relevant to the claims brought in this action.

145.   Paragraph 145 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.  By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.  But State Defendants deny any implication that these events are relevant to the claims brought in this action.

146.   Paragraph 146 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.  By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.  But State Defendants deny any implication that these events are relevant to the claims brought in this action.

147.   Paragraph 147 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.  By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.  But State Defendants deny any implication that these events are relevant to the claims brought in this action.

148.   Paragraph 148 contains Plaintiffs' characterization of historical events, not allegations of fact, to which no response is required.  By way of further response, State Defendants admit that events have occurred in the State previously that have harmed racial minorities.  But State Defendants deny any implication that these events are relevant to the claims brought in this action.

149.   Paragraph 149 contains Plaintiffs' characterization of a legal action, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited legal action for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

150.   Paragraph 150 contains Plaintiffs' characterization of the cited report, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited

report for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

151. Paragraph 151 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

152. Paragraph 152 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. State Defendants further state that the cited objections include actions by counties unrelated to the actions of the State.

153. The first sentence of Paragraph 153 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. State Defendants deny the remaining allegations in this paragraph.

154. The first sentence of Paragraph 154 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. The remainder of this paragraph contains Plaintiffs' characterization of the cited statement, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited statement for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

155. State Defendants deny the allegations contained in the first sentence of Paragraph 155.  The remaining allegations of this paragraph contain Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited report for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

156.  The State Defendants deny the allegations contained in Paragraph 156.

157.  The first sentence of Paragraph 157 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in the remaining portions of this paragraph and deny them on that basis.

158.  State Defendants deny the allegations contained in the first sentence of Paragraph 158.  The second sentence contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.  The third sentence contains Plaintiffs' characterization of voter data, not allegations of fact, to which no response is required.  By way of further response, State

Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith. The State Defendants deny the allegations contained in the fourth sentence of this paragraph, and lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

159. The first sentence of Paragraph 159 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

160. State Defendants deny the allegations contained in Paragraph 160.

161. Paragraph 161 contains Plaintiffs' characterization of voter data and press reports, as well as legal conclusions, not allegations of fact, to which no response is required and deny them on that basis. By way of further response, State Defendants respectfully refer the Court to the cited material for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

162. State Defendants deny the allegations contained in the first sentence of Paragraph 162. The remainder of this paragraph contains Plaintiffs' characterization of voter data and the cited report, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited material for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

163. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 163 and deny them on that basis.

164. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 164 and deny them on that basis.

165. Paragraph 165 contains Plaintiffs' characterization of investigations and legal actions, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited legal actions for a full and accurate statement of their contents and deny any allegations inconsistent therewith. State Defendants deny the remaining allegations in this paragraph.

166. Paragraph 166 contains Plaintiffs' characterization of investigations and legal actions, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited legal actions for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

167. State Defendants admit the allegations contained in the first sentence of Paragraph 167, and deny the allegations contained in the final sentence of this paragraph. The remaining portions of this paragraph contain legal conclusions, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited statutes for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

168. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 168 and deny them on that basis. The remaining portions of this paragraph contain Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.

169. The first sentence of Paragraph 169 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is

39

denied on that basis.   The remaining portions of this paragraph contain Plaintiffs' characterization of an uncited statement, not allegations of fact, to which no response is required.   By way of further response, State Defendants respectfully refer the Court to the cited statement for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

170.   Paragraph 170 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

171.   Paragraph 171 contains Plaintiffs' characterization of legislative history, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited legislative history for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

172.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 172 and deny them on that basis.

173.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 173 and deny them on that basis.

174.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 174 and deny them on that basis.

175.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 175 and deny them on that basis.

176.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 176 and deny them on that basis.

177.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 177 and deny them on that basis.

178.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 178 and deny them on that basis.

179.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 179 and deny them on that basis.

180.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 180 and deny them on that basis.

181. State Defendants deny the allegations contained in the first sentence of Paragraph 181.  The remainder of this paragraph contains Plaintiffs' characterization of legal action, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited legal actions for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

## B.  Georgians with disabilities have also experienced historical and widespread discrimination

182.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 182 and deny them on that basis.

183.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 183 and deny them on that basis.

184.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 184 and deny them on that basis.

185.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 185 and deny them on that basis.

186.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 186 and deny them on that basis.  State Defendants further state that county election officials are responsible for the location and layout of voting precincts.

187.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 187 and deny them on that basis.

