No. 23-13095; No. 23-13085

# In the
# United States Court of Appeals
## for the Eleventh Circuit

In re: Georgia Senate Bill 202

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-mi-55555 — J.P. Boulee, *Judge*

## BRIEF OF DEFENDANT-APPELLANTS GOVERNOR OF GEORGIA, GEORGIA SECRETARY OF STATE, GREGORY W. EDWARDS, GEORGIA STATE ELECTION BOARD & ELECTION BOARD MEMBERS

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Ross W. Bergethon
  *Principal Deputy
  Solicitor General*
James E. Barrett
  *Deputy Solicitor General*
Office of the Georgia
  Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Appellants*

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Abbott, Robert, *Defendant*;

Abudu, Honorable Nancy, *Former Attorney for Plaintiff-Appellees*;

ACLU Foundation of Georgia, *Counsel for Plaintiff-Appellees*;

ACLU Foundation of Georgia, Inc., *Counsel for Plaintiff-Appellees*;

Adegbile, Debo P., *Counsel for Plaintiff-Appellees*;

Aden, Leah, *Counsel for Plaintiff-Appellees*;

Advancement Project, *Counsel for Plaintiff-Appellees*;

Ameri, Mana, *Counsel for Plaintiff-Appellees*;

American Civil Liberties Union Foundation of Georgia, *Counsel for Plaintiff-Appellees*;

American Civil Liberties Union Foundation, Inc., *Counsel for Plaintiffs- Appellees*;

Andrews, Wanda, *Defendant*;

Aquino, Nora, *Plaintiff-Appellee*;

Asian Americans Advancing Justice-Asian Law Caucus, *Counsel for Plaintiff-Appellees*;

Asian Americans Advancing Justice-Atlanta, *Plaintiff-Appellee*;

Augusta Georgia Law Department, *Counsel for Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Ausburn, Deborah, *Counsel for State Defendant-Appellants*;

Awuku, George, *Defendant*;

Banks, Marques, *Counsel for Plaintiff-Appellees*;

Banter, James, *Counsel for Defendant*;

Bao, Judy, *Counsel for Plaintiff*

Barkdull, Annika Boone, *Counsel for State Defendant-Appellants*;

Barnes, Sherry, *Defendant*;

Baron, Noah, *Counsel for Plaintiffs*

Barrett, James E., *Counsel for State Defendant-Appellants;*

Barron, Richard, *Defendant*;

Bartolomucci, H. Christopher, *Counsel for State Defendant-Appellants*;

Beausoleil, William, *Counsel for Plaintiff-Appellees*;

Beck Owen & Murray, *Counsel for Defendant*;

Betakes, Steven, *Counsel for Intervenor-Defendants*;

Belichick, Joseph, *Counsel for Plaintiff-Appellees*;

Bell, Jordan, *Counsel for Defendant*;

Bennette, Matlacha, *Counsel for Plaintiff-Appellees*;

Bergethon, Ross W., *Counsel for State Defendant-Appellants*

Black Voters Matter Fund, *Plaintiff-Appellee*;

Blender, Matthew, *Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Bloodworth, Kristin, *Counsel for Defendant*;

Boulee, Honorable J. P., *United States District Court Judge*;

Bowman, Brad, *Counsel for Defendant*;

Boyle, Donald, *Counsel for State Defendant-Appellants*;

Broder, Karl, *Counsel for Defendant*;

Brooks, Jessica, *Defendant*;

Brooks, Sofia, *Counsel for Plaintiff-Appellees*;

Brown, Marcia, *Defendant*;

Bruning, Stephen, *Defendant*;

Bruning, Steven, *Defendant*;

Bryan, Bennett, *Counsel for Defendant*;

Burwell, Kaye, *Counsel for Defendant*;

Campbell-Harris, Dayton, *Counsel for Plaintiff-Appellees*;

Carr, Christopher M., Attorney General of the State of Georgia, *Counsel for State Defendant-Appellants*;

Carver, William, *Counsel for Intervenor-Defendants*;

Cathey, Thomas, *Counsel for Defendant*;

Chalmers, Adams, Backer & Kaufman, LLC, *Counsel for Defendant*;

Chatham County Attorney, *Counsel for Defendant*;

Chatham County Board of Elections, *Defendant*;

Chatham County Board of Registrars, *Defendant*;

Clarke County Board of Elections and Voter Registration, *Defendant*;

Clayton County Board of Elections and Registration, *Defendant*;

Cobb County Board of Elections and Registration, *Defendant*;

Cochran, Ken, *Defendant*;

Columbia County Board of Elections, *Defendant*;

Columbia County Board of Registrars, *Defendant*;

Common Cause, *Plaintiff-Appellee*;

Consovoy McCarthy PLLC, *Counsel for Intervenor-Defendants*;

Cramer, Raisa, *Counsel for Plaintiff-Appellees*;

Crawford, Teresa, *Defendant*;

Crowell & Moring, LLP, *Counsel for Plaintiff-Appellees*;

Cushman, Ann, *Defendant*;

Cusick, John, *Counsel for Plaintiff-Appellees*;

Dasgupta, Riddhi, *Counsel for Defendant-Appellants*;

Dave, Charles, *Defendant*;

Davenport, Jennifer, *Counsel for Defendant*;

Davis Wright Tremaine LLP, *Counsel for Plaintiff-Appellees*;

Davis, Britton, *Counsel for Plaintiff-Appellees*;

Day, Stephen, *Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

DeKalb County Board of Registrations and Elections, *Defendant*;

DeKalb County Law Department, *Counsel for Defendant*;

Delta Sigma Theta Sorority, Inc., *Plaintiff-Appellee*;

Denmark, Emilie, *Counsel for Defendant*;

Dentons US LLP, *Counsel for Intervenor-Defendants*;

Deshazior, Zurich, *Defendant*;

DeThomas, Courtney, *Counsel for Plaintiff-Appellees*;

Dianis, Judith, *Counsel for Plaintiff-Appellees*;

Dickey, Gilbert, *Counsel for Intervenor-Defendants*;

Dicks, Terence, *Defendant*;

Dimmick, Brian, *Counsel for Plaintiff-Appellees*;

DiStefano, Don, *Defendant*;

Doss, Travis, *Defendant*;

Dozier, Shauna, *Defendant*;

Drennon, Baxter, *Counsel for Intervenor-Defendants*;

Duffey, William, Jr., *State Defendant-Appellant*;

Duffie, Wanda, *Defendant*;

Durbin, Jauan, *Plaintiff-Appellee*;

Durso, Katherine, *Defendant*;

Edwards, Gregory, District Attorney for Dougherty County, *State Defendant-Appellant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Elias Law Group LLP, *Counsel for Plaintiff-Appellees*;

Ellington, Thomas, *Defendant*;

Enjeti-Sydow, Anjali, *Plaintiff-Appellee*;

Evans-Daniel, Karen, *Defendant*;

Evans, James, *Counsel for Defendant*;

Evans, Rachel, *Counsel for Plaintiff-Appellees*;

Eveler, Janine, *Defendant*;

Falk, Donald M., *Counsel for State Defendant-Appellants*;

Fambrough, Willa, *Defendant*;

Faransso, Tania, *Counsel for Plaintiff-Appellees*;

Farrell, Gregory, *Counsel for Plaintiff-Appellees*;

Feldsherov, Ilya, *Counsel for Plaintiff-Appellees*;

Fenwick & West, LLP, *Counsel for Plaintiff-Appellees*;

Field, Brian J., *Counsel for State Defendant-Appellants*;

First Congregational Church, United Church of Christ
     Incorporated, *Plaintiff-Appellee*;

Fogelson, Matthew, *Counsel for Plaintiff-Appellees*;

Forsyth County Board of Voter Registrations and Elections,
     *Defendant*;

Fortier, Lucas, *Counsel for Plaintiff-Appellees*;

Foster, Mikayla, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Freeman Mathis & Gary, LLP, *Counsel for Defendant*;

Fulton County Attorney's Office, *Counsel for Defendant*;

Fulton County Registration and Elections Board, *Defendant*;

Galeo Latino Community Development Fund, Inc., *Plaintiff-Appellee*;

Gammage, Keith, *Defendant*;

Garabadu, Rahul, *Counsel for Plaintiff-Appellees*;

Gartland, Pat, *Defendant*;

Gay, Nancy, *Defendant*;

Geiger, Debra, *Defendant*;

Georgia Adapt, *Plaintiff-Appellee*;

Georgia Advocacy Office, *Plaintiff-Appellee*;

Georgia Coalition for the People's Agenda, Inc., *Plaintiff-Appellee*;

Georgia Department of Law, *Counsel for State Defendant-Appellants*;

Georgia Latino Alliance for Human Rights, Inc., *Plaintiff-Appellee*;

Georgia Muslim Voter Project, *Plaintiff-Appellee*;

Georgia Republican Party, Inc., *Intervenor-Defendant*;

Georgia State Conference of the NAACP, *Plaintiff-Appellee*;

Georgia State Election Board, *Defendant*;

Ghazal, Sara, *State Defendant-Appellant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Gibbs, Fannie, *Plaintiff-Appellee*;

Gillon, Thomas, *Defendant*;

Givens, Diane, *Defendant*;

Gossett, David, *Counsel for Plaintiff-Appellees*;

Green, Tyler, *Counsel for Intervenor-Defendants*;

Greenbaum, Jon, *Counsel for Plaintiff-Appellees*;

Greenberg Traurig, LLP, *Counsel for Defendant*;

Groves, Angela, *Counsel for Plaintiff-Appellees*;

Gwinnett County Board of Registrations and Elections, *Defendant*;

Gwinnett County Department of Law, *Counsel for Defendant*;

Hall Booth Smith, P.C., *Counsel for Intervenor-Defendants*;

Hall County Board of Elections and Registration, *Defendant*;

Hall County Government, *Counsel for Defendant*;

Hall, Dorothy, *Defendant*;

Hall, John, *Counsel for Intervenor-Defendants*;

Hamilton, Brittni, *Counsel for Plaintiff-Appellees*;

Hancock, Jack, *Counsel for Defendant*;

Hart, Ralph, *Counsel for Defendant*;

Hart, Twyla, *Defendant*;

Hasselberg, Emily, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Hayes, Vilia, *Counsel for Plaintiff-Appellees*;

Haynie, Litchfield & White, PC, *Counsel for Defendant*;

Hazard, Joel, *Defendant*;

Heard, Bradley, *Counsel for Plaintiff-Appellees*;

Heckmann, Elizabeth A., *Counsel for Plaintiffs*

Heimes, Marianne, *Defendant*;

Henseler, James, *Counsel for Plaintiff-Appellees*;

Herren, Thomas, *Counsel for Plaintiff-Appellees*;

Hiatt, Alexandra, *Counsel for Plaintiff-Appellees*;

Ho, Dale, *Counsel for Plaintiff-Appellees*;

Hodge, Malinda, *Defendant*;

Houk, Julie, *Counsel for Plaintiff-Appellees*;

Hoyos, Luis, *Counsel for Plaintiff-Appellees*;

Hughes Hubbard & Reed, LLP, *Counsel for Plaintiff-Appellees*;

Hughes, Aileen, *Counsel for Plaintiff-Appellees*;

Hull Barrett, PC, *Counsel for Defendant*;

Ingram, Randy, *Defendant*;

Jacoutot, Bryan, *Counsel for State Defendant-Appellants*;

Jaffe, Erik S., *Counsel for State Defendant-Appellants*;

Jahangiri, Mahroh, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Jaikumar, Arjun, *Counsel for Plaintiff-Appellees*;