188.   State Defendants deny the allegations contained in the second sentence of Paragraph 188.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

189.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 189 and deny them on that basis.

190.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in the first and last sentences of Paragraph 190 and deny them on that basis.   The

43

remainder of this paragraph contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required.

191. State Defendants deny the allegations contained in Paragraph 191.

192. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 192 and deny them on that basis.

193. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 193 and deny them on that basis.

**C.     Georgia has an increasing number of voters of color.**

194. State Defendants deny that there are discriminatory provisions in Georgia law. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 194 and deny them on that basis.

195. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 195 and deny them on that basis. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

196.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 196. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

197.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 197. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

198.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 198. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

199.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 199. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

200.   Paragraph 200 contains Plaintiffs' characterization of survey data, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

201.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 201 and deny them on that basis.

202.   Paragraph 202 contains Plaintiffs' characterization of survey data, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

203.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 203.

204.   Paragraph 204 contains Plaintiffs' characterization of survey data, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited data for a

full and accurate statement of their contents and deny any allegations inconsistent therewith.

205.  State Defendants admit the allegations included in the final sentence of Paragraph 205.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in this paragraph and deny them on that basis.

206.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 206 and deny them on that basis.

**D. Black voter participation reached historic levels in the 2020 primary election, General Election, and the Runoff Elections.**

207.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 207 and deny them on that basis.

208.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 208 and deny them on that basis.

209.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 209 and deny them on that basis.

210.   State Defendants admit that turnout was record-setting for the 2020 election cycle.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 210 and deny them on that basis. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

211.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 211. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

212.   State Defendants admit that more than 1.3 million absentee ballots were cast in the 2020 General Election. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 212. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

213.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 213 and deny them on that basis.

214.   State Defendants admit that drop boxes were used in the 2020 election cycle in some counties under an emergency rule that has since expired. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 214. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

215.   State Defendants admit the first three sentences of Paragraph 215. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph.

216.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 216 and deny them on that basis.

217.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 217 and deny them on that basis.

218.   State Defendants admit that President Biden won Georgia's electoral votes and that Senators Warnock and Ossoff were elected in runoff elections.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 218.

**E.   The Georgia General Assembly passed S.B. 202 immediately following historic Black voter participation in the General Election and Runoff Elections, in a flawed and nontransparent process.**

219.   State Defendants admit that the General Assembly passed SB 202 on March 25, 2021. State Defendants deny the remaining allegations contained in Paragraph 219.

**1.   *S.B. 202 was passed in a hostile, racially charged environment following the General Election and Runoff Elections***

220.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 220 and deny them on that basis.

221.   State Defendants admit that lawsuits were filed after the 2020 election and were unsuccessful in changing any election outcome. State Defendants lack sufficient knowledge or information with which to form a

belief as to the truth of the remaining allegations contained in Paragraph 221 and deny them on that basis.

222.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 223 and deny them on that basis.

223.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 223 and deny them on that basis.

224.   State Defendants admit that post-election litigation filed in 2020 was unsuccessful in changing election outcomes. The remaining allegations in Paragraph 224 contain Plaintiffs' characterization of the referenced legal actions, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

225.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 225.  By way of further response, State Defendants respectfully refer the Court to the cited report for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

226.   State Defendants admit that Senators Ossoff and Warnock were elected in runoff elections and admit that Speaker Ralston formed a Special Committee on Election Integrity chaired by Rep. Barry Fleming, and that Rep. Alan Powell was its vice chair. This remaining allegations in Paragraph 226 contain Plaintiffs' characterization of SB 202, its timing, and its legislative history, not allegations of fact, to which no response is required.

227.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 227. The remaining allegations in this paragraph contain Plaintiffs' legal conclusions and characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required.

228. Paragraph 228 contains Plaintiffs' characterization of the cited statements.  By way of further response, State Defendants respectfully refer the Court to the cited statements for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

### 2.   *The Georgia General Assembly passed S.B. 202 with little process or regard for the ideals of an open democracy*

229.   Paragraph 229 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants

respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

230.   Paragraph 230 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

231.   Paragraph 231 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

232.   Paragraph 232 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a

full and accurate statement of its contents and deny any allegations inconsistent therewith.