James Bates Brannan Groover LLP, *Counsel for Defendant*;

Jarrard & Davis, LLP, *Counsel for Defendant*;

Jasrasaria, Jyoti, *Counsel for Plaintiff-Appellees*;

Jaugstetter, Patrick, *Counsel for Defendant*;

Jedreski, Matthew, *Counsel for Plaintiff-Appellees*;

Jester, Alfred, *Defendant*;

Jester, Nancy, *Defendant*;

Jhaveri, Sejal, *Counsel for Plaintiff-Appellees*;

Johnson, Aaron, *Defendant*;

Johnson, Ben, *Defendant*;

Johnson, Darlene, *Defendant*;

Johnson, Melinda, *Counsel for Plaintiff-Appellees*;

Johnston, Janice W., *State Defendant-Appellant*;

Joiner, Amelia, *Counsel for Defendant*;

Kanu, Nkechi, *Counsel for Plaintiff-Appellees*;

Kaplan, Mike, *Defendant*;

Kastorf Law, LLC, *Counsel for Plaintiff-Appellees*;

Kastorf, Kurt, *Counsel for Plaintiff-Appellees*;

Kaufman, Alex, *Counsel for Intervenor-Defendants*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Keker Van Nest & Peters LLP, *Counsel for Plaintiff-Appellees*;

Kemp, Brian, Governor of the State of Georgia, *State Defendant-Appellant;*

Kennedy, David, *Defendant*;

Kennedy, Kate, *Counsel for Plaintiff-Appellees*;

Keogh, William, *Counsel for Defendant*;

Khan, Sabrina, *Counsel for Plaintiff-Appellees*;

Kim, Danielle, *Counsel for Plaintiff-Appellees*;

Kingsolver, Justin, *Counsel for Plaintiff-Appellees*;

Klein, Spencer, *Counsel for Plaintiff-Appellees*;

Knapp, Halsey, *Counsel for Plaintiff-Appellees*;

Koorji, Alaizah, *Counsel for Plaintiff-Appellees*;

Krevolin & Horst, LLC, *Counsel for Plaintiff-Appellees*;

Kucharz, Kevin, *Counsel for Defendant*;

Lakin, Sophia, *Counsel for Plaintiff-Appellees*;

Lam, Leo, *Counsel for Plaintiff-Appellees*;

Lang, Antan, *Defendant*;

LaRoss, Diane, *Counsel for State Defendant-Appellants*;

Latino Community Fund of Georgia, *Plaintiff-Appellee*;

Lauridsen, Adam, *Counsel for Plaintiff-Appellees*;

Lawhon, Justin R., *Counsel for Defendant*

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Law Office of Bryan L. Sells, LLC, *Counsel for Plaintiff-Appellees*;

Law Office of Gerald R Weber, LLC, *Counsel for Plaintiffs-Appellees*;

Law Office of Heather Szilagyi, *Counsel for Plaintiff-Appellees*;

Lawyers' Committee for Civil Rights Under Law, *Counsel for Plaintiffs-Appellees*;

Le, Anh, *Former Defendant*;

League of Women Voters of Georgia, Inc., *Plaintiff-Appellee*;

Leung, Kimberly, *Counsel for Plaintiff-Appellees*;

Lewis, Anthony, *Defendant*;

Lewis, Joyce, *Counsel for Plaintiff-Appellees*;

Lin, Stephanie, *Counsel for Plaintiff-Appellees*;

Lindsey, Edward, *State Defendant-Appellant*;

Lower Muskogee Creek Tribe, *Plaintiff-Appellee*;

Lowman, David, *Counsel for Defendant*;

Ludwig, Jordan, *Counsel for Plaintiff-Appellees*;

Luth, Barbara, *Defendant*;

Ma, Eileen, *Counsel for Plaintiff-Appellees*;

Mack, Rachel, *Counsel for Defendant*;

Macon-Bibb County Board of Elections, *Defendant*;

Mahoney, Thomas, *Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Manifold, Zach, *Defendant*;

Martin, Grace Simms, *Counsel for Defendants*;

Mashburn, Matthew, *State Defendant-Appellant*;

May, Caitlin, *Counsel for Plaintiff-Appellees*;

Maynard, Darius*, Former Defendant*;

McAdams, Issac, *Defendant*;

McCandless, Spencer, *Counsel for Plaintiff-Appellees*;

McCarthy, Thomas, *Counsel for Intervenor-Defendants*;

McClain, Roy, *Defendant*;

McCord, Catherine, *Counsel for Plaintiff-Appellees*;

McFalls, Tim, *Defendant*;

McFarland, Ernest, *Counsel for Plaintiff-Appellees*;

McGowan, Charlene, *Counsel for State Defendant-Appellants*;

Mcrae, Colin, *Defendant*;

Melcher, Molly, *Counsel for Plaintiff-Appellees*;

Metropolitan Atlanta Baptist Ministers Union, Inc., *Plaintiff-Appellee*;

Miller, Nicholas, *Counsel for State Defendant-Appellants*;

Milord, Sandy, *Counsel for Defendant*;

Minnis, Terry, *Counsel for Plaintiff-Appellees*;

Mizner, Susan, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Mocine-McQueen, Marcos, *Counsel for Plaintiff-Appellees*;

Momo, Shelley, *Counsel for Defendant*;

Morrison, Tina, *Counsel for Plaintiff-Appellees*;

Mosbacher, Jennifer, *Defendant*;

Motter, Susan, *Defendant*;

Murchie, Laura, *Counsel for Plaintiff-Appellees*;

Murray, Karen, *Defendant*;

NAACP Legal Defense and Education Fund, Inc., *Counsel for Plaintiff-Appellees*;

National Republican Congressional Committee, *Intervenor-Defendant*;

National Republican Senatorial Committee, *Intervenor-Defendant;*

Natt, Joel, *Defendant*;

Nemeth, Miriam, *Counsel for Plaintiff-Appellees*;

Nercessian, Armen, *Counsel for Plaintiff-Appellees*;

Newland, James, *Defendant*;

Nguyen, Candice, *Counsel for Plaintiff-Appellees*;

Nguyen, Phi, *Counsel for Plaintiff-Appellees*;

Nkwonta, Uzoma, *Counsel for Plaintiff-Appellees*;

Noa, Jack, *Defendant*;

Noland Law Firm, LLC, *Counsel for Defendants;*

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Noland, William H., *Counsel for Defendant*s;

Norris, Cameron, *Counsel for Intervenor-Defendants*;

Norse, William, *Defendant*;

Nwachukwu, Jennifer, *Counsel for Plaintiff-Appellees*;

O'Brien, James, *Defendant*;

O'Connor, Eileen, *Counsel for Plaintiff-Appellees*;

O'Lenick, Alice, *Defendant*;

Olm, Rylee, *Counsel for Plaintiff-Appellees*;

Oxford, Neil, *Counsel for Plaintiff-Appellees*;

Paik, Steven, *Plaintiff-Appellee*;

Pant, Shontee, *Counsel for Plaintiff-Appellees*;

Paradise, Loree, *Counsel for State Defendant-Appellants*;

Parker, Warrington, *Counsel for Plaintiff-Appellees*;

Pelletier, Susan, *Counsel for Plaintiff-Appellees*;

Petrany, Stephen J., *Counsel for State Defendant-Appellants*

Porter, Megan, *Counsel for Plaintiff-Appellees*;

Powell, Laura, *Counsel for Plaintiff-Appellees*;

Prince, Joshua, *Counsel for State Defendant-Appellants*;

Pulgram, Laurence, *Counsel for Plaintiff-Appellees*;

Pullar, Patricia, *Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Qadir, Hunaid, *Defendant*;

Radzikinas, Carla, *Defendant*;

Raffensperger, Brad, Secretary of State of Georgia, *State Defendant-Appellant*;

Raffle, Rocky, *Defendant*;

Ramahi, Zainab, *Counsel for Plaintiff-Appellees*;

Remlinger, Brian, *Counsel for Plaintiff*

Rich, James, *Counsel for Plaintiff-Appellees*;

Richardson, Jasmyn, *Counsel for Plaintiff-Appellees*;

Richmond County Board of Elections, *Defendant*;

Ringer, Cheryl, *Counsel for Defendant*;

Rise, Inc., *Plaintiff-Appellee*;

Rodriguez, Anthony, *Defendant*;

Rosborough, Davin, *Counsel for Plaintiff-Appellees*;

Rosenberg, Ezra, *Counsel for Plaintiff-Appellees*;

Rosenberg, Steven, *Counsel for Defendant*;

Russ, John, *Counsel for Plaintiff-Appellees*;

Ruth, Kathleen, *Defendant*;

Ryan, Elizabeth, *Counsel for Plaintiff-Appellees*;

Sabzevari, Arash, *Counsel for Defendant*;

Sachdeva, Niharika, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Schaerr, Gene C., *Counsel for State Defendant-Appellants*;

Schaerr Jaffe, LLP, *Counsel for State Defendant-Appellants*;

Scott, William, *Counsel for Defendant*;

Seals, Veronica, *Defendant*;

Segarra, Esperanza, *Counsel for Plaintiff-Appellees*;

Sells, Bryan, *Counsel for Plaintiff-Appellees*;

Shah, Niyati, *Counsel for Plaintiff-Appellees*;

Sheats, Gala, *Defendant*;

Shelly, Jacob, *Counsel for Plaintiff-Appellees*;

Shirley, Adam, *Defendant*;

Sieff, Adam, *Counsel for Plaintiff-Appellees*;

Silas, Tori, *Defendant*;

Sixth District of the African Methodist Episcopal Church,
      *Plaintiff-Appellee*;

Smith, Casey, *Counsel for Plaintiff-Appellees*;

Smith, Dele, *Defendant*;

Smith, Mandi, *Defendant*;

Solh, Chavira, *Counsel for Plaintiff-Appellees*;

Solomon, Elbert, *Plaintiff-Appellee*;

Sosebee, Charlotte, *Defendant*;

Southern Poverty Law Center, *Counsel for Plaintiff-Appellees*;

Sowell, Gregory, *Counsel for Defendant*;

Spangler, Herbert, *Former Defendant*;

Sparks, Adam, *Counsel for Plaintiff-Appellees*;

Squiers, Cristina, *Counsel for State Defendant-Appellants*;

State of Georgia, *State Defendant;*

Stewart Melvin & Frost, LLP, *Counsel for Defendant*;

Strawbridge, Patrick, *Counsel for Intervenor-Defendants*;

Sumner, Stuart, *Counsel for Intervenor-Defendants*;

Sullivan, Rebecca N., *Former Defendant*;

Sung, Connie, *Counsel for Plaintiff-Appellees*;

Swift, Karli, *Defendant*;

Szilagyi, Heather, *Counsel for Plaintiff-Appellees*;

Tatum, Tobias, *Counsel for State Defendant-Appellants*;

Taylor English Duma LLP, *Counsel for State Defendant-Appellants*;

Taylor, Wandy, *Defendant*;

Thatte, Anuja, *Counsel for Plaintiff-Appellees*;

The ACLU Foundation Disability Rights Program, *Counsel for Plaintiff-Appellees*;

The Arc of the United States, *Plaintiff-Appellee*;

The Concerned Black Clergy of Metropolitan Atlanta, Inc., *Plaintiff-Appellee*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

The Georgia State Election Board, *State Defendant-Appellant*;

The Justice Initiative, Inc., *Plaintiff-Appellee*;

The New Georgia Project, *Plaintiff-Appellee*;

The Republican National Committee, *Intervenor-Defendant*;

The Urban League of Greater Atlanta, Inc., *Plaintiff-Appellee*;