233.   Paragraph 233 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

234.   Paragraph 234 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

235.   Paragraph 235 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

236.   Paragraph 236 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

237.   Paragraph 237 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

238.   Paragraph 238 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

239.   Paragraph 239 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required

and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

240.   Paragraph 240 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

241.   Paragraph 241 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant committee rules and notices for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

242.   Paragraph 242 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants

respectfully refer the Court to the relevant statement for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

243.   Paragraph 243 contains Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant floor debate and rules for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

244.   State Defendants admit that Governor Kemp signed SB 202 on March 25, 2021. The remaining allegations in Paragraph 244 contain Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the relevant journals and records for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

245.   State Defendants admit that Rep. Cannon was removed from the Capitol on March 25, 2021. The remaining allegations in Paragraph 245 contain Plaintiffs' characterization of SB 202 and its legislative history, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to

57

the relevant state records for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

**F.    The challenged provisions of S.B. 202 place limitations on opportunities for voters to exercise their right to vote.**

### 1.    *Sections 20 & 26, mobile voting unit restrictions*

246. Paragraph 246 contains legal conclusions to which no response is required and is denied on that basis.

247. State Defendants admit that, during the 2020 elections, mobile voting units were employed by one county, Fulton County, for the first time. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 247 and deny them on that basis.

248. Paragraph 248 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

## 2. *Section 25, new identification requirements, timing parameters, and wet signature requirements for requesting an absentee ballot*

249. Paragraph 249 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

250. Paragraph 250 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

251. Paragraph 251 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

252. Paragraph 252 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

253. Paragraph 253 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

254. Paragraph 254 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

### 3. *Sections 27 & 28, new identification requirements for casting an absentee ballot*

255. Paragraph 255 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

256. Paragraph 256 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

257. Paragraph 257 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

258. Paragraph 258 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

259. Paragraph 259 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

### 4.   *Section 26, secure drop box limitations*

260.  State Defendants admit that during the COVID-19 pandemic, some voters were able to use outdoor drop boxes to return their ballots under emergency rules that have since expired.  By way of further response, State Defendants aver that SB 202 statutorily provided for drop boxes for the first time. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 260 and they are denied on that basis.

261.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 261 and they are denied on that basis.

262.   State Defendants admit the allegations in Paragraph 262. By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

263.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 263 and they are denied on that basis.

264. Paragraph 264 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

265.   Paragraph 265 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and

accurate statement of their contents and deny any allegations inconsistent therewith.

266.   Paragraph 266 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

267.   Paragraph 267 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

### 5.   *Section 28, runoff early voting restriction*

268.   Paragraph 268 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and

accurate statement of their contents and deny any allegations inconsistent therewith.

**6.     *Section 33, Line Relief Ban***

269.   Paragraph 269 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

270.   Paragraph 270 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and they are denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

**7.     *Sections 34 & 35, out-of-precinct provisional ballot***

271.   Paragraph 271 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

272.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 272 and they are denied on that basis.

273.   Paragraph 273 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and they are denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

> **8.   *Section 47, felony punishment for acceptance of an absentee ballot for delivery or return if not a family member or caregiver***

274.   Paragraph 274 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

**G.   S.B. 202 severely burdens all voters, and discriminates against Black voters, other voters of color, disabled voters, and other historically disenfranchised communities, in particular.**

275.   State Defendants deny the allegations contained in Paragraph 275.

276.  State Defendants deny the allegations contained in Paragraph 276.

### 1.   *Elimination of mobile voting units*

277.  State Defendants deny the allegations contained in the first sentence of Paragraph 277.  With respect to the quotation in the fourth sentence of this paragraph, State Defendants respectfully refer the Court to the cited material for a full and accurate statement of its contents and deny any allegations inconsistent therewith.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in the second through the ninth sentences.  State Defendants deny the tenth and eleventh sentences in this paragraph and deny the remaining allegations in this paragraph.

### 2.   *Additional requirements for absentee voting*

278.  State Defendants deny the allegations contained in the first sentence of Paragraph 278.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

279.  State Defendants deny the allegations contained in Paragraph 279.

280.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 280 and deny them on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited survey for a full and accurate statement of its contents and deny any allegations inconsistent therewith.

281.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 281 and deny them on that basis.

282.   State Defendants deny the allegations contained in the first and second sentences of Paragraph 282.   The final sentence contains Plaintiffs' characterization of the cited study, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited study for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

283. Paragraph 283 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

284.   State Defendants admit that the General Election and Runoff Elections featured record-setting turnout and an increased use in absentee

ballots. The remaining allegations in Paragraph 284 contain Plaintiffs' characterization of voter data, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

285. Paragraph 285 contains Plaintiffs' characterization of the cited report, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith. The State Defendants deny the remaining allegations in this paragraph.