Thomas, Ethan, *Counsel for Plaintiff-Appellees*;

Thompson, Grace, *Counsel for Plaintiff-Appellees*;

Till, Ann, *Defendant*;

Topaz, Jonathan, *Counsel for Plaintiff-Appellees*;

Trent, Edward, *Counsel for State Defendant-Appellants*;

Tucker, William, *Counsel for Plaintiff-Appellees*;

Tyson, Bryan, *Counsel for State Defendant-Appellants*;

Uddullah, Angelina, *Plaintiff-Appellee*;

Unger, Jess, *Counsel for Plaintiff-Appellees*;

United States Department of Justice, *Counsel for Plaintiff-Appellees*;

United States of America, *Plaintiff-Appellee*;

Van Stephens, Michael, *Counsel for Defendant*;

Vander Els, Irene, *Counsel for Defendant*;

Varghese, George, *Counsel for Plaintiff-Appellees*;

Varner, Johnny, *Defendant*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Vasquez, Jorge, *Counsel for Plaintiff-Appellees*;

Vaughan, Elizabeth, *Counsel for State Defendant-Appellants*;

Waite, Tristen, *Counsel for Defendant*;

Wang, Emily, *Counsel for Plaintiff-Appellees*;

Ward-Packard, Samuel, *Counsel for Plaintiff-Appellees*;

Wardenski, Joseph, *Counsel for Plaintiff-Appellees*;

Watson, Jeanetta R., *Former Defendant*;

Webb, Brian K., *Counsel for State Defendant-Appellants*;

Weber, Gerald, *Counsel for Plaintiff-Appellees*;

Weigel, Daniel, *Counsel for State Defendant-Appellants*;

Wesley, Carol, *Defendant*;

White, Daniel, *Counsel for Defendant*;

White, William, *Counsel for Intervenor-Defendants*;

Wiggins, Larry, *Defendant*;

Wilberforce, Nana, *Counsel for Plaintiff-Appellees*;

Wilborn, Eric, *Counsel for Defendant*;

Willard, Russell D., *Counsel for State Defendant-Appellants*;

Williams, Gilda, *Counsel for Plaintiff-Appellees*;

Williams, Tuwanda, *Counsel for Defendant*;

Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Plaintiff-Appellees*;

In re: Georgia Senate Bill 202, No. 23-13095; No. 23-13085

Wilson, Jacob C., *Counsel for Defendants*;

Wilson, Melanie, *Counsel for Defendant*;

Wingate, Mark, *Defendant*;

Winichakul, Pichaya, *Counsel for Plaintiff-Appellees*;

Women Watch Afrika, *Plaintiff-Appellee*;

Woodfin, Conor, *Counsel for Intervenor-Defendants*;

Woolard, Cathy, *Defendant*;

Worley, David J., *Former Defendant*;

Wurtz, Lori, *Defendant*;

Yoon, Meredyth, *Counsel for Plaintiff-Appellees*;

Young, Sean, *Counsel for Plaintiff-Appellees*; and

Zatz, Clifford, *Counsel for Plaintiff-Appellees*.

<u>*/s/ Stephen J. Petrany*</u>
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

State Defendants request oral argument in this case. Whether the First Amendment shields conduct that undermines the State's interests in preventing voter intimidation and securing fair elections raises important questions best addressed through both briefing and oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ................................................ i

Table of Authorities ......................................................... iv

Statement Regarding Adoption of Briefs of Other Parties ............ ix

Jurisdiction ................................................................. x

Statement of the Issues ..................................................... 1

Introduction ................................................................. 2

Statement of the Case ....................................................... 5

    A. Background ........................................................... 5

    B. Proceedings Below ................................................. 12

        1. Initial Motions for Preliminary Injunction ................... 14

        2. Renewed Motions for Preliminary Injunction ............. 16

    C. Standard of Review ............................................... 17

Summary of Argument ...................................................... 17

Argument ................................................................... 22

    I. Plaintiffs are not likely to succeed on the merits of their First Amendment claim. .................................................... 23

        A. The handout law regulates conduct, not expression. ... 23

            1. Handing voters items like tacos or phone chargers is not speech or inherently expressive conduct. .......... 25

            2. Even if voter handouts could sometimes be inherently expressive conduct, Plaintiffs' facial challenge still fails. .................................................... 31

# TABLE OF CONTENTS
## (continued)

**Page**

B.  Assuming the law regulates expressive conduct, it
    remains constitutional. .................................................. 35

  1.  The polling line is a nonpublic forum, and the law is
      reasonable. ............................................................... 36

  2.  The law is constitutional under any standard of
      scrutiny, because it is narrowly tailored to advance
      compelling state interests. ...................................... 41

II.  The equities weigh against a preliminary injunction. ....... 51

Conclusion ........................................................................ 54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Spear*,
   356 F.3d 651 (6th Cir. 2004) ..................................................... 49

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) .................................................................. 29

*Bloedorn v. Grube*,
   631 F.3d 1218 (11th Cir. 2011) ...........................................19, 37

*Brnovich v. Democratic Nat'l Comm.*,
   594 U.S. 647 (2021) .................................................................. 46

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ..................................................................... 49

*Burns v. Town of Palm Beach*,
   999 F.3d 1317 (11th Cir. 2021) ................................................ 34

*\*Burson v. Freeman*,
   504 U.S. 191 (1992) ...... 5, 6, 14, 20, 21, 38–41, 44–47, 49, 51, 53

*Citizens for Police Accountability Pol. Comm. v.*
   *Browning*,
   572 F.3d 1213 (11th Cir. 2009) ....................................41, 47, 53

*City of Dallas v. Stanglin*,
   490 U.S. 19 (1989) ..............................................................24, 29

*Clark v. Cmty. for Creative Non-Violence*,
   468 U.S. 288 (1984) ....................................24, 27, 30, 42, 43, 46

*Common Cause/Ga. v. Billups*,
   554 F.3d 1340 (11th Cir. 2009) ................................................ 45

iv

*Curling v. Raffensperger*,
  50 F.4th 1114 (11th Cir. 2022) .................................................. 17

*FEC v. Colo. Republican Fed. Campaign Comm.*,
  533 U.S. 431 (2001) .................................................... 6

*First Vagabonds Church of God v. City of Orlando*,
  638 F.3d 756 (11th Cir. 2011) (en banc) .................................. 44

\*Fort Lauderdale Food Not Bombs v. City of Fort
  Lauderdale,
  11 F.4th 1266 (11th Cir. 2021)......................................42, 43, 46

\*Fort Lauderdale Food Not Bombs v. City of Fort
  Lauderdale,
  901 F.3d 1235 (11th Cir. 2018) ..........................24–27, 29, 30, 34

*Frank v. Lee*,
  84 F.4th 1119 (10th Cir. 2023)............................................47, 48

*Greer v. Spock*,
  424 U.S. 828 (1976) .................................................... 39

*Hawkins v. City & Cnty. of Denver*,
  170 F.3d 1281 (10th Cir. 1999) .................................................. 38

\*Holloman ex rel. Holloman v. Harland,
  370 F.3d 1252 (11th Cir. 2004) ....................................26, 30, 34

*Howlett v. Rose*,
  496 U.S. 356 (1990) .................................................... 13

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) .................................................... 40

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of
  State,*
  32 F.4th 1363 (11th Cir. 2022)................................15, 22, 34, 54

*Lichtenstein v. Hargett,*
 83 F.4th 575 (6th Cir. 2023)..........................................27, 42, 46

*Make the Road by Walking, Inc. v. Turner,*
 378 F.3d 133 (2d Cir. 2004)........................................................ 38

*McDonough v. Garcia,*
 90 F.4th 1080 (11th Cir. 2024)................................................. 36

*\*Minn. Voters All. v. Mansky,*
 585 U.S. 1 (2018) ........................................................19, 36–38

*New Ga. Project v. Raffensperger,*
 976 F.3d 1278 (11th Cir. 2020) ..........................................45, 53

*Ostrewich v. Tatum,*
 72 F.4th 94 (5th Cir. 2023)...................................................... 47

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
 460 U.S. 37 (1983) ...............................................................36, 40

*Pleasant Grove City v. Summum,*
 555 U.S. 460 (2009) ................................................................. 37

*Porter v. Martinez,*
 68 F.4th 429 (9th Cir. 2023)................................................43, 47

*Purcell v. Gonzalez,*
 549 U.S. 1 (2006) ................................................................15, 54

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ................................................................. 44

*Roulette v. City of Seattle,*
 97 F.3d 300 (9th Cir. 1996) ..................................................... 29

*\*Rumsfeld v. FAIR,*
 547 U.S. 47 (2006) ................................................18, 24, 25, 28

*Schirmer v. Edwards,*
 2 F.3d 117 (5th Cir. 1993) ...................................................... 48

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) (en banc) ............................22, 51

*Spence v. Washington,*
  418 U.S. 405 (1974) ..........................................................24, 27

*Swain v. Junior,*
  958 F.3d 1081 (11th Cir. 2020) ................................................ 53

*Texas v. Johnson,*
  491 U.S. 397 (1989) ..........................................................27, 34

*United States v. Ackell,*
  907 F.3d 67 (1st Cir. 2018).................................................... 35

*United States v. Kokinda,*
  497 U.S. 720 (1990) ..........................................................37, 39

*\*United States v. O'Brien,*
  391 U.S. 367 (1968) ............................... 20, 21, 24, 41, 42, 45, 46

*United States v. Pugh,*
  90 F.4th 1318 (11th Cir. 2024).................................................. 32

*United States v. Salerno,*
  481 U.S. 739 (1987) .............................................................. 32

*Veasey v. Perry,*
  769 F.3d 890 (5th Cir. 2014) .................................................... 53

*Virginia v. Hicks,*
  539 U.S. 113 (2003) .............................................................. 32

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................20, 42, 44, 47

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) .............................................................. 50

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989) ................................................................ 13

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ................................................. 52

**Statutes & Constitutional Provisions**

O.C.G.A. § 21-2-263 ...................................................................12, 50

O.C.G.A. § 21-2-385 ........................................................................ 17

O.C.G.A. § 21-2-414 ..............................................5, 7, 11, 14, 17, 36

O.C.G.A. § 21-2-566 ......................................................................... 7

O.C.G.A. § 21-2-567 ......................................................................... 7

O.C.G.A. § 21-2-570 ...................................................................... 7, 8

U.S. Const. amend. I......................................................................... 23

**Other Authorities**

H.B. 268, 154th Leg., Reg. Sess. (Ga. 2017).................................... 7

S.B. 202, 156th Leg., Reg. Sess. (Ga. 2021)................................... 11

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

The State Defendants adopt the brief of the Intervenor-Appellants (Georgia Republican Party, Inc., National Republican Congressional Committee, National Republican Senatorial Committee, and Republican National Committee), which addresses the district court's order preliminarily enjoining the provision of Georgia law (O.C.G.A. § 21-2-385(a)) that requires voters to print their date of birth on the outer envelope of an absentee ballot.  *See* Doc. 613.

## JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court granted two preliminary injunctions prohibiting enforcement of two Georgia laws: (1) the portion of O.C.G.A. § 21-2-414(a) that prohibits anyone from handing out money, gifts, food, or drinks to voters in a 25-foot buffer zone around the polling line, and (2) the portion of O.C.G.A. § 21-2-385(a) that requires voters to print their date of birth on the outer envelope of an absentee ballot.

This appeal is timely because the district court granted the preliminary injunctions on August 18, 2023, and the State Defendants appealed the orders on September 18, 2023.  *See* Fed. R. App. P. 4(a)(1)(A) (30 days), 26(a)(1)(C) (deadline falling on Sunday extends to Monday).