### 3.   *Restrictions on distribution of absentee ballots*

286. Paragraph 286 contains Plaintiffs' characterization of voter data, not allegations of fact, to which no response is required. By way of further response, State Defendants respectfully refer the Court to the cited data for a full and accurate statement of their contents and deny any allegations inconsistent therewith. State Defendants deny the remaining allegations in this paragraph.

287.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 287 and deny them on that basis.

### 4.   *Restrictions on drop boxes*

288.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 288 and deny them on that basis.

289.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 289 and deny them on that basis.

290.   State Defendants deny the allegations contained in Paragraph 290.

### 5.   *Prohibiting provisional ballots cast in the wrong precinct*

291.   Paragraph 291 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.   By way of further response, State Defendants respectfully refer the Court to the text of SB 202 for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

292.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 292 and deny them on that basis.

293.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 293 and deny them on that basis.

### 6.   *The early voting runoff restrictions*

294. The first sentence of Paragraph 294 contains Plaintiffs' characterization of SB 202, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the text of SB 202 for a full and accurate statement of their contents and deny any allegations inconsistent therewith.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

295.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 295 and deny them on that basis.

### 7. *The Line Relief Ban*

296.    Paragraph 296 contains Plaintiffs' characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the text of SB 202 for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

297.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 297 and deny them on that basis.

298.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 298 and deny them on that basis.

### 8. *Criminalizing the acceptance of an absentee ballot for delivery or return*

299.    Paragraph 299 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

300.    State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 300 and deny them on that basis.

301.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 301 and deny them on that basis.

## 9.  *The cumulative effects of the challenged provisions*

302.  State Defendants admit the that Plaintiffs accurately quote SB 202 in the first sentence of Paragraph 302.  The second sentence contains Plaintiffs' characterization of the cited report, not allegations of fact, to which no response is required.  By way of further response, State Defendants respectfully refer the Court to the cited report for a full and accurate statement of their contents and deny any allegations inconsistent therewith.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

303.  State Defendants deny the allegations contained in the first sentence of Paragraph 303.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in this paragraph and deny them on that basis.

304.  State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph

304 and deny them on that basis. By way of further response, State Defendants respectfully refer the Court to the cited report for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

305.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 305 and deny them on that basis.

306.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 306 and deny them on that basis.

307.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 307 and deny them on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited article for a full and accurate statement of its contents and deny any allegation inconsistent therewith.

308.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 308 and deny them on that basis.   By way of further response, State Defendants respectfully refer the Court to the cited Tweet for a full and

accurate statement of its contents and deny any allegation inconsistent therewith.

309.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 309 and deny them on that basis.

310.   State Defendants deny that they "allow these lines to occur year after year." State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the remaining allegations contained in Paragraph 310 and deny them on that basis.

311.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 311 and deny them on that basis.

312.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 312 and deny them on that basis.

313.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 313 and deny them on that basis.

314.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 314 and deny them on that basis.

315.   Paragraph 315 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

316.   Paragraph 316 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited Official Election Bulletin and statute for a full and accurate statement of their contents and deny any allegation inconsistent therewith.

317.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 317 and deny them on that basis.

318.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 318 and deny them on that basis.

319.   State Defendants deny the allegations contained in Paragraph 319.

10. ***S.B. 202's provisions deny qualified individuals with disabilities an equal opportunity to participate in and benefit from voting***

320. State Defendants deny the allegations contained in Paragraph 320.

321. State Defendants deny the allegations contained in Paragraph 321.

322. State Defendants deny the allegations contained in Paragraph 322.

323. State Defendants deny the allegations contained in Paragraph 323.

11. ***The disparate burdens and barriers imposed by individual provisions of S.B. 202 and the combined effect of the provisions will exponentially harm voters with multiple and/or intersecting race and disability identities***

324. State Defendants deny the allegations contained in Paragraph 324.

325. State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 325 and deny them on that basis.

326.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 326 and deny them on that basis.