## STATEMENT OF THE ISSUES

1. Whether the district court erred when it facially enjoined part of a Georgia election law that prohibits *conduct*—giving items to a person waiting in line to vote—based on the First Amendment, which protects *expression*.

2. Whether the district court erred when it held that the materiality provision of the Civil Rights Act, 52 U.S.C. §10101(a)(2)(B), prohibits Georgia from requiring absentee voters to include their birthdate on the outer envelope of an absentee ballot.

## INTRODUCTION

Laws protecting voters at the polls have a long and proud lineage. The Supreme Court and lower courts have consistently upheld those laws against constitutional challenge, even state laws that explicitly prohibit core First Amendment expression, such as campaign speech. Yet here, the district court preliminarily enjoined a Georgia law that restricts no speech at all; the law prohibits handing out items to voters waiting in a polling line. Despite the law's narrow reach, the district court concluded that it likely violates the First Amendment. That is wrong many times over, and this Court should reverse.

Georgia has long prohibited campaigning and soliciting votes in a 25-foot buffer zone around the polling line. More recently, the State updated its law to also ban handouts to voters because, over the last few years, campaign tactics have changed. Candidates, political parties, and special interest groups try to sway elections through last-minute efforts on election day, such as hiring food trucks to give away free meals to voters, personally handing out pizza and snacks to voters waiting in line, and throwing parties with live entertainment like mariachi bands and circus performers. To ensure the continued integrity of its elections and protect voters from coercion, Georgia made it unlawful to hand out

2

money, food, drinks, or gifts to voters in the polling line.  This careful prophylactic measure curtails aggressive efforts aimed at voters right before they cast their ballot.

The law addresses a recognized problem.  The invasive activities of advocacy organizations aroused fear and suspicion in voters waiting in line.  Individuals handing out items often identified themselves as members of advocacy groups closely aligned with high-profile candidates or a particular political party.  And overwhelmed election officials, already burdened with the difficult task of running an election, were forced to closely monitor the polling line and police how individuals approached voters.  The lack of bright-line rules made enforcement murky.  Officials had to enforce existing laws against campaigning, voter fraud, and coercion based on highly fact-specific judgment calls, with little time to decide.  Those fact-specific calls were occasionally inconsistent or unpredictable, especially as organizations' polling-place tactics rapidly evolved.

Several of the advocacy organizations that had undertaken massive voter-handout efforts sued, claiming that the law violated their First Amendment right to free speech.  Although the handout law does not prohibit *any* speech, the district court

preliminarily enjoined it in part, holding that handouts to voters in line are somehow "expressive."

The district court is wrong.  The act of handing a drink or a cheeseburger to a voter waiting in a polling line is plainly conduct.  Nothing about it is inherently expressive.  Plaintiffs themselves could not even identify the supposedly inherent "message" of handing something to a waiting voter.  And even if Georgia's law regulates expressive conduct or pure speech, it is still constitutional because it is a narrowly tailored solution to support concededly compelling state interests in securing elections.  At the very least, the law is not invalid in *all of its applications*, meaning Plaintiffs' facial challenge must fail.

The district court itself recognized that there is no constitutional problem with the buffer zone around the polling *place*, and it makes no sense to treat the polling *line* as fundamentally different.  The district court thought that, theoretically, a polling line could be "thousands of feet" long, and then the buffer zone would have "no limit" at all.  Doc. 241 at 55.[1]  But rare hypothetical outliers never justify facially invalidating a law, and, regardless, voters waiting at a distance need *more*

---

[1] Unless otherwise noted, record citations refer to the consolidated docket, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555.

protection than voters who are *close* to the protections of the polling place.  This Court should reverse.

## STATEMENT OF THE CASE

After Georgia amended its election laws, advocacy organizations filed a barrage of suits challenging nearly every aspect of the amendments.  Relevant to this appeal, Plaintiffs moved for a preliminary injunction against the portion of O.C.G.A. § 21-2-414(a) that prohibits giving handouts to voters waiting in line to vote in the 25-foot buffer zone around the polling line.  The district court initially held that the *Purcell* doctrine barred preliminary relief because the injunction would have disrupted the 2022 midterm election.  Plaintiffs renewed their motions in mid-2023, and the district court granted a preliminary injunction.

### A.  Background

As the Supreme Court has explained, "the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud."  *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (plurality op.).  In the 1800s, efforts to sway elections were shameless.  For example, "elderly and timid [opposition] voters" were purposefully scared away from polling places, and vote buyers would "simply place a ballot in the hands

5

of the bribed voter and watch until he placed it in the polling box."
*Id.* at 200–02.

States responded to these problems with a major wave of
reforms that helped secure the election process. In fact, "all 50
States, together with numerous other Western democracies,
settled on the same solution: a secret ballot secured in part by a
restricted zone" around the polling place to protect voters from
organized special interests. *Id.* at 206. And since that time, the
"widespread and time-tested consensus demonstrates that some
restricted zone [around casting ballots on election day] is
necessary [to prevent] voter intimidation and election fraud." *Id.*

The powerful state interest in securing elections has not
diminished over the last century. Georgia continues to rely on
these kinds of laws to protect voters from fraud, intimidation, and
interference on election day. *See, e.g.*, Doc. 197 at 10–12. And,
like many other states, Georgia has continued to amend its laws
as necessary as "candidates, donors, and parties test the limits of
the current law" in hopes of finding creative ways "to circumvent
them." *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S.
431, 457 (2001).

Several different laws have long protected Georgia voters
waiting to vote in person. No person or organization may "solicit

6

votes" or "distribute or display any campaign material" within a 25-foot buffer zone around the polling line and a 150-foot buffer zone around the polling place. O.C.G.A. § 21-2-414(a). No one may block access to a polling place, or "use[] or threaten[] violence" to "prevent a reasonable elector from voting," O.C.G.A. § 21-2-566(3)–(4), or threaten or intimidate a person to coerce them to "vote or refrain from voting for or against any particular candidate," O.C.G.A. § 21-2-567(a). And no one may "give or receive … money or gifts for the purpose of registering as a voter, voting, or voting for a particular candidate." O.C.G.A. § 21-2-570.

Despite these laws, over the last decade Georgia has seen an unprecedented surge in individuals and organizations seeking to accost voters waiting in the polling line. It started with organizations "set[ting] up tables within the 150-foot buffer [zone], claiming they were nonpartisan or conducting research," Doc. 197-2 at 8, which led Georgia to ban that practice within the polling-place and polling-line zones, H.B. 268, 154th Leg., Reg. Sess. (Ga. 2017); O.C.G.A. § 21-2-414(a). Then groups began to realize that the best way to approach voters as they waited in line was to provide the voters with small items like food, water bottles, or ponchos, items that could be explained as encouraging or

supporting voters without qualifying as an unlawful gift. Doc. 197-2 at 9, 18; *see also* O.C.G.A. § 21-2-570 (banning gifts).

At first, election officials tried to monitor organizations and determine on a case-by-case basis whether a person was crossing the line into vote-buying or threatening voters. Doc. 197-2 at 12. But organizations started "using food trucks to … [reward] those who voted; candidates [started] campaigning in the restricted zones under the pretext of line warming; line warming personnel [began] dress[ing] in colors associated with a specific political party and informing voters about the positions of candidates and for whom to vote." Doc. 241 at 47; *see* Doc. 197-2 at 18; Doc 578 at 9. Organizations even began rolling out "full-service taco bar[s]," Doc. 234 at 199, "partner[ing] with local restaurants" to prepare meals for voters, Doc. 171-3 at 3, and handing out "water, snacks, ponchos, fans, books, and phone chargers," Doc. 185-5 at 3. Groups hired "mariachi bands" and "circus performers," Doc. 185-8 at 2–3, gave out "coloring books" and set up "lactation pods," Doc. 171-3 at 3–4, and approached voters in line with "sandwiches" and "cheeseburgers," Doc. 185-7 at 2. Election officials observed "food truck operators … overtly inducing people to vote." Doc. 197-2 at 37.

8

This flurry of aggressive activities unsurprisingly led to voter fear and confusion. "Older voters felt intimidated by the presence" of facially "nonpolitical" groups that approached voters under the pretext of "handing out food and water" and "plastic bracelets." Doc. 197-2 at 50. They feared that the groups' real intentions were to "influenc[e] voters or buy[] votes." *Id.* Nor was their fear unsupported, as candidates had been caught handing out food at their precincts in the past, sometimes overtly campaigning, sometimes not. *See* Doc. 197 at 11 & n.1. Voters complained to election officials because they felt that the groups offering handouts were in fact "partisan." Doc. 197-2 at 39.

Even ostensibly nonpartisan groups sometimes revealed their hidden colors. One organization sending out food trucks admitted that its goal in approaching voters with handouts was not just to support voters as they waited to vote but also to gain one "last chance to reach Georgians before they vote," emphasizing that "[t]he results [of the 2021 U.S. Senate runoff election] ha[d] the potential to determine control of the U.S. Senate." *Id.* at 11, 29–30. Other organizations, while facially nonpartisan, were prominently aligned with a parallel partisan organization. *See, e.g.*, Doc. 234 at 59–61; Doc. 241 at 49–50 & n.19.

Election officials fared no better than voters, overwhelmed by the barrage of advocacy organizations showing up in force to hand out items to voters in line and host events at polling places. It became impossible for officials to know "where to draw the line" and decide whether a "complete meal from a food truck" or a "nice" hat was an impermissible gift meant to influence voting or not. Doc. 197-2 at 12; *see also* Doc. 234 at 12 (advocacy organizations admitting that lavish gifts would probably cross the line into unlawful "influence").

Enforcement was especially tricky because there was no blanket ban on handouts. Election officials had to undertake a "fact de[p]endent inquiry" every time someone showed up at a polling place with handouts: was it lawful support or an unlawful attempt to give in exchange for voting? Doc. 197-2 at 23. Some officials concluded that "water and … peanuts" were "reasonable," but that "fancier" refreshments likely were unlawful. *Id.* at 24. Requiring geographically dispersed, quasi-volunteer poll workers to apply a discretionary enforcement policy caused delays and led to conflicting decisions, causing frustration for advocacy organizations, election officials, and voters as they tried to grapple with how the law applied to the aggressive handout practices. *See, e.g.*, *id.* at 39.

10

In response, the state legislature decided to end the confusion and case-by-case enforcement.  The legislature updated the buffer zones around the polling line and polling place to address voter handouts:

> No person shall … give, offer to give, or participate in the giving of any money or gifts, including, but not limited to, food and drink, to an elector … nor shall any person … establish or set up any tables or booths on any day in which ballots are being cast:
> (1) Within 150 feet of the … polling place …;
> (2) Within any polling place; or
> (3) Within 25 feet of any voter standing in line to vote at any polling place.

O.C.G.A. § 21-2-414(a).