327.   Paragraph 327 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

328.   Paragraph 328 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

### FIRST CLAIM FOR RELIEF
**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301, *et seq.***
**(Intentional Racial Discrimination & Discriminatory Results)**

329.   State Defendants incorporate their responses to the foregoing paragraphs as if set forth fully herein.

78

330.   Paragraph 330 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

331.   Paragraph 331 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

332.   State Defendants deny the allegations contained in Paragraph 332.

333.   State Defendants deny the allegations contained in Paragraph 333.

## SECOND CLAIM FOR RELIEF
### Fourteenth and Fifteenth Amendments
### U.S. Const. amend., XIV, XV; 42 U.S.C. §1983
### (Intentional Race Discrimination)

334.   State Defendants incorporate their responses to the foregoing paragraphs as if set forth fully herein.

335.   Paragraph 335 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

336.   State Defendants deny the allegations contained in Paragraph 336.

337.   State Defendants deny the allegations contained in this paragraph.

### THIRD CLAIM FOR RELIEF
**First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. §1983**
**(Undue Burden on the Right to Vote)**

338.   State Defendants incorporate their responses to the foregoing paragraphs as if set forth fully herein.

339.   Paragraph 339 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

340.   State Defendants deny the allegations contained in Paragraph 340.

341.   State Defendants deny the allegations contained in Paragraph 341.

### FOURTH CLAIM FOR RELIEF
**Freedom of Speech / Expression**
**U.S. Const. amend. I; 42 U.S.C. §1983**

342.   State Defendants incorporate their responses to the foregoing paragraphs as if set forth fully herein.

343.   Paragraph 343 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

344.   State Defendants lack sufficient knowledge or information with which to form a belief as to the truth of the allegations contained in Paragraph 344 and deny them on that basis.

345.   State Defendants deny the allegations contained in Paragraph 345.

346.   State Defendants deny the allegations contained in Paragraph 346.

347. Paragraph 347 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

348.   State Defendants deny the allegations contained in Paragraph 348.

## FIFTH CLAIM FOR RELIEF
### Title II of the Americans with Disabilities Act
### 42 U.S.C. §§ 12131, et seq.
### (Discrimination on the Basis of Disability by State and Local Government Entities)

349.   State Defendants incorporate their responses to the foregoing paragraphs as if set forth fully herein.

350.   State Defendants deny the allegations contained in the last sentence of Paragraph 350. The remaining allegations in this paragraph contain Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and are denied on that basis.

351.   State Defendants deny the allegations contained in Paragraph 351.

352. Paragraph 352 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

353. Paragraph 353 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

354. Paragraph 354 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

355. Paragraph 355 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

356. Paragraph 356 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

357. State Defendants deny the allegations contained in Paragraph 357.

358. State Defendants deny the allegations contained in Paragraph 358.

359. State Defendants deny the allegations contained in Paragraph 359.

360. State Defendants deny the allegations contained in Paragraph 360.

## SIXTH CLAIM FOR RELIEF
### Section 504 of the Rehabilitation Act
### 29 U.S.C. § 794
### (Discrimination on the Basis of Disability by Recipients of Federal Financial Assistance)

361.   State Defendants incorporate by reference their responses to the foregoing paragraphs as if set forth fully herein.

362. Paragraph 362 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

363. Paragraph 363 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

364. Paragraph 364 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

365. Paragraph 365 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

366. Paragraph 366 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

367. Paragraph 367 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

368. Paragraph 368 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

369. Paragraph 369 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

370. State Defendants deny the allegations contained in Paragraph 370.

371. State Defendants deny the allegations contained in Paragraph 371.

## SEVENTH CLAIM FOR RELIEF
**Violation of the Civil Rights Act of 1964**
**52 U.S.C. §10101, 42 U.S.C. § 1983**

372. Paragraph 372 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

373. Paragraph 373 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

374. Paragraph 374 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis.  By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and

accurate statement of their contents and deny any allegations inconsistent therewith.

375. Paragraph 375 contains Plaintiffs' legal conclusions and characterization of SB 202, not allegations of fact, to which no response is required and is denied on that basis. By way of further response, State Defendants respectfully refer the Court to the cited authority for a full and accurate statement of their contents and deny any allegations inconsistent therewith.

376. Paragraph 376 contains Plaintiffs' legal conclusions, not allegations of fact, to which no response is required and is denied on that basis.

## **PRAYER FOR RELIEF**

The remaining portions of Plaintiffs' Amended Compliant contain its request for relief, to which no response is required. To the extent a response is deemed necessary, State Defendants deny that Plaintiffs are entitled to any relief whatsoever.

Respectfully submitted this 21st day of January, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Riddhi Dasgupta*
Joshua J. Prince*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com

86

Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

_/s/ Gene C. Schaerr_
Gene C. Schaerr

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I served this appendix by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Stephen J. Petrany*
Stephen J. Petrany