The law establishes a clear buffer zone where no handouts are permitted regardless of the intent behind or messages supposedly linked to them.  It relieves individual election officials of the burden of deciding whether a particular group's handouts are too nice or whether that group is using them as cover to campaign or pressure voters.  The buffer zones empower voters to decide whether they want to engage with the individuals and groups providing handouts.[2]

---

[2] This law was part of the Election Integrity Act of 2021, which also made several changes to the voting process "to reduce the burden on election officials and boost voter confidence."  S.B. 202 at 4, 156th Leg., Reg. Sess. (Ga. 2021).  One concern the law

### B. Proceedings Below

A cluster of advocacy organizations promptly sued in federal court to enjoin Georgia's election reform bill.  One coalition was led by The New Georgia Project and included Black Voters Matter Fund, Rise, Inc., and a handful of individuals.  Doc. 39 at 1, *New Ga. Project v. Raffensperger*, No. 1:21-cv-01229 (N.D. Ga. May 17, 2021).  The New Georgia Project was founded and first led by two-time Democratic gubernatorial candidate Stacey Abrams and later run by Democratic Senator Raphael Warnock, and styles itself a "nonpartisan, community-based nonprofit organization." *Id.* at 9.  The Georgia State Conference of the NAACP also sued, alongside Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; Galeo Latino Community Development Fund, Inc.; Common Cause; Lower Muskogee Creek Tribe; and The Urban League of Greater Atlanta, Inc.  Doc. 35 at 1, *Ga. State Conf. of the NAACP v. Raffensperger*, No. 1:21-cv-01259 (N.D. Ga. May 28, 2021).  The last coalition was led by the Sixth District of the African Methodist Episcopal Church and included Georgia

---

addressed was that lines grew too long during the 2020 elections that took place in the heart of the COVID-19 pandemic.  Doc. 574-37 at 28 & n.8; *see, e.g.*, Doc. 171-11 at 4.  The law thus imposed a new process that requires officials to track line length and break up precincts or increase polling place capacity if long lines occur during the prior election.  *See* O.C.G.A. § 21-2-263(b).

Muslim Voter Project; Women Watch Afrika; Latino Community Fund of Georgia; and Delta Sigma Theta Sorority, Inc.  Doc. 1 at 1, *Sixth Dist. of the Afr. Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021).  Plaintiffs sued a hodgepodge of state and county officials, arguing that various provisions of the election reform bill violated federal law.[3]

Not long after, the Georgia Republican Party, the Republican National Committee, and the National Republican Senatorial and Congressional Committees intervened, *see, e.g.*, Doc. 40, *Ga. State Conf. of the NAACP v. Raffensperger*, No. 1:21-cv-01259 (N.D. Ga. June 4, 2021), and then the district court consolidated the cases, concluding that they "involve virtually identical defendants and mostly the same facts and legal issues," Doc. 1 at 7.

---

[3] The State of Georgia is listed on the appellate docket, but it should not be a party to this appeal.  The State is not a defendant in the three consolidated cases underlying this appeal, and even if it were, the State has sovereign immunity and is not a "person" that can be sued under § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  And although one group of Plaintiffs did sue the Georgia State Election Board, Doc. 1 at 1, *Sixth Dist. of the Afr. Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021), the Board is also not a "person" amenable to suit under § 1983.  *See Howlett v. Rose*, 496 U.S. 356, 365 (1990).

### 1.    Initial Motions for Preliminary Injunction

Over a year after filing suit, Plaintiffs moved for preliminary injunctive relief against "the provisions of O.C.G.A. § 21-2-414(a)" that ban handouts to voters in the 150-foot buffer zone around the polling place and the 25-foot buffer zone around the polling line, arguing that the law was facially unconstitutional.  Doc. 171 at 2; *see* Doc. 185 at 1–2.

They alleged that (1) the overlapping bans burden their right to free speech and expressive conduct; Doc. 171-1 at 19–21, Doc. 185-1 at 12–16; (2) both the polling line and the area around the polling place are traditional public forums, not nonpublic forums, even on election day; Doc. 171-1 at 25–26; (3) the handout laws are not content-neutral toward speech because they target certain categories of conduct; *Id.* at 22–25, Doc. 185-1 at 16–17; and (4) the bans fail strict scrutiny (or even intermediate scrutiny) because they are not narrowly tailored; Doc. 171-1 at 29–34, Doc. 185-1 at 18–20.

The district court denied Plaintiffs' motions for preliminary injunctive relief.  Doc. 241 at 74.  It concluded that the challenged provisions are content-based restrictions on speech subject to heightened scrutiny under *Burson*, but held that the 150-foot buffer zone around the polling place satisfies First Amendment

14

scrutiny.  *Id.* at 54.  The State has compelling interests in "restoring peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity."  *Id.* at 51–52.  And the law is narrowly tailored, allowing pro-voting speech within the buffer zone and handouts outside the buffer zone.  *Id.* at 53–54.

As to the polling-line-handout buffer zone, the court concluded that the same state interests supported protecting voters, but it decided that the 25-foot buffer zone around the polling line is not narrowly tailored because it is "limitless" and "has no fixed line of demarcation."  *Id.* at 54–55.  Nevertheless, the district court refused to enjoin the law, concluding that under "the *Purcell* doctrine" it is rarely appropriate "to allow a voting-related injunction to take effect close to election day" because of the serious "unintended consequences of last-minute changes to election laws."  Doc. 241 at 66, 70 (discussing the application of *Purcell v. Gonzalez*, 549 U.S. 1 (2006), in *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022) (*LWVF*)).

As a result, both the polling-place and polling-line handout laws took effect during the 2022 election cycle.  During that cycle, which included several major statewide elections for a U.S. Senate

15

seat, the Governor, the Secretary of State, and the Attorney General, 95.3% of Georgia voters waited in line no longer "than 30 minutes to vote." Doc. 574-37 at 14.

### 2. Renewed Motions for Preliminary Injunction

In April and May 2023, almost six months after the 2022 elections, Plaintiffs renewed their motions for preliminary injunctive relief. Doc. 535; Doc. 547. This time, they challenged only the polling-line buffer zone. Doc. 535 at 2; Doc. 547 at 1–2. They asserted the same arguments as before, Doc. 535-1 at 6, 8, 10; Doc. 547-1 at 7, but now argued that *Purcell* no longer precluded relief because they sought to enjoin the law's application to 2024 elections. Doc. 535-1 at 13; Doc. 547-1 at 12–13.

The court granted a facial preliminary injunction, refusing to "depart" from its earlier decision that the polling-line-handout law infringes Plaintiffs' First Amendment right to free speech. Doc. 614 at 20. The court held that the law is not narrowly tailored because the polling line zone might theoretically reach long distances. *Id.* at 26. It also concluded that the State's interests did not warrant denying relief as an equitable matter. *Id.* at 39.[4]

---

[4] This consolidated appeal involves two separate preliminary injunction orders, each covering a different Georgia law: In No. 23-13095, the State Defendants appeal the preliminary

### C.  Standard of Review

This Court reviews the grant of a preliminary injunction for abuse of discretion but reviews any underlying legal questions *de novo*.  *Curling v. Raffensperger*, 50 F.4th 1114, 1120–21 (11th Cir. 2022).  "[A] court abuses its discretion in granting a preliminary injunction if, in determining whether success is likely, it incorrectly or unreasonably applies the law."  *Id.* at 1121.

### SUMMARY OF ARGUMENT

The district court should not have granted a preliminary injunction.  It immediately departed from the correct track when it held that *speech*, rather than *conduct*, is at issue.  And then, even assuming that expression is at issue, the district court erred again, applying the wrong standard of scrutiny.  Plus, even under the strictest standard of scrutiny, the law should prevail, contrary

---

injunction of the polling-line-handouts law.  *See* Doc. 614; O.C.G.A. § 21-2-414(a).  In No. 23-13085, the State Defendants appeal the preliminary injunction of (part of) O.C.G.A. § 21-2-385(a), which requires voters to print their date of birth on the outer envelope of an absentee ballot.  *See* Doc. 613.

State Defendants' brief focuses on the polling-line-handouts law, and State Defendants adopt the Intervenor-Appellants' brief, which focuses on the preliminary injunction of O.C.G.A. § 21-2-385(a).  As for standing to appeal the injunction of O.C.G.A. § 21-2-385(a), the State Defendants rely on the jurisdictional briefing.  *See* Response to Jurisdiction Question, Doc. 95, No. 23-13085 (11th Cir. Oct. 30, 2023).

to the district court's holding.  On top of everything else, the district court misstated the equities, which lean against a preliminary injunction.

**I.A.**  The district court held that the handout law regulates expression, Doc. 241 at 33, but that is wrong; these handouts are plainly conduct and the First Amendment does not apply at all. Conduct triggers First Amendment protection only in rare cases where it "inherently express[es]" a message, *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006), usually through symbolic acts like burning a politician in effigy.  Giving a voter a handout is simply too ambiguous to convey any message at all.  Anyone intending to convey a message will pair the handout with speech, and "explanatory speech" is a sure sign that conduct is not expressive. *Id.*  Yet the district court erroneously held that conduct qualifies as inherently expressive as long as observers conclude that the act is supposed to be expressive, regardless of whether they infer *contradictory* messages.  *Compare* Doc. 241 at 47 (some voters "perceived intimidation"), with *id.* at 30 (other voters think "that line warming activities … support and encourage").  Neither the Supreme Court nor this Court has ever sanctioned such a broad standard, which would encompass virtually all conduct.

18

And even if voter handouts were inherently expressive in a few instances, Plaintiffs cannot rely on these outliers to support a *facial* challenge to the law.  There is a reason all of the core precedents involve as-applied challenges.  Facial challenges to regulation of conduct, rather than speech, rarely succeed because the challenger must demonstrate that the law is unconstitutional in all its applications.  Plaintiffs cannot come close to showing that voter handouts are inherently expressive in *every possible instance*, so their facial challenge necessarily fails.

**B.**  Assuming for the sake of argument that the handout law touches on expressive activity, the district court was still wrong to hold it invalid.

*First*, contrary to the district court's holding, Doc. 241 at 32 & n.16, a voting line is a nonpublic forum.  The line is an extension of the polling place and thus a nonpublic forum where states may impose reasonable regulations, even content-based speech restrictions.  Forum analysis requires considering more than "physical characteristics"—the "government's intent and policy concerning the usage" must also be taken into account.  *Bloedorn v. Grube*, 631 F.3d 1218, 1233 (11th Cir. 2011).  And as the Supreme Court explained in *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018), the polling place is a nonpublic forum

19

because the government has long imposed a restricted speech zone there to ensure election integrity and prevent voter fraud and intimidation.  That reasoning applies as forcefully to the voting line.  The district court short-circuited the analysis by defaulting to the presumption that public sidewalks are public forums, but the Supreme Court has rejected that presumption, in multiple contexts.

*Second*, even if the polling line were a public forum, the law is constitutional.  Assuming handouts to voters constitute some kind of expressive conduct, the proper test is the *O'Brien* standard for content-neutral regulations of expressive conduct.  *See United States v. O'Brien,* 391 U.S. 367 (1968).  The law is content-neutral because it bans handouts as a prophylactic measure to prevent voter confusion, fraud, and intimidation, not to prevent expression.  And a law is still content neutral with respect to *speech* even if it distinguishes between kinds of *conduct*.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

But even if the handout law were not content neutral and thus governed by the heightened *Burson* scrutiny that the district court applied, the handout law is still constitutional.  The Supreme Court's decision in *Burson* requires the State to establish that the law is narrowly tailored to protect a compelling interest

20

where it seeks to impose content-based regulations of speech around the polling place. 504 U.S. at 198. No one seriously doubts the State's compelling interests (including the district court, Doc. 614 at 24). So the only question—regardless of whether *O'Brien* or *Burson* applies—is whether the law is narrowly tailored.

The law is narrowly tailored to advance the compelling interests of "protecting voters from confusion and undue influence" and "preserving the integrity of [the] election process." *Burson*, 504 U.S. at 199 (quotation omitted). The law (1) imposes only a buffer zone around the polling line; (2) applies only to conduct, not pure speech; and (3) curbs discretionary (thus, potentially unfair) enforcement. The polling-line buffer zone is not so expansive that it amounts to a complete ban on First Amendment-protected conduct on election day. Protecting voters waiting in line to cast their ballot is about as narrow as can be.

**II.** The equities also cut against an injunction. Plaintiffs will suffer no irreparable harm, thanks to other recent changes, because lines are short and so the polling-line and polling-place buffer zones will overlap in most cases. Plaintiffs' repeated delays also counsel against any finding of irreparable harm. By contrast, the State suffers significant harm whenever it is prevented from

21

conducting elections under state law. Election fraud and voter coercion may sway the results of elections and cannot be undone. On top of that, the unpredictability of preliminary injunctive relief is especially harmful in the election context because it confuses voters, and this is not the rare situation where such relief is warranted.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). And it becomes even more perilous when it targets a "state's election law" because the injunction alone may cause "voter confusion." *LWVF*, 32 F.4th at 1370–71 (quotations omitted). A preliminary injunction is warranted only if the movants clearly establish each of four prerequisites: (1) substantial likelihood of success on the merits; (2) that withholding an injunction will cause irreparable harm; (3) that the potential injury to the movants outweighs the harm the injunction would inflict on the opposing parties; and (4) that the injunction is in the public's best interest. *Siegel*, 234 F.3d at 1176. Plaintiffs have not done so here, and the district court was wrong to rule otherwise.

## I.    Plaintiffs are not likely to succeed on the merits of their First Amendment claim.

On the merits, the district court was wrong on every level. The handout law regulates conduct, not speech, so it does not implicate the First Amendment at all.  Regardless, even if the law sometimes affects expression, it does not do so in *every* case, so Plaintiffs' facial challenge must fail.  And even assuming voter handouts are always inherently expressive, polling places and polling lines are nonpublic forums, so regulations of expression need only be reasonable.  Finally, even supposing that polling lines are public forums, the handout law is still valid because it is narrowly tailored to serve the State's concededly compelling interests.

### A.    The handout law regulates conduct, not expression.

Plaintiffs' First Amendment challenge fails at the outset because the handout law regulates only conduct.  Restricting handouts to voters in line does not abridge anyone's ability to engage in oral, written, or even symbolic speech.  Free items might grab voters' attention, but they do not inherently communicate anything.

The First Amendment protects the "freedom of speech," not the freedom of conduct.  U.S. Const. amend. I.  The Supreme

23

Court flatly rejects the view that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *O'Brien*, 391 U.S. at 376. And it cautions courts to be skeptical of anyone claiming a First Amendment right to engage in conduct on the grounds that the conduct itself is so expressive that it amounts to speech. *Rumsfeld*, 547 U.S. at 65–66. "It is possible to find some kernel of expression in almost every activity a person undertakes," but "such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

The First Amendment extends to conduct only when it is "inherently expressive." *Rumsfeld*, 547 U.S. at 66. And the burden to prove that regulated conduct is inherently expressive falls on the person challenging the regulation. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). To determine whether conduct is inherently expressive, this Court asks "(1) whether 'an intent to convey a particularized message was present[]' and (2) whether 'in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (*Food Not Bombs I*) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11

24

(1974)) (alteration adopted).  The "context" in which the conduct occurs must make the actor's message clear, *id.* at 1241 (quotation omitted), and when "explanatory speech is necessary," that "is strong evidence that the conduct … is not so inherently expressive," *Rumsfeld*, 547 U.S. at 66.

Applying these principles here shows that handing out food or other items of value in an election line is not inherently expressive.  And even if in some (rare) cases handouts could qualify as inherently expressive conduct, Plaintiffs' facial challenge would still fail because they cannot show that polling-line handouts are inherently expressive in every instance.

### 1.  Handing voters items like tacos or phone chargers is not speech or inherently expressive conduct.

Plaintiffs cannot establish either an intent to convey a particularized message *or* that recipients would understand there was such a message.  *See Food Not Bombs I*, 901 F.3d at 1240. That means their claim fails at the outset.

To start, Plaintiffs assert that they intend to convey a particular message through the act of handing items to voters, but they struggle to converge on any actual message.  Some are protesting the government for its failure to "alleviate these long wait times," Doc. 171-1 at 15, others expressing "gratitude," *id.* at

25

14, or informing voters that they "have a community that supports them," *id.* at 14–15, or reassuring voters that they are exercising "powerful weapons," *id.* at 15, or "celebrat[ing]" the civil rights movement, *id.* at 19.

That grab-bag of ideas is not a message and has no "common thread." *Contra* Doc. 241 at 31.  It is a long list of distinct thoughts that various Plaintiffs believe to be consistent with the act of giving handouts to voters.  Plaintiffs' confusion around intent suggests that the act of handing items to voters is not an act that a person would usually intend or expect to—on its own—*convey* any particular message.

As for the second prong of the analysis, no "reasonable person" who watches someone hand an item to a voter recognizes even "a generalized message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).  Although a person is not obligated to prove that observers will understand the exact "narrow, succinctly articulable message" that she intended to communicate, *Food Not Bombs I*, 901 F.3d at 1245 (quotation omitted), she must prove that the conduct always communicates— and that an observer will understand—at least a generic version of the intended message, *Holloman*, 370 F.3d at 1270.  There is nothing like that here.

26

Inherently expressive conduct usually requires symbolism. *See Clark*, 468 U.S. at 293; *Food Not Bombs I*, 901 F.3d at 1241. The tradition of using symbols to convey a political point is as old as the republic itself—American colonists would speak by "burning the king in effigy or by raising liberty poles." *Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023). Courts have recognized that symbolic conduct might involve flying a flag covered with a peace symbol, *Spence*, 418 U.S. at 410, or burning an American flag at an anti-government protest, *Texas v. Johnson*, 491 U.S. 397, 404–05 (1989), or hosting an open, communal meal in a public park to protest "hunger and poverty," *Food Not Bombs I*, 901 F.3d at 1240.

Giving something of value to a voter does not inherently symbolize anything. A handout does not speak out for or against the government or for or against any particular policy. A handout does not openly protest the existence of long lines (though perhaps it contributes to them). A handout gives the voter some item that may or may not be useful. Handouts might help voters persevere in a long line, or they might make it *harder* to stay in line, depending on what the item is. But the fact that handouts may incentivize different voting behavior does not mean that they communicate any message.

27

The messaging that Plaintiffs attribute to the handouts is actually communicated through their *speech*.  Plaintiffs repeatedly confirmed that they engage in supplementary speech; approaching voters with handouts was valuable *precisely because* it opened the door to protected speech.  *See, e.g.*, Doc. 185-4 at 2; Doc. 185-7 at 3 ("These interactions frequently lead to deeper conversations with voters," conversations which "are at the core of our mission.").  Plaintiffs' individual representatives pair handouts with "verbal speech, celebrating voters, thanking them for casting their vote, and informing them that they will be able to vote if they stay in line."  Doc. 171-1 at 28.  Sometimes they simultaneously distribute "nonpartisan voter guides" that state candidates' positions on various issues, such as whether a candidate is "tough on crime." Doc. 171-15 at 3–4.  This is exactly the sort of speech-conduct combo where the "explanatory speech" that accompanies the handout proves that the act itself did not inherently communicate anything.  *Rumsfeld*, 547 U.S. at 66.

Simply stated, the First Amendment does not protect a speaker's right to *act* in ways that magnify the impact of their speech.  A person cannot avoid criminal liability for engaging in "vandalism, theft[,] or destruction of property" by claiming that the First Amendment lets them "spike trees in a logging forest to

28

demonstrate support for stricter environmental laws; steal from the rich to protest perceived inequities in the distribution of wealth; or bomb military research centers in a call for peace." *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996). This Court should reject "the fallacy of seeking to use the First Amendment as a cloak for [unlawful] conduct by the diaphanous device of attributing protected expressive attributes to that conduct." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986).

The district court's contrary conclusion rests on faulty premises. For one, the district court misinterpreted the reasonable-observer test altogether. In its view, all that Plaintiffs had to show was that a "reasonable person" would infer that the conduct is expressive rather than just plain conduct. Doc. 614 at 20–21.

But under that test, all conduct would qualify as expressive, because there is "some kernel of expression in almost every activity a person undertakes." *City of Dallas*, 490 U.S. at 25. This Court has never collapsed the speech-conduct distinction and treated all conduct as expressive. *See, e.g.*, *Food Not Bombs I*, 901 F.3d at 1241 (holding that food sharing is expressive when symbolic). The conduct must convey a sufficiently discernable message, such that an observer will receive at least the

29

"generalized message" even if they don't get all of the "specific" details the person meant to convey. *Holloman*, 370 F.3d at 1270.

In *Holloman*, for example, it was enough that other students in the public school classroom could identify Holloman's raised fist during the Pledge of Allegiance as "a generalized message of disagreement or protest directed toward [the teacher], the school, or the country in general" even if they missed that he was protesting the teacher's punishing their classmate who had refused to recite the pledge the day before. *Id.* In *Food Not Bombs I*, this Court held that observers were likely to receive at least a general message "of community and care for all citizens" because of the context of a communal meal: it was open to anyone, identified by tables and banners, took place in a public park near government buildings, followed increased local media coverage of homelessness, and was designed to communicate a message that was directly tied to the conduct. 901 F.3d at 1242–44. And in *Clark*, organizers of a protest against homelessness wanted to set up a symbolic homeless encampment—a tent city—on the National Mall. 468 U.S. at 291–92.

But Plaintiffs are not staging a symbolic event, *see Food Not Bombs I*, 901 F.3d at 1242, and giving handouts to voters in line is not tied to even a particular *category* of messages, let alone an

identifiable message. The evidence showed that observers described the handout process as everything from partisan interference to voter intimidation, to encouraging voters, to protesting the government, to celebrating civil rights, to bribing voters. Doc. 171-1 at 14–15, 19; Doc. 197 at 11 & n.1; Doc. 197-2 at 39, 50. In other words, they did not understand handouts as conveying any particular message, or even messages with some "common thread." *Contra* Doc. 241 at 31. And that makes sense, because handing out items to voters is run-of-the-mill conduct. If this is inherently expressive conduct, virtually all conduct is inherently expressive, and that cannot be right. The Court should reverse on this basis alone.

> **2.    Even if voter handouts could sometimes be inherently expressive conduct, Plaintiffs' facial challenge still fails.**

The district court facially enjoined the handout law without ever analyzing whether the law is unconstitutional in other contexts. It is not, even assuming that Plaintiffs' conduct is entitled to some measure of First Amendment recognition. (Plaintiffs made it clear below that they assert only a facial

challenge.  Doc. 171-1 at 40; Doc. 185-1 at 11 (adopting NAACP position).[5])

A facial challenge to a legislative Act is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  A plaintiff generally cannot press a First Amendment facial challenge unless the law is "specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."  *United States v. Pugh*, 90 F.4th 1318, 1329 (11th Cir. 2024) (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003)).  For example, a trespass rule that applies to everyone— "strollers, loiterers, drug dealers, roller skaters, bird watchers, [and] soccer players" alike—does not facially violate the First Amendment, despite also applying to someone engaging in free speech, because it regulates much non-expressive conduct.  *Hicks*, 539 U.S. at 123.

---

[5] *See also* Doc. 39 at 65, *New Ga. Project v. Raffensperger*, No. 1:21-cv-01229 (N.D. Ga. May 17, 2021); Doc. 35 at 85, *Ga. State Conf. of the NAACP v. Raffensperger*, No. 1:21-cv-01259 (N.D. Ga. May 28, 2021); Doc. 1 at 89, *Sixth Dist. of the African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021)

The act of handing out items to voters is not *necessarily* associated with speech in all circumstances, because people may decide to hand out items to voters for all sorts of non-expressive reasons.  They may see a need and simply want to fill it.  Even Plaintiffs admit that sometimes the act of handing an item to a voter is not expressive at all—a handout can be a bribe or a chance to initiate a conversation with a voter.  *See* Doc. 234 at 12 (high value gifts could be used to "influence" voters).  A handout for a voter is not speech-centered conduct that serves as a common mode of expression, so regulations of voter handouts are not amenable to facial challenge.

Moreover, Plaintiffs never established that the law would be invalid in all (or even most) of its applications.  Plaintiffs emphasize that they are "majority-Black organizations well known for their social justice work" that are handing out items at polling lines in districts "with significant Black populations."  Doc. 171-1 at 21.  They hope that voters will see their brand and recall their "advoca[cy] for policies to expand voting rights and equity," Doc. 39 at 11, *New Ga. Project,* No. 1:21-cv-01229, "grassroots voter…education," *id.* at 12, and "voter education on … voting in person on election day," Doc. 35 at 9, *Ga. State Conf. of the NAACP*, No. 1:21-cv-01259.  But this evidence cuts against them,

because it shows not only that their speech (not their conduct) conveys their message, but also that their situation is unique. Plaintiffs fail to show that everyone else is in a similar situation, so they come nowhere close to showing that handouts are inherently expressive *in every case*. They have thus "failed to contend with any of the plainly legitimate applications of the [handout law]." *LWVF*, 32 F.4th at 1374 (quotation omitted).

*Food Not Bombs I* confirms as much. There, this Court held that "[w]hether food distribution or sharing can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge" because, in many instances, sharing food is not expressive conduct. 901 F.3d at 1241 (alterations adopted and quotation omitted). That is true here, too—at a minimum, handouts are not *always* expressive.

As a final point, the district court's decision here is not only wrong, it is unprecedented. Both the Supreme Court and this Court rely heavily—if not *exclusively*—on as-applied challenges when considering whether a law that regulates conduct violates the First Amendment. *See, e.g.*, *Johnson*, 491 U.S. at 403 n.3; *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021); *Food Not Bombs I*, 901 F.3d at 1241; *Holloman*, 370 F.3d at

1270.  And that makes sense because, while even seemingly harmful speech often has minimal effect, that is not true of harmful conduct.  *See, e.g.*, *United States v. Ackell*, 907 F.3d 67, 77 (1st Cir. 2018) (First Amendment challenge to stalking statute). So facially enjoining a law that targets *conduct* comes with much higher costs than one that addresses only expression.  Yet here, the district court addressed only Plaintiffs' specific situation and did not even consider whether the law is unconstitutional in *all* of its applications.  Doc. 241 at 32–33; Doc. 614 at 21.  This Court should reverse.

### B.  Assuming the law regulates expressive conduct, it remains constitutional.

The district court's errors did not stop at the conduct-expression distinction.  Even assuming that handouts are inherently expressive conduct, the law satisfies any applicable standard of scrutiny.  As an initial matter, the polling line is a nonpublic forum, meaning the law need only be *reasonable*, which it undoubtably is.  Moreover, even if a polling line were a traditional public forum, the handout law satisfies whatever form of scrutiny applies because the state interests are compelling and the law is narrowly tailored.

35

1. **The polling line is a nonpublic forum, and the law is reasonable.**

When a regulation "applies only in a specific location," courts apply the "forum based approach" to the First Amendment. *Mansky*, 585 U.S. at 11 (quotation omitted). This case satisfies that description: The handout law applies only to a narrow selection of government property (usually the polling place and some part of a sidewalk) and only for a limited time (election day). O.C.G.A. § 21-2-414(a).

Under the forum analysis, the scope of First Amendment protection depends on whether a government property is a public forum ("traditional" or "designated") or a "nonpublic forum." *Mansky*, 585 U.S. at 11.[6] In a public forum, "the rights of the state to limit expressive activity are sharply circumscribed" because it is "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quotation omitted). By contrast, the state may dedicate a

---

[6] The en banc Court is reconsidering the test for a potential fourth category, the "limited public forum," but that forum is not at issue and was either eliminated by *Mansky* or is indistinguishable from the nonpublic forum because the same test applies in both settings. *McDonough v. Garcia*, 90 F.4th 1080, 1090 & n.5 (11th Cir. 2024), *reh'g en banc granted, opinion vacated*, 93 F.4th 1220 (11th Cir. 2024).

nonpublic forum to a particular purpose, including by limiting the content or allowing only certain speakers to speak. *Bloedorn*, 631 F.3d at 1235. Regulations in nonpublic forums need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," which means the state may exclude speech based on content, such as by banning "political advocates and forms of political advocacy." *Mansky*, 585 U.S. at 12 (quotation omitted).

Deciding whether property is a public or nonpublic forum requires considering both the nature of the property and the context of the speech dispute. "The mere physical characteristics of the property cannot dictate forum analysis." *United States v. Kokinda*, 497 U.S. 720, 727 (1990) (plurality op.); *Bloedorn*, 631 F.3d at 1233. Courts must also consider "the government's intent and policy concerning the usage … and the presence of any special characteristics." *Bloedorn*, 631 F.3d at 1232–33 (university sidewalks not public forum). The doctrine embodies the idea that government property is not a public forum if that would "defeat[] the essential function of the land or the program." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 478 (2009) (refusing to treat park as traditional public forum in context of "privately donated, permanent monuments").

The polling place, and the line of voters waiting to cast their votes, are nonpublic forums.  The Supreme Court in *Mansky* held that the polling place "qualifies as a nonpublic forum" because "[i]t is, at least on Election Day, government-controlled property set aside for the sole purpose of voting."  585 U.S. at 12.  It thus did not matter at all that on other days the property—when it is not a polling place—may in fact be a public forum (or not even government property).  The property is completely repurposed for voting on election days, transforming it into a nonpublic forum. When the government has "completely chang[ed] the for[um]'s use," *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004), then "it no longer retains its public forum status," *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999).  For the last 150 years, the voting forum has been intentionally secured as nonpublic to keep certain threats to elections at bay.  *Burson*, 504 U.S. 201–05.

The district court erroneously concluded that, unlike the polling place, a polling *line* is a traditional public forum simply because streets and sidewalks are *usually* treated as traditional public forums.  Doc. 241 at 32.  But the Supreme Court has repeatedly rejected the assumption that public sidewalks are always, in every situation, traditional public forums.  *See, e.g.*,

*Kokinda*, 497 U.S. at 727 (plurality op.) (sidewalk on post office property is a nonpublic forum despite being indistinguishable from the "municipal sidewalk"); *Greer v. Spock*, 424 U.S. 828 (1976) (sidewalk on military base nonpublic forum despite being open to the public).  Instead, it has explained that "the location *and purpose* of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum."  *Kokinda*, 497 U.S. at 728–29 (emphasis added).  And when "provid[ing] a public forum" would undermine the property's purpose, like how "partisan political" speeches or demonstrations would disturb military training for new soldiers on a military base, then that property must instead be characterized as a nonpublic forum. *Greer*, 424 U.S. at 838, 839.

There is also no principled reason to sever the polling line from the rest of the polling place and deny it nonpublic-forum status.  The threats to voters and elections are at their apex when the voter is *outside* the polling place waiting in line—away from the relative security and privacy of the polling place itself.  As Justice Scalia explained in *Burson*, "sidewalks adjacent to the polling places" are a nonpublic forum on election day, because that understanding is as "venerable a part of the American tradition as the secret ballot."  504 U.S. at 214 (Scalia, J., concurring).

39

To be sure, a plurality in *Burson* opined that "parks, streets, and sidewalks" are "quintessential public forums," 504 U.S. at 196–97 (plurality op.), but that preliminary statement is ultimately inconsistent with *Burson*'s holding that, because of its unique interests around polling places on election day, the State can ban speech based on its content. *Id.* at 206. Even the plurality recognized that the sidewalks and streets around the polling place are in fact *not* open for "communicating thoughts between citizens" and "discussing public questions." *Perry Educ. Ass'n*, 460 U.S. at 45 (quotation omitted); *see Burson*, 504 U.S. at 207. General categories—sidewalks are sidewalks are sidewalks—are inadequate because they "unjustifiably elide what may prove to be critical differences of which we should rightfully take account." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 681 (1992). Indeed, the Supreme Court's clear recognition in *Mansky*, 25 years later, that polling places are nonpublic forums (even though that is likely *only* the case when they are in use as polling places) reaffirms that Justice Scalia had the better of the argument in *Burson*.

Finally, the handout law easily satisfies the requirement that regulations of nonpublic forums be "reasonable." *See Int'l Soc. for Krishna Consciousness, Inc.*, 505 U.S. at 679. The district court

40

correctly recognized that the state's interests—"maintaining peace and order around the polling place, protecting voters from political pressure[,] and supporting election integrity—are undoubtedly compelling."  Doc. 614 at 24 (citing *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009)).  Because the polling line is a nonpublic forum, the law is plainly valid, and this Court should reverse.

> **2.  The law is constitutional under any standard of scrutiny, because it is narrowly tailored to advance compelling state interests.**

Setting aside all of the above, the district court still erred in its analysis of narrow tailoring.  Supposing for the moment that the polling line is a public forum, the handout law is still a content-neutral regulation of conduct, subject to intermediate scrutiny.  And even if the law were somehow a content-based regulation of speech, it would still comply with heightened scrutiny under *Burson*.  There, the Supreme Court held that states can regulate speech based on content around the polling place because of the long-recognized compelling interests in protecting voters and securing elections.  504 U.S. at 206.  Either way, the handout law prevails.

**a.**  Although it should not ultimately matter, the appropriate level of scrutiny here is found in *O'Brien*. 391 U.S. 367.  Content-

41

neutral regulations of expressive conduct are subject to intermediate scrutiny. Such laws are valid when they are "narrowly drawn to further a substantial governmental interest … unrelated to the suppression of free speech." *Clark,* 468 U.S. at 294 (citing *O'Brien,* 391 U.S. at 377). Likewise, content-neutral regulations of the time, place, and manner of expressive conduct or speech are permitted as long as they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark,* 468 U.S. at 293. "These standards substantially overlap" and often "yield the same result." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (*Food Not Bombs II*); *see also Ward*, 491 U.S. at 798 (explaining that "in the last analysis" the *O'Brien* test is "little, if any, different from the standard applied to time, place, or manner restrictions" (quotation omitted)).

The handout law is plainly content neutral. "[T]he First Amendment's content-neutrality test asks whether a law treats different *messages* differently, not whether it treats different *conduct* differently." *Lichtenstein*, 83 F.4th at 588. The handout law is a prophylactic measure designed to protect voters from intimidation and interference. It does not target any message

that might be conveyed through giving out handouts to voters. *See Porter v. Martinez*, 68 F.4th 429, 441 (9th Cir. 2023) (law content-neutral when it "applies evenhandedly" regardless of its effect on expression). This law just targets conduct—giving things to voters. As in *Clark*, the most obvious evidence that the government is not using the handout law to target speech is that it leaves wide open other avenues for conveying the pro-voting message. 468 U.S. at 295–96 (protesters could still protest by erecting symbolic tent cities, even if they could not sleep in them). The handout law does not stop Plaintiffs from speaking or displaying signs that convey the "message that voting is important," "that voters should remain in line," or that "every individual voter … has a valuable voice." Doc. 185-1 at 13; Doc. 535-1 at 6.

The handout law has relevant parallels to the regulation of food sharing in *Food Not Bombs II*. That law was designed to protect the accessibility of public parks and not to ban the plaintiffs' messaging, and this Court held that its non-expression-related purpose was enough to make it content neutral—even though it targeted exactly the kinds of gatherings that the plaintiffs claimed were expressive conduct. 11 F.4th at 1293. Likewise here, the law bans the practice of approaching voters

43

with handouts to protect voters and election integrity, not to deter or stop pro-voting messages.

The district court's key mistake on this point was conflating the analysis for regulations of speech (written or verbal) with that for regulations of conduct. Doc. 241 at 39; Doc. 614 at 8. It analogized to *Burson*, where the Court upheld a 100-foot polling-place speech ban that was not content neutral because it prohibited "the solicitation of votes and the display or distribution of campaign materials." 504 U.S. at 193. That law was content-based because it targeted specific kinds of *verbal and written speech*. No doubt, a regulation of speech that targets specific subject matter is not content neutral, because it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

But a regulation that covers conduct (as opposed to verbal or written speech) is content neutral so long as it "serves purposes unrelated to the content of expression … even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. Because the handout law stops the *act* of providing handouts, rather than precluding expression, it is content neutral. *See, e.g.*, *First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756, 761–62 (11th Cir. 2011) (en banc)

("[T]he interest of the City in managing parks and spreading large group feedings to a larger number of parks is unrelated to the suppression of speech.").

Regardless, even applying *Burson*'s heightened scrutiny, the handout law remains valid. The only difference between *Burson* scrutiny (which the district court applied) and *O'Brien* scrutiny (which the district court should have applied) is that the former requires a *compelling* state interest and the latter requires only an *important* state interest. *Burson*, 504 U.S. at 198; *O'Brien*, 391 U.S. at 376. But the district court correctly held (and Plaintiffs do not dispute) that the State's interests here are compelling. Doc. 614 at 24; Doc. 535-1 at 9–11; Doc. 547-1 at 7–11. States have not only a strong interest but also a *responsibility* to protect the integrity of elections. *See Burson*, 504 U.S. at 200–03. Georgia "has a compelling interest in protecting voters from confusion and undue influence" and "preserving the integrity of its election process." *Id.* at 199 (quotation omitted); *see also New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). States may validly be concerned that "'third-party' organizations, candidates, and political party activists" pose a threat because they can "have ulterior motives," so requiring that they keep a

45

distance from the voting process advances the State's interest in "preserving the integrity of its election process" and "improves voter confidence." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021).

**b.** The disagreement is thus confined to narrow tailoring, which is required under either *Burson* or *O'Brien*. And the handout law "is narrowly drawn." *Food Not Bombs II*, 11 F.4th at 1291 (quoting *Clark*, 468 U.S. at 294).

To start, the law prohibits only *handouts* to voters, and does not prohibit anyone from expressing messages through written or verbal speech that they hoped to convey through their handouts. That alone makes it narrowly tailored. By definition, "[c]onduct restrictions will never 'burden substantially more speech' than necessary." *Lichtenstein*, 83 F.4th at 598 (quotation omitted). They impose a negligible First Amendment burden because they "leave open *every* avenue for actual speech." *Id.* at 599.

For another, the law is not a blanket ban on voter handouts. *See Burson*, 504 U.S. at 210. It applies only in the narrow, easily identifiable, 25-foot buffer zone around the polling line. It does not stop organizations who want to provide items to voters from doing so, as long as they stay a few steps back from the polling

line itself.  Voters are free to engage with advocacy organizations if they choose to do so.

The law also curbs discretionary enforcement.  The buffer zone minimizes confrontations between individuals and election officials because officials can rely on the buffer zone to protect voters from interference.  The bright line sets clear expectations for officials, organizations, and voters about what is and is not permitted on election day.  *Cf. Ward*, 491 U.S. at 800; *Porter*, 68 F.4th at 448.  Clarity minimizes the risk of selective enforcement and resolves any concerns that certain groups are being targeted because of their partisan affiliation rather than the manner in which they are handing out items to voters.

Most importantly, the Supreme Court and this Court have already upheld buffer zones that imposed greater burdens on First Amendment speech.  The *Burson* Court upheld a buffer-zone law that banned campaigning—targeting speech based on its content.  504 U.S. at 211.  In *Browning* this Court upheld a content-based buffer zone law that banned exit solicitation.  572 F.3d at 1221.  Other federal courts of appeals have also upheld similar buffer zones.  *See, e.g.*, *Ostrewich v. Tatum*, 72 F.4th 94, 107 (5th Cir. 2023) (upholding Texas's 100-foot no-loitering, no-electioneering polling-place zone); *Frank v. Lee*, 84 F.4th 1119, 1127 (10th Cir.

2023) (upholding Wyoming's 300-foot no-electioneering polling-place zone); *Schirmer v. Edwards*, 2 F.3d 117, 122 (5th Cir. 1993) (upholding Louisiana's expansion of the polling place zone from 300 to 600 feet); *see also Frank*, 84 F.4th at 1127 n.5 (identifying 10 states with 200-foot or greater election-day buffer zones).  The handout law employs the same manner of regulation—a buffer zone around voters—and imposes an even lesser burden on speech.

The district court erroneously concluded otherwise, but its reasoning was at odds with itself.  The district court correctly concluded that the law imposing the 150-foot buffer zone around the polling place (also banning handouts) *is* narrowly tailored, Doc. 241 at 53–54, but then it held that the 25-foot zone around the polling line is *not* narrowly tailored, *id.* at 56.  Yet the only difference between the two laws is the way the buffer zone is drawn.  The length of the polling-line buffer zone varies with the polling line as it ebbs and flows.

The district court concluded that the variation meant the polling line zone is hypothetically "limitless" and thus not narrowly tailored, Doc. 241 at 55, but that was misguided for many reasons.  At the most basic level, the size of the buffer zone is not what determines whether it is narrowly tailored.  The

*Burson* Court explicitly held that the size of a buffer zone is not "a question of constitutional dimension," 504 U.S. at 210 (quotation omitted), meaning that states may customize the size, shape, and design of the buffer zone. What states cannot do is enact a *blanket ban* disguised as a buffer zone. Polling places dot the state, so a large enough buffer zone per polling place can turn into a total ban everywhere. *See, e.g.*, *Anderson v. Spear*, 356 F.3d 651, 658 (6th Cir. 2004) (enjoining a 500-foot buffer zone successfully designed to "eliminate all electioneering [anywhere] on election day"). And a total ban is an entirely different kind of law than a buffer zone. "[D]istinctions in degree become significant only when they can be said to amount to differences in kind." *Buckley v. Valeo*, 424 U.S. 1, 30 (1976); *Burson*, 504 U.S. at 210.

By tightly tailoring the buffer zone to the polling line itself, Georgia has ensured that the polling-line zone will never serve as a blanket ban. If anything, tailoring the buffer zone to the polling line is the least restrictive means of protecting voters on election day. There is at least as great a need to protect voters in the back of the line because they are farther away from the protections of the polling place itself. The alternative would be to enlarge the polling place buffer zone to ensure that it is big enough that the

49

polling line will not extend outside of it. The polling-line zone is thus the *less* invasive method to protect all voters in line.

It also makes little sense to treat the polling-line zone differently from the polling-place zone because the two will almost always overlap. Georgia's election reform bill also imposed new rules requiring precincts to either expand capacity or split in two whenever it is shown that they likely will have long lines on election day. *See* O.C.G.A. § 21-2-263(b). That means polling lines will not infinitely extend throughout the State, and the district court was wrong to conclude that the buffer zone has "no boundary." Doc. 614 at 14.

Finally, even if it were constitutionally invalid to extend a buffer zone around an exceedingly long line, that would be a problem *as applied*, not facially. In most instances, the polling line buffer zone will be a reasonable size (if it exists at all). *See* Doc. 574-37 at 14. And courts may not "strike down [a law] on its face based … [on] hypothetical and unreal possibilities." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 455 (2008) (quotation omitted). That is especially true here where the "evidentiary record" shows that long lines were an aberration caused by a global pandemic. *Id.*

50

The handout law "is reasonable and does not *significantly impinge* on constitutionally protected rights." *Burson*, 504 U.S. at 208–09 (quotation omitted).  For this reason, too, the Court should reverse.

## II.  The equities weigh against a preliminary injunction.

Regardless of the merits, preliminary injunctive relief is inappropriate in this case.  There is no irreparable harm to Plaintiffs, and the damage to the State's interest is immense.

To begin, a preliminary injunction is appropriate only if "the asserted irreparable injury [is] neither remote nor speculative, but actual and imminent."  *Siegel*, 234 F.3d at 1176 (quotation omitted).  But during the 2022 election the handout law did not prevent Plaintiffs from expressing their messages.  Nor did it prevent them from handing out gifts to voters; organizers continued to distribute food and water by offering the items to voters before and after they waited in line to vote.  Doc. 601 at 59; Doc. 601-24 at 3.

And recent experience has shown that election lines will rarely, if ever, extend farther than 150 feet from the polling place. Generally, wait times are now short in Georgia, averaging about two minutes in recent elections.  Doc. 578 at 7; Doc. 578-9 at 29– 32.  And upcoming elections will (presumably) occur without a

51

global pandemic causing long lines, social distancing, and reduced poll staff. Doc. 535-12 at 2. That means Georgia voters can anticipate even shorter lines and wait times. Nothing about this scenario suggests a likelihood of *any* harm—irreparable or otherwise—to Plaintiffs.

Plaintiffs also repeatedly delayed their motion for preliminary relief. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). And that is especially true when the plaintiff "fail[s] to offer any explanation for [the] delay." *Id.* Plaintiffs do not and cannot justify their decision to procrastinate for fourteen months. The handout law was enacted in March 2021, but Plaintiffs waited until late May 2022 to first move for a preliminary injunction. Doc. 171; Doc. 185. And after the district court denied their first request for preliminary relief in August 2022, they delayed another eight months before trying again. Plaintiffs cannot assert "the need for speedy and urgent action" after sitting on their rights for many months at a time. *Wreal*, 840 F.3d at 1248.

And any hypothetical harm to Plaintiffs pales in comparison to the "seriou[s] and irreparabl[e] harm" Georgia will suffer if

prevented from "conducting [its] elections pursuant to a statute enacted by the Legislature." *New Ga. Project*, 976 F.3d at 1283 (quotation omitted); *see also Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (public interest and balance of equities merge when state opposes preliminary injunction). The State has a paramount interest in "protecting voters from confusion and undue influence" and "preserving the integrity of the election process." *Browning*, 572 F.3d at 1219.

Unlike Plaintiffs' amorphous alleged harms, the threat of election interference and voter intimidation is well-documented. During recent elections, gift-giving around polling places exploded to include "food trucks, food tables, and other activities." Doc. 601-19 at 8–9 (explaining the "substantial increase" of gift distribution around polling places). Understandably, this led some voters to "suspect the motives [were] partisan." *Id.*

Against that backdrop, prophylactic measures like the handout law are essential. Once an election occurs, any taint from voter harassment, intimidation, or coercion (or the *appearance* of these maladies) cannot be undone. *See Burson*, 504 U.S. at 198–99. Even if the preliminary injunction is "ultimately reversed, the State cannot run the election over again." *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014). Plaintiffs simply have not

53

established that this case warrants preliminary relief that may itself create "voter confusion." *LWVF*, 32 F.4th at 1371 (quoting *Purcell*, 549 U.S. at 4–5).

## CONCLUSION

For the reasons set out above, this Court should reverse the decision of the district court.

Respectfully submitted.

*/s/ Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Ross W. Bergethon
  *Principal Deputy*
  *Solicitor General*
James E. Barrett
  *Deputy Solicitor General*
Office of the Georgia
  Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,246 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany