**No. 23-13095**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

IN RE: GEORGIA SENATE BILL 202

On Appeal from the United States District Court for the
Northern District of Georgia, No. 1:21-mi-55555, (Boule, J.)

**APPELLEES NEW GEORGIA PROJECT, BLACK LIVES MATTER
FUND, RISE, INC., ELBERT SOLOMON, FANNIE MARIE JACKSON
GIBBS, AND JAUAN DURBIN'S ANSWER BRIEF**

Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
sparks@khlawfirm.com

Uzoma N. Nkwonta
Jacob D. Shelly
Melinda K. Johnson
Tina Meng Morrison
Marcos Mocine-McQueen
Samuel T. Ward-Packard
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
mjohnson@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
swardpackard@elias.law

*Attorneys for Appellees*

**No. 23-13095**
**In re: Georgia Senate Bill 202**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1, Plaintiff-Appellees New Georgia Project, Black Voters Matter Fund, Jauan Durbin, Fannie Marie Jackson Gibbs, Rise, Inc. and Elbert Solomon (collectively, "NGP Appellees") certify that, to the best of their and counsel's knowledge, the following persons have an interest in the outcome of this case or appeal:

1.    Abbott, Robert, *Defendant*

2.    Abudu, Nancy, *Former Attorney for Plaintiffs-Appellees*

3.    Adegbile, Debo, *Attorney for Plaintiffs-Appellees*

4.    Aden, Leah, *Attorney for Plaintiffs-Appellees*

5.    Advancement Project, *Attorneys for Plaintiffs-Appellees*

6.    Ameri, Mana, *Attorney for Plaintiffs-Appellees*

7.    American Civil Liberties Union Foundation of Georgia, a/k/a American Civil Liberties Union Foundation of Georgia, Inc., *Attorneys for Plaintiffs-Appellees*

8.    American Civil Liberties Union Foundation, a/k/a American Civil Liberties Union Foundation, Inc., *Attorneys for Plaintiffs-Appellees*

9.    Andrews, Wanda, *Defendant*

C-1

10. Aquino, Nora, *Plaintiff-Appellee*

11. Asian Americans Advancing Justice-Asian Law Caucus, *Attorneys for Plaintiffs-Appellees*

12. Asian Americans Advancing Justice-Atlanta, *Plaintiff-Appellee*

13. Augusta Law Department, *Attorneys for Defendant*

14. Ausburn, Deborah, *Attorney for Defendants-Appellants*

15. Awuku, George, *Defendant*

16. Banks, Marques, *Former Attorney for Plaintiffs-Appellees*

17. Banter, James, *Attorney for Defendant*

18. Bao, Judy, *Attorney for Intervenor-Plaintiff*

19. Barnes, Sherry, *Defendant*

20. Baron, Noah B., *Attorney for Plaintiffs*

21. Barron, Richard, *Defendant*

22. Bartolomucci, Christopher, *Attorney for Defendants-Appellants*

23. Beausoleil, William, *Attorney for Plaintiffs-Appellees*

24. Beck Owen & Murray, *Attorneys for Defendant*

25. Begakis, Steven, *Attorney for Intervenor-Defendants-Appellants*

26. Belichick, Joseph, *Attorney for Plaintiffs-Appellees*

27. Bell, Jordan, *Attorney for Defendant*

28. Bennette, Matletha, *Attorney for Plaintiffs-Appellees*

29.    Bibb County Board of Elections, *Defendant*

30.    Bibb County Board of Registrars, *Defendant*

31.    Black Voters Matter Fund, *Plaintiff-Appellee*

32.    Blender, Matthew, *Defendant*

33.    Bloodworth, Kristin, *Former Attorney for Defendant*

34.    Boone, Annika, *Attorney for Defendants-Appellants*

35.    Bowman, Brad, *Attorney for Defendant*

36.    Boyle, Donald, *Attorney for Defendants-Appellants*

37.    Broder, Karl, *Attorney for Defendant*

38.    Brooks, Jessica, *Defendant*

39.    Brooks, Sofia, *Attorney for Plaintiffs-Appellees*

40.    Brown, Marcia, *Defendant*

41.    Bruning, Stephen, *Defendant*

42.    Bruning, Steven, *Defendant*

43.    Bryan, Bennett, *Attorney for Defendant*

44.    Burwell, Kaye, *Attorney for Defendant*

45.    Campbell-Harris, Dayton, *Attorney for Plaintiffs-Appellees*

46.    Carr, Christopher, *Attorney for Defendants-Appellants*

47.    Carver, William, *Attorney for Intervenor-Defendants-Appellants*

48.    Cathey, Thomas, *Former Attorney for Defendant*

49.  Chalmers, Adams, Backer & Kaufman, LLC, *Attorneys for Defendant*

50.  Chatham County Attorney, *Attorneys for Defendant*

51.  Chatham County Board of Elections, *Defendant*

52.  Chatham County Board of Registrars, *Defendant*

53.  Clarke County Board of Election and Voter Registration, *Defendant*

54.  Clayton County Board of Elections and Registration, *Defendant*

55.  Cobb County Board of Elections and Registration, *Defendant*

56.  Cochran, Ken, *Defendant*

57.  Columbia County Board of Elections, *Defendant*

58.  Columbia County Board of Registrars, *Defendant*

59.  Common Cause, *Plaintiff-Appellee*

60.  Consovoy McCarthy PLLC, *Attorneys for Intervenor-Defendants-Appellants*

61.  Cramer, Raisa, *Former Attorney for Plaintiffs-Appellees*

62.  Crawford, Teresa, *Defendant*

63.  Crowell & Moring, LLP, *Attorneys for Plaintiffs-Appellees*

64.  Cushman, Ann, *Defendant*

65.  Cusick, John, *Attorney for Plaintiffs-Appellees*

66.  Dasgupta, Riddhi, *Attorney for Defendants-Appellants*

67.  Dave, Charles, *Defendant*

68. Davenport, Jennifer, *Attorney for Defendant*

69. Davis Wright Tremaine LLP, *Attorneys for Plaintiffs-Appellees*

70. Davis, Britton, *Former Attorney for Plaintiffs-Appelle*es.

71. Day, Stephen, *Defendant*

72. DeKalb County Board of Registrations and Elections, *Defendant*

73. DeKalb County Law Department, *Attorneys for Defendant*

74. Delta Sigma Theta Sorority, Inc., *Plaintiff-Appellee*

75. Denmark, Emilie, *Attorney for Defendant*

76. Dentons US LLP, *Attorneys for Intervenor-Defendants-Appellants*

77. Deshazior, Zurich, *Defendant*

78. DeThomas, Courtney, *Attorney for Plaintiffs-Appellees*

79. Dianis, Judith, *Attorney for Plaintiffs-Appellees*

80. Dickey, Gilbert, *Attorney for Intervenor-Defendants-Appellants*

81. Dicks, Terence, *Defendant*

82. Dimmick, Brian, *Attorney for Plaintiffs-Appellees*

83. DiStefano, Don, *Defendant*

84. Doss, Travis, *Defendant*

85. Dozier, Shauna, *Defendant*

86. Drennon, Baxter, *Attorney for Intervenor-Defendants-Appellants*

87. Duffie, Wanda, *Defendant*

88.     Durbin, Jauan, *Plaintiff-Appellee*

89.     Durso, Katherine, *Defendant*

90.     Edwards, Gregory, *Defendant*

91.     Elias Law Group LLP, *Attorneys for Plaintiffs-Appellees*

92.     Ellington, Thomas, *Defendant*

93.     Enjeti-Sydow, Anjali, *Plaintiff-Appellee*

94.     Evans-Daniel, Karen, *Defendant*

95.     Evans, James, *Attorney for Defendant*

96.     Evans, Rachel, *Attorney for Plaintiffs-Appellees*

97.     Eveler, Janine, *Defendant*

98.     Falk, Donald, *Attorney for Defendants-Appellants*

99.     Fambrough, Willa, *Defendant*

100.    Faransso, Tania, *Attorney for Plaintiffs-Appellees*

101.    Farrell, Gregory, *Attorney for Plaintiffs-Appellees*

102.    Feldsherov, Ilya, *Former Attorney for Plaintiffs-Appellees*

103.    Fenwick & West, LLP, *Attorneys for Plaintiffs-Appellees*

104.    Fervier, John, *Defendant-Appellant*

105.    Field, Brian, *Attorney for Defendants-Appellants*

106.    First Congregational Church, United Church of Christ Incorporated,

*Plaintiff-Appellee*

107.  Fogelson, Matthew, *Attorney for Plaintiffs-Appellees*

108.  Forsyth County Board of Voter Registrations and Elections,

*Defendant*

109.  Fortier, Lucas, *Attorney for Plaintiffs-Appellees*

110.  Foster, Mikayla, *Attorney for Plaintiffs-Appellees*

111.  Freeman Mathis & Gary, LLP, *Attorneys for Defendant*

112.  Fuller, Stephen P., *Attorney for Amicus Curiae*

113.  Fulton County Attorney's Office, *Attorneys for Defendant*

114.  Fulton County Registration and Elections Board, *Defendant*

115.  Galeo Latino Community Development Fund, Inc., *Plaintiff-Appellee*

116.  Gammage, Keith, *Defendant*

117.  Garabadu, Rahul, *Former Attorney for Plaintiffs-Appellees*

118.  Gartland, Pat, *Defendant*

119.  Gay, Nancy, *Defendant*

120.  Geiger, Debra, *Defendant*

121.  Georgia Adapt, *Plaintiff-Appellee*

122.  Georgia Advocacy Office, *Plaintiff-Appellee*

123.  Georgia Coalition for the People's Agenda, Inc., *Plaintiff-Appellee*

124.  Georgia Department of Law, *Attorneys for Defendants-Appellants*

125.  Georgia Latino Alliance for Human Rights, Inc., *Plaintiff-Appellee*

126.  Georgia Muslim Voter Project, *Plaintiff-Appellee*

127.  Georgia Republican Party, Inc., *Intervenor-Defendant-Appellant*

128.  Georgia State Conference of the NAACP, *Plaintiff-Appellee*

129.  Georgia State Election Board, *Defendant-Appellant*

130.  Ghazal, Sara Tindall, *Defendant-Appellant*

131.  Gibbs, Fannie, *Plaintiff-Appellee*

132.  Gillon, Thomas, *Defendant*

133.  Givens, Diane, *Defendant*

134.  Gossett, David, *Attorney for Plaintiffs-Appellees*

135.  Green, Tyler, *Attorney for Intervenor-Defendants-Appellants*

136.  Greenbaum, Jon, *Attorney for Plaintiffs-Appellees*

137.  Greenberg Traurig, LLP, *Attorneys for Defendant*

138.  Groves, Angela, *Attorney for Plaintiffs-Appellees*

139.  Gwinnett County Board of Registrations and Elections, *Defendant*

140.  Gwinnett County Department of Law, *Attorneys for Defendant*

141.  Hall Booth Smith, P.C., *Attorneys for Intervenor-Defendants-Appellants*

142.  Hall County Board of Elections and Registration, *Defendant*

143.  Hall County Government, *Attorneys for Defendant*

144.  Hall, Dorothy, *Defendant*

145.  Hall, John, *Attorney for Intervenor-Defendants-Appellants*

146.  Hamilton, Brittni, *Attorney for Plaintiffs-Appellees*

147.  Hancock, Jack, *Attorney for Defendant*

148.  Hart, Ralph, *Attorney for Defendant*

149.  Hasselberg, Emily, *Attorney for Plaintiffs-Appellees*

150.  Hayes, Vilia, *Attorney for Plaintiffs-Appellees*

151.  Haynie, Litchfield & White, PC, *Attorneys for Defendant*

152.  Hazard, Joel, *Defendant*

153.  Heard, Bradley, *Attorney for Plaintiffs-Appellees*

154.  Heckmann, Elizabeth, *Attorney for Plaintiffs*

155.  Heimes, Marianne, *Defendant*

156.  Henseler, James, *Attorney for Plaintiffs-Appellees*

157.  Herren, Thomas, *Attorney for Plaintiffs-Appellees*

158.  Hiatt, Alexandra, *Attorney for Plaintiffs-Appellees*

159.  Ho, Dale, *Former Attorney for Plaintiffs-Appellees*

160.  Hodge, Malinda, *Defendant*

161.  Houk, Julie, *Attorney for Plaintiffs-Appellees*

162.  Hoyos, Luis, *Attorney for Plaintiffs-Appellees*

163.  Hughes Hubbard & Reed, *Attorneys for Plaintiffs-Appellees*

164.  Hughes, Aileen, *Attorney for Plaintiffs-Appellees*

C-9

165. Hull Barrett, PC, *Attorneys for Defendant*

166. Ingram, Randy, *Defendant*

167. Jacoutot, Bryan, *Attorney for Defendants-Appellants*

168. Jaffe, Erik, *Attorney for Defendants-Appellants*

169. Jahangiri, Mahroh, *Former Attorney for Plaintiffs-Appellees*

170. Jaikumar, Arjun, *Former Attorney for Plaintiffs-Appellees*

171. James-Bates-Brannan-Groover-LLP, *Attorneys for Defendant*

172. Jarrard & Davis, LLP, *Attorneys for Defendant*

173. Jasrasaria, Jyoti, *Former Attorney for Plaintiffs-Appellees*

174. Jaugstetter, Patrick, *Attorney for Defendant*

175. Jedreski, Matthew, *Attorney for Plaintiffs-Appellees*

176. Jeffares, Rick, *Defendant-Appellant*

177. Jester, Alfred, *Defendant*

178. Jester, Nancy, *Defendant*

179. Jhaveri, Sejal, *Attorney for Plaintiffs-Appellees*

180. Johnson, Aaron, *Defendant*

181. Johnson, Ben, *Defendant*

182. Johnson, Darlene, *Defendant*

183. Johnson, Melinda, *Attorney for Plaintiffs-Appellees*

184. Johnston, Janice, *Defendant-Appellant*

185. Joiner, Amelia, *Attorney for Defendant*

186. Kanu, Nkechi, *Attorney for Plaintiffs-Appellees*

187. Kaplan, Mike, *Defendant*

188. Kastorf Law, LLC, *Attorneys for Plaintiffs-Appellees*

189. Kastorf, Kurt, *Attorney for Plaintiffs-Appellees*

190. Kaufman, Alex, *Attorney for Intervenor-Defendants-Appellants*

191. Keker Van Nest & Peters LLP, *Attorneys for Plaintiffs-Appellees*

192. Kemp, Brian, *Defendant-Appellant*

193. Kennedy, David, *Defendant*

194. Kennedy, Kate, *Attorney for Plaintiffs-Appellees*

195. Keogh, William, *Attorney for Defendant*

196. Khan, Sabrina, *Former Attorney for Plaintiffs-Appellees*

197. Kim, Danielle, *Attorney for Plaintiffs-Appellees*

198. King, Janelle, *Defendant-Appellant*

199. Kingsolver, Justin*, Attorney for Plaintiffs-Appellees*

200. Klein, Spencer, *Former Attorney for Plaintiffs-Appellees*

201. Knapp, Jr., Halsey, *Attorney for Plaintiffs-Appellees*

202. Koorji, Alaizah, *Attorney for Plaintiffs-Appellees*

203. Krevolin & Horst, LLC, *Attorneys for Plaintiffs-Appellees*

204. Kucharz, Kevin, *Attorney for Defendant*

205. Lakin, Sophia Lin, *Attorney for Plaintiffs-Appellees*

206. Lam, Leo*, Attorney for Plaintiffs-Appellees*

207. Lang, Antan, *Defendant*

208. LaRoss, Diane, *Attorney for Defendants-Appellants*

209. Latino Community Fund of Georgia, *Plaintiff-Appellee*

210. Lauridsen, Adam, *Attorney for Plaintiffs-Appellees*

211. Law Office of Gerald R Weber, LLC, *Attorneys for Plaintiffs-Appellees*

212. Lawyers' Committee for Civil Rights Under Law, *Attorneys for Plaintiffs-Appellees*

213. League of Women Voters of Georgia, Inc., *Plaintiff-Appellee*

214. Leung, Kimberly, *Attorney for Plaintiffs-Appellees*

215. Lewis, Anthony, *Defendant*

216. Lewis, Joyce Gist, *Attorney for Plaintiffs-Appellees*

217. Lin, Stephanie, *Attorney for Plaintiffs-Appellees*

218. Lindsey, Edward, *Defendant*

219. Lower Muskogee Creek Tribe, *Plaintiff-Appellee*

220. Lowman, David, *Attorney for Defendant*

221. Ludwig, Jordan, *Attorney for Plaintiffs-Appellees*

222. Luth, Barbara, *Defendant*

223.    Ma, Eileen, *Attorney for Plaintiffs-Appellees*

224.    Mack, Rachel, *Attorney for Defendant*

225.    Mahoney, Thomas, *Defendant*

226.    Manifold, Zach, *Defendant*

227.    Martin, Grace, *Attorney for Defendant*

228.    Mashburn, Matthew, *Defendant-Appellant*

229.    May, Caitlin, *Attorney for Plaintiffs-Appellees*

230.    McAdams, Issac, *Defendant*

231.    McCandless, Spencer, *Former Attorney for Plaintiffs-Appellees*

232.    McCarthy, Thomas, *Attorney for Intervenor-Defendants-Appellants*

233.    McClain, Roy, *Defendant*

234.    McCord, Catherine, *Attorney for Plaintiffs-Appellees*

235.    McFalls, Tim, *Defendant*

236.    McFarland, Ernest, *Attorney for Plaintiffs-Appellees*

237.    McGowan, Charlene, *Former Attorney for Defendants-Appellants*

238.    McRae, Colin, *Defendant*

239.    Melcher, Molly, *Attorney for Plaintiffs-Appellees*

240.    Metropolitan Atlanta Baptist Ministers Union, Inc.*, Plaintiff-Appellee*

241.    Miller, Nicholas, *Attorney for Defendants-Appellants*

242.    Milord, Sandy, *Attorney for Defendant*

243.  Minnis, Terry, *Attorney for Plaintiffs-Appellees*

244.  Mizner, Susan, *Attorney for Plaintiffs-Appellees*

245.  Mocine-McQueen, Marcos, *Attorney for Plaintiffs-Appellees*

246.  Momo, Shelley, *Attorney for Defendant*

247.  Morrison, Tina Meng, *Attorney for Plaintiffs-Appellees*

248.  Mosbacher, Jennifer, *Defendant*

249.  Motter, Susan, *Defendant*

250.  Murchie, Laura, *Attorney for Plaintiffs-Appellees*

251.  Murray, Karen, *Defendant*

252.  NAACP Legal Defense and Education Fund, Inc., *Attorneys for Plaintiffs-Appellees*

253.  National Republican Congressional Committee, *Intervenor-Defendant-Appellant*

254.  National Republican Senatorial Committee, *Intervenor-Defendant-Appellant*

255.  Natt, Joel, *Defendant*

256.  Nemeth, Miriam, *Former Attorney for Plaintiffs-Appellees*

257.  Nercessian, Armen*, Attorney for Plaintiffs-Appellees*

258.  Newland, James, *Defendant*

259.  Nguyen, Candice, *Attorney for Plaintiffs-Appellees*

260.  Nguyen, Phi, *Former Attorney for Plaintiffs-Appellees*

261.  Nkwonta, Uzoma, *Attorney for Plaintiffs-Appellees*

262.  Noa, Jack, *Defendant*

263.  Noland Law Firm, LLC, *Attorneys for Defendant*

264.  Noland, William*, Attorney for Defendant*

265.  Norris, Cameron, *Attorney for Intervenor-Defendants-Appellants*

266.  Norse, William, *Defendant*

267.  Nwachukwu, Jennifer, *Attorney for Plaintiffs-Appellees*

268.  O'Brien, James, *Defendant*

269.  O'Connor, Eileen, *Attorney for Plaintiffs-Appellees*

270.  O'Lenick, Alice, *Defendant*

271.  O'Kelley, Elijah J., *Attorney for Defendants-Appellants*

272.  Olm, Rylee, *Attorney for Plaintiffs-Appellees*

273.  Oxford, Neil, *Attorney for Plaintiffs-Appellees*

274.  Paik, Steven, *Plaintiff-Appellee*

275.  Pant, Shontee, *Attorney for Plaintiffs-Appellees*

276.  Paradise, Loree Anne, *Former Attorney for Defendants-Appellants*

277.  Parker, Warrington, *Attorney for Plaintiffs-Appellees*

278.  Pelletier, Susan, *Former Attorney for Plaintiffs-Appellees*

279.  Petran, Stephan J., *Attorney for Defendants-Appellants*

280.  Porter, Megan, *Former Attorney for Plaintiffs-Appellees*

281.  Powell, Laura, *Attorney for Plaintiffs-Appellees*

282.  Prince, Joshua, *Former Attorney for Defendants-Appellants*

283.  Pulgram, Laurence, *Attorney for Plaintiffs-Appellees*

284.  Pullar, Patricia, *Defendant*

285.  Qadir, Hunaid, *Defendant*

286.  Radzikinas, Carla, *Defendant*

287.  Raffensperger, Brad, *Defendant-Appellant*

288.  Raffle, Rocky, *Defendant*

289.  Ramahi, Zainab, *Attorney for Plaintiffs-Appellees*

290.  Remlinger, Brian, *Attorney for Intervenor-Plaintiff*

291.  Rich, James, *Attorney for Plaintiffs-Appellees*

292.  Richardson, Jasmyn, *Attorney for Plaintiffs-Appellees*

293.  Richmond County Board of Elections, *Defendant*

294.  Ringer, Cheryl, *Former Attorney for Defendant*

295.  Rise, Inc., *Plaintiff-Appellee*

296.  Rodriguez, Anthony, *Defendant*

297.  Rosborough, Davin, *Attorney for Plaintiffs-Appellees*

298.  Rosenberg, Ezra, *Attorney for Plaintiffs-Appellees*

299.  Rosenberg, Steven, *Former Attorney for Defendant*

300.  Russ, John, *Attorney for Plaintiffs-Appellees*

301.  Ruth, Kathleen, *Defendant*

302.  Ryan, Elizabeth, *Attorney for Plaintiffs-Appellees*

303.  Sabzevari, Arash, *Attorney for Defendant*

304.  Sachdeva, Niharika, *Attorney for Plaintiffs-Appellees*

305.  Schaerr Jaffe LLP, *Attorneys for Defendants-Appellants*

306.  Schaerr, Gene, *Attorney for Defendants-Appellants*

307.  Scott, William, *Former Attorney for Defendant*

308.  Seals, Veronica, *Defendant*

309.  Segarra, Esperanza, *Former Attorney for Plaintiffs-Appellees*

310.  Sells, Bryan, *Attorney for Plaintiffs-Appellees*

311.  Shah, Niyati, *Attorney for Plaintiffs-Appellees*

312.  Sheats, Gala, *Defendant*

313.  Shelly, Jacob, *Attorney for Plaintiffs-Appellees*

314.  Shirley, Adam, *Defendant*

315.  Sieff, Adam, *Attorney for Plaintiffs-Appellees*

316.  Silas, Tori, *Defendant*

317.  Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellee*

318.  Smith, Casey, *Attorney for Plaintiffs-Appellees*

319.  Smith, Dele, *Defendant*

320.  Smith, Mandi, *Defendant*

321.  Solh, Chahira, *Attorney for Plaintiffs-Appellees*

322.  Solomon, Elbert*, Plaintiff-Appellee*

323.  Sosebee, Charlotte, *Defendant*

324.  Southern Christian Leadership Conference, *Plaintiff-Appellee*

325.  Southern Poverty Law Center, *Attorneys for Plaintiffs-Appellees*

326.  Sowell, Gregory, *Attorney for Defendant*

327.  Sparks, Adam, *Attorney for Plaintiffs-Appellees*

328.  Squiers, Cristina, *Attorney for Defendants-Appellants*

329.  Stewart Melvin & Frost, LLP, *Attorneys for Defendant*

330.  Sumner, Stuart, *Attorney for Intervenor-Defendants-Appellants*

331.  Sung, Connie, *Attorney for Plaintiffs-Appellees*

332.  Swift, Karli, *Defendant*

333.  Szilagyi, Heather, *Attorney for Plaintiffs-Appellees*

334.  Tatum, Tobias, *Attorney for Defendants-Appellants*

335.  Taylor English Duma LLP, *Attorneys for Defendants-Appellants*

336.  Taylor, Wandy, *Defendant*

337.  Thatte, Anuja, *Attorney for Plaintiffs-Appellees*

338.  The ACLU Foundation Disability Rights Program, *Attorneys for Plaintiffs-Appellees*

339.  The Arc of the United States, *Plaintiff-Appellee*

340.  The Concerned Black Clergy of Metropolitan Atlanta, Inc., *Plaintiff-Appellee*

341.  The Justice Initiative, Inc., *Plaintiff-Appellee*

342.  The Law Office of Bryan L. Sells, LLC, *Attorneys for Plaintiffs-Appellees*

343.  The New Georgia Project, *Plaintiff-Appellee*

344.  The Republican National Committee, *Intervenor-Defendant-Appellant*

345.  The State of Georgia, *Defendant-Appellant*

346.  The United States of America, *Plaintiff-Appellee*

347.  The Urban League of Greater Atlanta, Inc., *Plaintiff-Appellee*

348.  Thomas, Ethan, *Attorney for Plaintiffs-Appellees*

349.  Thompson, Grace, *Attorney for Plaintiffs-Appellees*

350.  Till, Ann, *Defendant*

351.  Topaz, Jonathan, *Attorney for Plaintiffs-Appellees*

352.  Torchinsky, Jason Brett, *Attorney for Amicus Curiae*

353.  Trent, Edward, *Attorney for Defendants-Appellants*

354.  Tucker, William, *Attorney for Plaintiffs-Appellees*

355.  Tyson, Bryan, *Attorney for Defendants-Appellants*

356.  Uddullah, Angelina, *Plaintiff-Appellee*

357.  Unger, Jess, *Former Attorney for Plaintiffs-Appellees*

358.  United States Department of Justice, *Attorneys for Plaintiffs-Appellees*

359.  Stephens, Michael Van, *Attorney for Defendant*

360.  Vander Els, Irene, *Former Attorney for Defendant*

361.  Varghese, George, *Attorney for Plaintiffs-Appellees*

362.  Varner, Johnny, *Defendant*

363.  Vasquez, Jorge, *Former Attorney for Plaintiffs-Appellees*

364.  Vaughan, Elizabeth, *Former Attorney for Defendants-Appellants*

365.  Waite, Tristen, *Attorney for Defendant*

366.  Wang, Emily, *Attorney for Plaintiffs-Appellees*

367.  Ward-Packard, Samuel, *Attorney for Plaintiffs-Appellees*

368.  Wardenski, Joseph, *Former Attorney for Plaintiffs-Appellees*

369.  Webb, Bryan, *Attorney for Defendants-Appellants*

370.  Weber, Gerald, *Attorney for Plaintiffs-Appellees*

371.  Weigel, Daniel, *Attorney for Defendants-Appellants*

372.  Wesley, Carol, *Defendant*

373.  White, Daniel, *Attorney for Defendant*

374.  White, William, *Attorney for Intervenor-Defendants-Appellants*

375.   Wiggins, Larry, *Defendant*

376.   Wilberforce, Nana, *Attorney for Plaintiffs-Appellees*

377.   Wilborn, Eric, *Attorney for Defendant*

378.   Williams, Gilda, *Former Attorney for Plaintiffs-Appellees*

379.   Williams, Tuwanda Rush, *Former Attorney for Defendant*

380.   Wilmer Cutler Pickering Hale and Dorr LLP, *Attorneys for Plaintiffs-Appellees*

381.   Wilson, Jacob, *Attorney for Defendant*

382.   Wilson, Melanie, *Attorney for Defendant*

383.   Wingate, Mark, *Defendant*

384.   Winichakul, Pichaya Poy, *Attorney for Plaintiffs-Appellees*

385.   Women Watch Afrika, *Plaintiff-Appellee*

386.   Woodfin, Conor, *Attorney for Intervenor-Defendants-Appellants*

387.   Woolard, Cathy, *Defendant*

388.   Wurtz, Lori, *Defendant*

389.   Yoon, Meredyth, *Attorney for Plaintiffs-Appellees*

390.   Young, Sean, *Former Attorney for Plaintiffs-Appellees*

391.   Zatz, Clifford, *Attorney for Plaintiffs-Appellees*

No NGP Plaintiff-Appellee has a parent corporation and no corporation(s) own(s) 10% or more of any of their stock. NGP Plaintiffs-Appellees certify that to

the best of their and undersigned counsel's knowledge, no publicly held company or corporation has an interest in the outcome of this case or appeal. As required by Circuit Rule 26.1-2(c), NGP Plaintiffs-Appellees certify that the CIP contained in this brief is complete and correct.

## STATEMENT REGARDING ORAL ARGUMENT

NGP Plaintiffs-Appellees welcome the opportunity to participate in oral argument to further explain how the decision below correctly applied familiar First Amendment principles.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES....................................................................... iv

STATEMENT OF THE ISSUE ...................................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE ....................................................................4

    I.    Line relief in Georgia ..............................................................4

    II.    S.B. 202's criminalization of line relief ........................................7

    III.    Legal challenges to S.B. 202 and initial preliminary injunction motions ...........................................................................8

    IV.    Renewed preliminary injunction motions .........................................9

        A.    The district court's findings of fact.........................................10

        B.    State Defendants' factual background does not accurately reflect the record below. .........................................................12

        C.    Conclusions of law.................................................................15

STANDARD OF REVIEW .......................................................................18

SUMMARY OF THE ARGUMENT.................................................................19

ARGUMENT ......................................................................................22

    I.    Plaintiffs demonstrated a substantial likelihood of success on the merits. ..............................................................................23

A.    Line relief is protected expressive activity. ............................23

B.    The Line Relief Ban is subject to strict scrutiny....................28

C.    The Line Relief Ban cannot survive strict scrutiny. ..............34

II.    The district court did not abuse its discretion in concluding that the equitable requirements favored a preliminary injunction. ................42

CONCLUSION ................................................................................45

CERTIFICATE OF COMPLIANCE ...................................................47

CERTIFICATE OF SERVICE ............................................................47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Access Now, Inc. v. Sw. Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004) ..........................................................20

*Anderson v. Spear*,
    356 F.3d 651 (6th Cir. 2004) .............................................................41

*Boos v. Barry*,
    485 U.S. 312 (1988)......................................................................32, 34

*Brooklyn Branch of NAACP v. Kosinski*,
    No. 21 CIV. 7667 (KPF), 2024 WL 2846687 (S.D.N.Y. May 30,
    2024) .........................................................................................28, 33

*Burk v. Augusta-Richmond County*,
    365 F.3d 1247 (11th Cir. 2004) ..........................................................33

*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021) ..........................................................27

*Burson v. Freeman*,
    504 U.S. 191 (1991) (plurality opinion) ................. 16, 20, 21, 29, 33, 34, 37, 40

*Citizens for Police Account. Pol. Comm. v. Browning*,
    572 F.3d 1213 (11th Cir. 2009) ......................................................30, 41

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..........................................................................34

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..........................................................................27

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................22, 42, 43

*First Vagabonds Church of God v. City of Orlando*,
    638 F.3d 756 (11th Cir. 2011) ............................................................33

*Frisby v. Schultz*,
  487 U.S. 474 (1988)...............................................................35

*Ft. Lauderdale Food Not Bombs v City of Ft. Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ..................................................27, 38

*In re: Ga. Senate Bill 202*,
  622 F. Supp. 3d 1312 (N.D. Ga. 2022)..............................................34

*Gonzalez v. Governor of Ga.*,
  978 F.3d 1266 (11th Cir. 2020) ............................................18, 19, 23

*Greer v. Spock*,
  424 U.S. 828 (1976)...........................................................20, 31

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...................................................24, 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995)................................................................25

*Hurley v. Moore*,
  233 F.3d 1295 (11th Cir. 2000) ........................................................20

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ............................................22, 43, 45

*Krys v. Lufthansa German Airlines*,
  119 F.3d 1515 (11th Cir. 1997) .......................................................19

*Melendez v. Sec'y, Fla. Dep't of Corr.*,
  No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022)............................29

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018)..........................................................20, 28, 30, 37

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ........................................................42

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983)...................................................................20

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)...............................................................20, 21, 32, 34

*Reider v. Philip Morris USA, Inc.*,
  793 F.3d 1254 (11th Cir. 2015) ...........................................................28

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988)..........................................................................36, 37

*Russell v. Lundergan-Grimes*,
  784 F.3d 1037 (6th Cir. 2015) .........................................................41, 42

*Solantic, LLC v. City of Neptune Beach*,
  410 F.3d 1250 (11th Cir. 2005) ...........................................................21

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ...........................................................42

*Texas v. Johnson*,
  491 U.S. 397 (1989)..............................................................................23

*United States v. Hansen*,
  599 U.S. 762 (2023)..............................................................................34

*United States v. Kokinda*,
  497 U.S. 720 (1990)........................................................................20, 31

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000)..............................................................................36

*Virginia v. Hicks*,
  539 U.S. 113 (2003)..............................................................................34

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)..............................................................................32

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................23

**Statutes**

O.C.G.A. § 21-2-414(a) ...............................................................7, 8, 35

O.C.G.A. § 21-2-567.................................................................................35

vi

O.C.G.A. § 21-2-570................................................................................35

**Other Authorities**

S.B. 202, 2021–2022 Leg., Reg. Sess. (Ga. 2021) ........................................2, 24, 32

## STATEMENT OF THE ISSUE

Whether the district court erred by preliminarily enjoining under the First Amendment a state law prohibiting anyone from providing food, water, or any other support items to individuals standing in lines that extend more than 150 feet from any polling place.

**INTRODUCTION**

Georgia voters have often had to contend with punishingly long lines at the polls—lines that test their perseverance and threaten their right to vote. It is not uncommon for voters to wait over an hour, in full sun or heavy rain, to cast a ballot. Across Georgia, nonpartisan civic organizations have developed programs to show support for voters facing such lines. By offering food, water, or small comfort items like chairs or umbrellas, such organizations express solidarity with voters' steadfast efforts to exercise their most fundamental right.

This case is about the State of Georgia's efforts to shut down such voter-support efforts and silence the messages of solidarity and encouragement they express. In 2021, after yet another election cycle where lines at many Georgia polling places stretched for hours, the General Assembly enacted S.B. 202, which targeted nonpartisan organizations' favored—and most effective—means of encouraging voters who must wait in these lines to vote. S.B. 202, 2021–2022 Leg., Reg. Sess. (Ga. 2021). As relevant here, S.B. 202 makes it a criminal offense to offer "food and drink" and other support items—like chairs and umbrellas—to help queuing electors persist during long waits. And this prohibition applies when the offer is made not just within 150 feet of the polling place, but also within 25 feet of *any* voter waiting in a line that extends outside the 150-foot buffer. This frontal attack on core political speech, untethered to sufficient state interests, is prohibited by the First Amendment.

New Georgia Project, Black Voters Matter Fund, and Rise, Inc. (collectively, "NGP Plaintiffs"[1]) pursue their missions by preaching the power of voting and celebrating voters who must endure difficult conditions to cast their ballots. They do so with their words, but also with their hands—by passing out bottles of water to voters standing in the heat; by delivering snacks to voters and their children who may be missing a meal as they idle in line; and by offering other small tokens, such as ponchos when it rains, to remind voters that they are not alone in their struggle. These are the expressive acts that S.B. 202 renders criminal.

The district court correctly recognized that the Constitution does not tolerate this censorship, at least not at unlimited distances from the polling place. Having determined that NGP Plaintiffs are likely to succeed on their claim that S.B. 202's ban on the provision of food, water, and other support items more than 150 feet from the polling place violates the First Amendment, and having found that the balance of the equities favors NGP Plaintiffs, the court preliminarily enjoined that aspect of the ban. The court's decision reasonably reviewed the facts in evidence and faithfully applied governing law.

Appellants—the Governor of Georgia, Georgia Secretary of State, Dougherty County District Attorney Gregory W. Edwards, and the Georgia State Election

---

[1] NGP Plaintiffs also include three Georgia voters: Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin. This brief refers to the line relief expression pursued by the three organizational plaintiffs and Mr. Durbin.

3

Board and its members ("State Defendants"), fail to show that the district court abused its discretion.[2] Their energies are focused elsewhere. They defend prohibitions that NGP Plaintiffs do not challenge and are at no risk of violating, such as restrictions on campaign solicitations and intimidating threats near a polling place—actions that were unlawful long before S.B. 202 was enacted. And they contrive all manner of purported facts that were properly rejected by the district court, or that are not in the record at all.

Ultimately, State Defendants offer no persuasive reason to reverse the district court's straightforward analysis: S.B. 202's line relief ban, when applied to voters more than 150 feet from the polling place, is subject to strict scrutiny, which it cannot survive. And because fundamental First Amendment rights are at stake, the equities favor NGP Plaintiffs. The Court should affirm.

## STATEMENT OF THE CASE

### I.    Line relief in Georgia

For years, Georgia elections have been plagued by notoriously long lines. Doc. 84-1 at 179–180; *see also, e.g.*, R. 185-3 ¶ 17 [SA-116]; R. 185-6 ¶ 9 [SA-131–

---

[2] NGP Plaintiffs bring their claim challenging this provision of S.B. 202 only against Mr. Edwards and Keith Gammage, Fulton County's Solicitor General, in their official capacities. *See* R. 879 ¶¶ 185–89 [SA-969–70] (Count IV). Mr. Gammage has not appealed the district court's ruling.

32].[3] On one early voting day during the 2022 Senate runoff, "*all* of Fulton County's twenty-four voting locations had a line of at least thirty minutes, and twenty-one had lines over one hour." Doc. 84-1 at 180 (emphasis added). And Fulton County is no outlier—on the same day, all eleven of Gwinnett County's early voting sites reported wait times "of at least forty-five minutes," and in DeKalb County, wait times at "eleven of its sixteen early voting locations exceeded thirty minutes." *Id*. Nor were long lines unique to 2022. In 2020, some voters waited over three hours to cast their ballots. R. 185-3 ¶ 17 [SA-116].

Because of Georgia's history of long lines to vote, many concerned citizens and civic organizations have long engaged in "line relief"—communicating their support for voters waiting in long lines by providing them with food, water, comfort, and other aid. *See* Doc. 84-1 at 171. New Georgia Project, Black Voters Matter Fund, and Rise, Inc. all have planned and organized line relief efforts in the past and intend to do so, to the extent permitted by law, in the future. *See* R. 185-1 at 2–5; R. 185-3 ¶ 30 [SA-119]; R. 185-5 ¶¶ 20-22 [SA-128–29]; R. 185-6 ¶¶ 13-14 [SA-133]. And individual Plaintiff Jauan Durbin has both provided line relief for others and been a recipient of such relief himself. R. 185-1 at 3; *see generally* R. 185-4 [SA-121–23].

---

[3] In this brief, unless otherwise noted, citations to "Doc. ##" refer to filings in this Court, and citations to "R. ##" refer to filings in the district court record. Citations to "SA-##" refer to the Plaintiffs-Appellees' Consolidated Supplemental Appendix.

For the individuals and organizations that provide it, line relief is an important means of communicating their solidarity with voters and their support for democratic participation more broadly. Doc. 84-1 at 171; *see also* R. 185-1 at 7–8. Line relief affirms the dignity of voters confronting a challenge to their exercise of their most fundamental right. Doc. 84-1 at 171; *see also* R. 185-1 at 7–8. Through it, NGP Plaintiffs express solidarity with and gratitude for voters, many of whom face physical barriers—such as age, pregnancy, or disability—to waiting in long lines. *See, e.g.*, R. 185-3 ¶ 18 [SA-117]; R. 547-7 ¶ 6 [SA-361]. And it has a special symbolic resonance in Georgia, and for predominantly Black organizations like New Georgia Project and Black Voters Matter Fund, because the struggle for Black voting rights in the South has often required solidarity in the face of physical impediments to voting. *See* R. 185-1 at 4 (citing R. 185-6 ¶ 10 [SA-132]); *see also* R. 171-1 at 3 ("In every Georgia election for which data exists, non-white voters have faced substantially longer average wait times than white voters."). Voters who have received the benefit of line relief have understood it to convey solidarity, dignity, and support. Doc. 84-1 at 171. Plaintiff Durbin, for instance, testified that receiving line relief "conveyed a message of support" that "lifted [his] spirits" and "strengthened [his] resolve. Doc. 84-1 at 171; *see also* R. 185-1 at 5 (collecting statements from Georgians who provided or received line relief).

Of course, as an activity that entails outreach to voters in or near a voting location, line relief is sometimes subject to state regulation. Out of respect for the democratic process and the rule of law, NGP Plaintiffs have always trained their volunteers to comply with all relevant laws and regulations when engaged in line relief; in particular, NGP Plaintiffs instruct their volunteers never to engage in any activity that could be considered partisan, electioneering, or otherwise an improper attempt to influence voters. R. 185-5 ¶¶ 10–11, 13–15 [SA-126, -127]; R. 185-7 ¶ 5 [SA-135]; R. 185-8 ¶ 6 [SA-141].

## II.    S.B. 202's criminalization of line relief

In 2021, as part of the omnibus election-reform bill S.B. 202, Georgia imposed sweeping new criminal sanctions on line relief. *See* O.C.G.A. § 21-2-414(a) (the "Line Relief Ban" or "Ban"). S.B. 202 makes it a misdemeanor to provide a voter with any item of value anywhere within "150 feet of the outer edge of any building within which a polling place is established" (the "Buffer Zone") or within "25 feet of any voter standing in line to vote at any polling place" (the "Supplemental Zone")—no matter the item. *Id.* And S.B. 202 criminalizes these acts regardless of context or circumstances; even if the person providing line relief does not engage in any communication that could be deemed persuasive or coercive in any way— indeed, even if they say nothing at all to the voter—the mere act of providing the relief itself is a crime. *See id.*

7

Furthermore, by criminalizing this activity not only in the Buffer Zone, but also the ever-shifting Supplemental Zone, S.B. 202's sanctions apply no matter the physical distance from the polling place. *See id.* Because the Supplemental Zone changes with the length of the line itself, it can extend many hundreds of feet from where active voting is occurring. Doc. 84-1 at 175 (district court's order explaining that "if a voting line extends 1,000 feet past the Buffer Zone, the Supplemental Zone also extends 1,000 feet"). Indeed, because the Buffer Zone already reaches any point within 150 feet of the polling place, the Supplemental Zone becomes relevant *only* at points at least 150 feet from the building in which voters are casting their ballots.

## III.    Legal challenges to S.B. 202 and initial preliminary injunction motions

Shortly after S.B. 202 was signed into law, NGP Plaintiffs and three other groups of plaintiffs filed lawsuits challenging the Line Relief Ban as an infringement on the First Amendment rights of both those who provide relief and those who receive it. *See* R. 185-1 at 6–7. These cases—all filed in the Northern District of Georgia—were later consolidated into *In re Georgia Senate Bill 202*. R. 1 [SA-1].[4]

In late May 2022, the AME and Georgia NAACP Plaintiffs moved in the district court to preliminarily enjoin State Defendants from enforcing the Line Relief

---

[4] The other plaintiffs' groups challenging the Line Relief Ban are the plaintiffs in *Sixth District of the African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284-JPB (the "AME Plaintiffs"), *Georgia State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-01259-JPB (the "Georgia NAACP Plaintiffs"), and

Ban. In early June, NGP Plaintiffs sought a similar injunction against Defendants Keith Gammage, the Fulton County Solicitor General, and Dougherty County District Attorney Gregory Edwards.

In an order issued on August 18, 2022, the district court denied both motions. Doc. 84-2 at 4–77. The court found that movants had not carried their burden to show likelihood of success on the merits as to enforcement of the Line Relief Ban inside the 150-foot Buffer Zone. *Id.* at 57. By contrast, the court found movants were likely to prevail on the challenge to the Ban in the Supplemental Zone, *id.* at 57–59, and further found that movants satisfied the other conditions for a preliminary injunction against such enforcement, *id.* at 60–64. The court nonetheless denied the motions because of the proximity to the 2022 general election. *Id.* at 65–76 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).

## IV.    Renewed preliminary injunction motions

In April and May 2023, the AME and Georgia NAACP Plaintiffs and NGP Plaintiffs renewed their respective motions, requesting preliminary-injunctive relief for the 2024 election cycle. This time, movants sought relief limited to the Supplemental Zone only. In a thorough and detailed 40-page order, the district court granted the motions.

---

*Concerned Black Clergy of Metropolitan Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-01728-JPB (the "CBC Plaintiffs").

### A.    The district court's findings of fact

In its order granting the preliminary injunction, the district court made extensive factual findings based on a detailed evidentiary record assembled by the parties over 16 months of discovery.

*First*, the court found as a matter of fact that line relief of the sorts Plaintiffs engage in communicates a message, and "that reasonable persons would interpret Plaintiffs' line relief efforts as expressing some sort of message"—in particular, messages "about community support, voter dignity, and the importance of political participation." Doc. 84-1 at 171. The court specifically credited Jauan Durbin's testimony that receiving line relief "conveyed a message of support" that "lifted [his] supports" and "strengthened [his] resolve." *Id.*

*Second*, the court found as a matter of fact that the Line Relief Ban was motivated by the content of the message that line relief conveys. The court explained that "the regulation was prompted by the notion that voters would perceive line relief as improper electioneering or political pressure." *Id.* at 172 The court further noted that the preamble of S.B. 202 itself "justifies the legislation on the grounds that it protects voters from the potential effects of Plaintiffs' speech." *Id.*

*Third*, the court found that the record "does not support" State Defendants' "concerns about election efficiency" as a justification for the Supplemental Zone restrictions. *Id.* at 173. The court credited testimony that county officials "have not

10

received complaints about line relief activities in the Supplemental Zone" and have "easily enforced" the Buffer Zone restriction. *Id*.

*Fourth*, the court found that the Line Relief Ban chilled NGP Plaintiffs' speech by "deterr[ing] Plaintiffs and other organizations from engaging in line warming activities," and that "the lost opportunity for expression cannot be remedied after the fact." *Id.* at 178. (citing R. 241 at 59) The court specifically credited NGP Plaintiffs' testimony that "S.B. 202 has already impacted their line relief programs and will continue to do so unless an injunction is issued," and found "actual and imminent irreparable injury" on that basis. *Id.* at 182.

*Fifth*, the court found that long lines have been common in Georgia's elections and that the problem is likely to persist. Citing testimony from the Secretary of State's Director of Elections and various county officials, the court found that lines remained long in 2022—in some cases forcing voters to wait well over an hour for early voting—and that they sometimes extended beyond the Buffer Zone, triggering the Supplemental Zone. Doc. 84-1 at 179–80. The court credited testimony that on one day of runoff early voting in 2022, "*all* of Fulton County's twenty-four voting locations had a line of at least thirty minutes, and twenty-one had lines over one hour." *Id.* at 180 (emphasis added). It similarly credited testimony that all eleven of Gwinnett County's early voting sites reported wait times "of at least forty-five minutes" and that, in DeKalb County, wait times at "eleven of its sixteen early voting

locations exceeded thirty minutes." *Id*.[5] Looking forward to 2024, the court credited testimony from AME, Georgia NAACP, and CBC Plaintiffs' expert, Dr. Stephen Pettigrew, who explained that long lines "tend to be worst in presidential election years." *Id.*; *see also id.* at 181.

*Sixth*, the court found Plaintiffs' timing in renewing their motions reasonable given the need to show imminent harm notwithstanding the constrains of the *Purcell* principle, "which limits the window in which Plaintiffs may seek to enjoin election-related regulations." *Id.* at 183–84.

## B.    State Defendants' factual background does not accurately reflect the record below.

State Defendants' statement of the case includes several assertions they made below that the district court did not credit, in addition to other purported facts that are not reflected in the record at all. *See* Opening Br. of State Defs. ("Br.") at 5–11, Doc. 81. Two in particular are central to their argument, meriting a brief discussion.

*First*, State Defendants assert that, before S.B. 202 was enacted, some voters felt "intimidated" by line-relief organizers handing out "food and water" and "plastic

---

[5] By contrast, State Defendants cited evidence that wait times on *election day* for the November 2022 elections "varied from zero to ten minutes," but as the court emphasized, this evidence "concerned wait times for *different* elections and during *different* voting periods than the information presented by Plaintiffs." Doc. 84-1 at 180–81 (emphasis in original). In other words, Defendants' evidence did not rebut— and Defendants did not otherwise contest—Plaintiffs' evidence that Georgia voters often have to wait in long lines to vote.

bracelets," because they thought the line warmers were trying to influence voters or buy votes. Br. at 9 (quoting R. 197-2 at 50 [SA-148]). But the district court made no such finding. In support, State Defendants rely entirely on a single email submitted to the Secretary of State's election complaints email account in October 2020. *Id.* (citing R. 197-2 at 50 [SA-148]). State Defendants never offered the complainant as a witness or declarant, and their reliance on the email piles inferences on top of the complainant's own assumptions.

The email in question asserts that at some time in 2020, Black Voters Matter Fund was "handing out food and water" outside a voting location in Albany, Dougherty County; that "a lady"—not alleged to be associated with BVMF—was "handing out plastic bracelets"; and that the complainant inferred, based on "a look of fear on their faces," that some other, unidentified "[o]lder voters felt intimidated by the presence of this group." R. 197-2 at 50 [SA-148]. In other words, the complainant did not say that she was intimidated, nor did she appear to have any basis for assuming these unidentified other voters were intimidated, beyond her private, subjective interpretation of their facial expressions.

State Defendants further mischaracterize the email as claiming that the unidentified other voters were afraid because they perceived an attempt to buy votes, Br. at 9. But the email simply opines, without basis, that "[h]anding out food & water can be misconstrued as influencing voters or buying votes." R. 197-2 at 50 [SA-

148]. Suffice it to say, the district court made no finding that voters had been intimidated by line relief efforts, nor did any evidence presented below support such a claim.

*Second*, State Defendants assert that before S.B. 202, election officials were "overwhelmed by the barrage of advocacy organizations showing up in force to hand out items to voters in line." Br. at 10. But they again fail to cite any factual findings from the district court that support this claim—no doubt because the court expressly found that line relief was *not* causing significant "election efficiency" issues. Doc. 84-1 at 173. And again, State Defendants rely instead on a single email that does not remotely support their assertion. In this case, the email was from Cobb County's Elections Director, concerning a single instance of line relief involving a food truck and some hats. R. 197-2 at 39 [SA-146]. Nothing in the email suggests that officials were "overwhelmed" by a "barrage" of anything, just that a single local official was unsure about how to handle a particular situation. Moreover, the email's main complaint is that Appellant the Secretary of State's "direction" about line relief was "confusing," *id.*, not—as State Defendants claim— that the law was "impossible" to enforce, Br. at 10. Nor does the email support State Defendants' claim that enforcing the pre–S.B. 202 regime caused not just administrative burden but "delays." *Id.* (citing R. 197-2 at 39 [SA-146]). In fact, nothing in the email indicates any voter or election official experienced delays of any sort because of line relief.

### C.    Conclusions of law

Applying this Court's and the Supreme Court's precedents to its factual findings, the district court held that Plaintiffs were likely to prevail on the merits and had otherwise satisfied the requirements for a preliminary injunction. The district court also rejected State Defendants' reliance on *Purcell* to foreclose relief for the 2024 election cycle.

*First*, the court concluded that "Plaintiffs are substantially likely to show that line relief constitutes expressive conduct that is protected by the First Amendment." Doc. 84-1 at 171. Having found as a matter of fact that both the providers and recipients of line relief understand it to convey "*some* sort of message," the court held the First Amendment's protections applied, consistent with this Court's instruction that an observer need not necessarily "infer a *specific* message" from conduct for it to qualify as expressive, *id.* at 170 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)), and the Supreme Court's recognition that "a narrow, succinctly articulable message is not a condition of constitutional protection," *id.* at 171 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)).

*Second*, the district court concluded that "Plaintiffs are substantially likely to show that the [line relief ban] is a content-based regulation of speech." *Id.* at 173. That conclusion flowed directly from two key factual findings: (1) that the line relief

ban was motivated by concern about the content of the message conveyed by such expressive communication, and (2) that the record did not support State Defendants' proffered alternative rationale, election efficiency. *Id.* at 172–73. The district court further emphasized its findings, based on testimony from county officials, that counties had "easily enforced" the Ban in the Buffer Zone and had not received complaints about line-relief activities in the Supplemental Zone. *Id.* at 173. The court therefore rejected the suggestion that the line relief ban was a content-neutral restriction aimed only at expressive conduct's "secondary effects"—*i.e.*, an incidental burden on expression resulting from a justified regulation of non-expressive conduct. *Id.* at 172; *see also id.* at 159–60 (discussing secondary-effects case law).

*Third*, the district court concluded that "Plaintiffs are substantially likely to show that implementing the Food, Drink and Gift Ban in the Supplemental Zone is not narrowly tailored and that it places an impermissible burden on the exercise of constitutional rights." *Id.* at 177. Applying modified strict scrutiny, *see Burson v. Freeman*, 504 U.S. 191, 208 (1991) (plurality opinion), the court acknowledged that the State's interest in maintaining "peace and order around the polling place," was compelling, but also emphasized the Supreme Court's instruction in *Burson* that when polling-place security is the state interest at stake, "a regulation 'becomes an impermissible burden' at 'some measurable distance from the polls.'" Doc. 84-1 at

174 (quoting *Burson*, 504 U.S. at 210) (alteration accepted). On that basis, the court concluded that the ban's extension to the Supplemental Zone was "plainly *not* narrowly tailored" because "the Supplemental Zone is tied to the location of a voter" and "has no fixed boundary and thus no limit." *Id.* at 175 (emphasis in original). For instance, "if a voting line extends 1,000 feet past the Buffer Zone, the Supplemental Zone also extends 1,000 feet." *Id*. Recognizing that *Burson* established the need to secure "*the voting area*"—not just any area with voters in it, no matter how far from the polls—the court held that the State's interests "necessarily diminish in importance as the distance from the polling place increases." *Id.* at 176 (quoting *Burson*, 504 U.S. at 208) (emphasis added by the District Court).

*Fourth*, the district court found that Plaintiffs satisfied the other criteria for a preliminary injunction. The court reaffirmed its 2022 findings that the "the Food, Drink, and Gift Ban has already deterred Plaintiffs and other organizations from engaging in line warming activities" and that any "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Doc. 84-1 at 178 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The court expressly rejected State Defendants' argument that NGP Plaintiffs lacked an irreparable injury, crediting NGP Plaintiffs' extensive evidence that S.B. 202 "has already impacted their line relief programs and will continue to do so unless an injunction is issued." *Id.* at 182 (citing R. 547-6 at 3 [SA-358]). The district court

17

also found that Plaintiffs had not unreasonably delayed their motion for preliminary injunction; rather, the timing of the motion was wholly reasonable in light of the need to balance *Purcell* constraints against the need to show "imminent" prospective harms. *Id.* at 183–84. Additionally, the court indicated that even if it had found the delay unreasonable, it would be unlikely to outweigh "the loss of First Amendment freedoms." *Id.* at 184. The court also rejected State Defendants' attempt to extend *Purcell* to foreclose relief for elections that were over six months away. *Id.* at 188.

Finally, the court found that the balance of equities and public interest also favored Plaintiffs. The court concluded that there was no "legitimate interest in enforcing an unconstitutional statute," *Id.* at 185–86 (quoting R. 241 at 61), and State Defendants' contrary argument largely turned on their assumption that the line relief ban did not implicate First Amendment rights. *Id.* at 186.

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Id.* (quoting *United States v. Estrada*, 969 F.3d 1245, 1261 (11th Cir. 2020)). This

Court's review under this standard is "very narrow" and "deferential." *Id.* (quoting *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005)). This Court finds a clear error only when, after reviewing the entire evidence, it has a "definite and firm conviction that a mistake has been committed." *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997).

## SUMMARY OF THE ARGUMENT

The district court should be affirmed. It correctly concluded that NGP Plaintiffs are likely to succeed on the merits of their claim against the Line Relief Ban's application in the Supplemental Zone and did not abuse its discretion in granting the limited injunction.

First, it is clear that the Ban restricts expression, and therefore the First Amendment applies. When NGP Plaintiffs and their volunteers engage in line relief, they convey a message of support for voting, voters, and the democratic process, and reasonable observers have no trouble discerning that message. Indeed, the record confirms that voters receiving line relief understand and appreciate the message of solidarity and encouragement. State Defendants argue that voters are likely to perceive a *different* message when a volunteer offers a bottle of water or bag of chips—in their telling, these voters will be threatened and somehow coerced when they eventually mark their ballot in a private polling booth. *See* Br. at 2. But this is

19

a concession that line relief *is* expressive. State Defendants merely contend that the conduct conveys a *different* message than reasonable observers perceive.

Second, the Ban applies in a traditional public forum, where political expression has historically been permitted and government restrictions on speech are strongly disfavored. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). State Defendants did not challenge the applicable forum analysis below, and so they should be precluded from doing so for the first time on appeal. *See, e.g.*, *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004); *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000). In any event, State Defendants' position is at odds with the Supreme Court's express recognition in *Burson* that the streets and sidewalks outside of polling places are quintessential public fora. 504 U.S. at 196–97. Instead of grappling with *Burson*, State Defendants reach for cases that dealt with polling places—but not the sidewalks surrounding them; or cases that dealt with sidewalks—but not in the vicinity of polling places. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (not about sidewalks); *United States v. Kokinda*, 497 U.S. 720, 723 (1990) (not about polling places); *Greer v. Spock*, 424 U.S. 828, 830–31 (1976) (not about polling places). *Burson*'s forum analysis controls this case and confirms that strict scrutiny applies.

Third, contrary to the requirements for public fora, the Ban regulates expression on the basis of content. *Reed v. Town of Gilbert*, 576 U.S. 155, 167

(2015). State Defendants admit as much by attempting to justify the Ban by citing the State's interests in preventing improper influence—that is, by citing their "disagreement with [their understanding of what] the message conveys." *Id.* at 164. That renders the Ban quintessentially content-based. *Id.*

By regulating expression on the basis of content in a traditional public forum, the Ban strikes at the heart of First Amendment freedoms and may stand only if it can survive strict scrutiny. *Id.* It cannot. Strict scrutiny requires the restriction to be narrowly tailored such that it is the least-restrictive means to accomplish compelling interests. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). While the State articulates interests in "peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity," Br. at 15, the Ban restricts far more speech than necessary to achieve these interests. Indeed, the Ban hardly serves these interests at all. Further, the Supreme Court has made clear that even a legitimately motivated restricted zone becomes unconstitutional at "some measurable distance from the polls." *Burson*, 504 U.S. at 210. The Line Relief Ban's extension to the Supplemental Zone runs afoul of that instruction, because it has no fixed outer limit at all. A restriction that is geographically unbounded is, by definition, not narrowly tailored.

State Defendants also fail to show that the district court abused its discretion in concluding that the remaining requirements for a preliminary injunction also

favored Plaintiffs. As the district court found based on the factual record before it, the Line Relief Ban has chilled and will continue to chill NGP Plaintiffs' line-relief activities. The loss of such "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Nor is it in the government's or the public's interest to enforce an unconstitutional restriction on speech. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). State Defendants' contrary arguments ignore the district court's expressly contrary findings. And their assertion that NGP Plaintiffs unreasonably delayed in renewing their preliminary injunction motion fails—it was not unreasonable to seek an injunction 18 months before the next general election.

## ARGUMENT

The district court did not abuse its discretion in issuing a preliminary injunction where Plaintiffs satisfied each of the requirements for a preliminary injunction: (1) they are substantially likely to succeed on the merits; (2) the loss of their First Amendment freedoms is an irreparable injury that will continue absent an injunction; (3) this constitutional injury outweighs any harm an injunction would cause Defendants, who have no legitimate interest in enforcing an unconstitutional

ban on speech; and (4) an injunction would serve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[6] This Court should affirm.

## I.    Plaintiffs demonstrated a substantial likelihood of success on the merits.

The district court correctly determined that Plaintiffs are likely to prevail on their First Amendment challenge to the Line Relief Ban. Because the Ban targets expressive conduct, it implicates the First Amendment. And because it targets this expression in a traditional public forum on the basis of content, it must satisfy the most demanding form of review—strict scrutiny. It cannot do so because it is not narrowly tailored to achieve the State's asserted interests; instead, the Ban subjects substantial amounts of protected political speech to criminal penalties. The First Amendment forbids this result.

### D.    Line relief is protected expressive activity.

The Supreme Court has "long recognized" that the First Amendment's protection "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct may also fall within the First Amendments' scope if it is "sufficiently imbued with elements of communication." *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). "[T]o determine whether a particular act

---

[6] The first factor "requires a showing of only *likely* or probable, rather than *certain*, success." *Gonzalez*, 978 F.3d at 1271 n.12 (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)) (emphasis in original). The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Id.* at 1271 (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)).

counts as expressive conduct, a court must determine whether '[a]n intent to convey a particularized message was present,' . . . [and] whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270 (quoting *Spence*, 418 U.S. at 410–11).

State Defendants remain of two minds about the expressive nature of Plaintiffs' line relief activities. They begin by arguing that food and water support for queuing voters is not inherently communicative. *See* Br. at 27 ("A handout does not speak out for or against the government or for or against any particular policy."). But they quickly give that position up—as they must—because the State's interest in the Ban turns primarily on the *message* the State fears that line relief can express. *See id.* at 32 (asserting "[a] handout can be a bribe"—that is, an expression of the offeror's desire that the voter support a favored candidate or cause); *see also* S.B. 202 § 2(13) (indicating General Assembly's position that line relief may subject voters to "political pressure" and "intimidation"). An act that expresses nothing, of course, could neither pressure nor intimidate, and thus it is clear that State Defendants' actual quarrel is not *whether* line relief conveys a message—it does— but rather *what* message is conveyed. Thus, Plaintiffs' practice of handing pretzels to hungry voters is fundamentally unlike "spik[ing] trees," "steal[ing] from the rich," or "bomb[ing] military research centers." *Contra* Br. at 28 (quoting *Roulette v. City*

*of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996)). Unlike those examples, where the conduct would be damaging even if no witnesses were present, the effect of line relief depends entirely on observers' perception of the intended expression.

The district court's findings about the messages that NGP Plaintiffs do in fact convey through line relief are well supported by the record. That different providers, recipients, or witnesses use different words to describe the message is of no import: they all tend to reflect a common understanding. *See Holloman*, 370 F.3d at 1270 (recognizing conduct is expressive where a "reasonable person would interpret [the conduct] as *some* sort of message," not where "an observer would necessarily infer a *specific* message)"; *see also Hurley*, 515 U.S. at 569 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection.").

NGP, for example, provided "food, water, and other line-relief resources" to convey a "nonpartisan message that civic engagement through the voting process is an important part of being a member of the community, and every individual voter, no matter where they live or who they are, has a valuable voice and their vote should count." R. 185-5 ¶ 16 [SA-127]. Plaintiffs' line relief activities encouraged voters "to remain in line to vote despite the associated hardships," and expressed "gratitude and appreciation for voters' sacrificing many hours of their day in order to participate in the democratic process." R. 185-8 ¶ 9 [SA-142]; *see also* R. 185-3 ¶¶ 14–16 [SA-115–16] (explaining that Rise engaged in line relief to "express to voters that every

Georgian should be able to cast a vote without undue barriers"); R. 185-6 ¶ 10 [SA-132] (conveying through line relief that voters should "not lose hope in the democratic process").

The record also proved that reasonable observers perceived these messages for what they were. *See* R. 185-5 ¶ 19 [SA-128]; R. 185-7 ¶ 7 [SA-136]; R. 185-8 ¶ 10 [SA-142]; R. 547-9 ¶ 6 [SA-364]. Plaintiff Durbin, who waited close to three hours to cast a ballot in 2018, appreciated "the encouragement and support of various campus organizations that were providing line relief, such as water and snacks." R. 185-4 ¶ 4 [SA-122]. As Durbin explained, "These groups urged us not to let the delay diminish the voting rights that our forebearers had fought so hard for." *Id.* Other NGP Plaintiffs received similar feedback. "Many voters expressed to [Rise] that [its] presence made them feel as though they were 'a part of a community.'" R. 185-3 ¶ 20 [SA-117]. Similarly, voters were "uniformly thankful for NGP's efforts and informed [its representatives] that the encouragement motivated them to persevere and remain in the long line so that they could make their voices heard." R. 185-8 ¶ 10 [SA-142]; *see also* R. 185-5 ¶ 18 [SA-128] ("voters time and time again expressed their appreciation and gratitude for our support"). These responses reflect a reasonable—indeed, obvious—interpretation of NGP Plaintiffs' messages.

Line relief efforts were also accompanied by contextual clues this Court has identified for ascertaining the communicative elements of expressive conduct. *See*

26

*Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343–44 (11th Cir. 2021). First, NGP Plaintiffs' line relief efforts were frequently accompanied by traditional expressive activity, including performance art, religious support, and conversations about the importance of voting and removing burdens to the franchise. R. 185-5 ¶¶ 9–10 [SA-126]; R. 185-8 ¶ 4 [SA-140–41]; R. 185-7 ¶¶ 7–8 [SA-136]; *cf. Burns*, 999 F.3d at 1343. Second, NGP Plaintiffs provided line relief to all voters indiscriminately, without regard for their political beliefs or candidate choices. R. 185-5 ¶¶ 14–15 [SA-127]; R. 185-8 ¶ 6 [SA-141]; *cf. Burns*, 999 F.3d at 1343. Third, NGP Plaintiffs were sharing food, "the significance of [which] dates back millennia" and is at the core of numerous religious and patriotic traditions. *Ft. Lauderdale Food Not Bombs v City of Ft. Lauderdale*, 901 F.3d 1235, 1243 (11th Cir. 2018) ("*FNB I*"); *Burns*, 999 F.3d at 1344–45.

State Defendants attempt to distinguish *FNB I*, which recognized that a nonprofit's distribution of food in a public park constituted expressive conduct protected by the First Amendment, 901 F.3d at 1238–43, as limited to "symbolic event[s]," Br. at 30. But *FNB I* expressly recognized that sharing food with others—the precise conduct at issue here—has been imbued with symbolic significance since biblical times. 901 F.3d at 1243.[7] Indeed, another federal court recently applied *FNB*

---

[7] State Defendants' one-sentence summaries of *Holloman* and *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), similarly confirm that a wide

*I* to New York's analogous line relief restriction and determined that "the same 'contextual clues' [of expressive conduct] present in [*FNB I*] are present" in line relief efforts, such that, "in context, a reasonable observer is likely to perceive Plaintiff's line warming activities as expressing some sort of message." *Brooklyn Branch of NAACP v. Kosinski*, No. 21 CIV. 7667 (KPF), 2024 WL 2846687, at *12 (S.D.N.Y. May 30, 2024). By targeting messages communicated to voters, the Ban singles out expressive content directed at political and civic engagement—the core of the First Amendment's protections.

### E.    The Line Relief Ban is subject to strict scrutiny.

In traditional public fora, "restrictions based on content must satisfy strict scrutiny." *Mansky*, 585 U.S. at 11. Because the Line Relief Ban both regulates expression in a traditional public forum and does so based on content, strict scrutiny applies.

### 1.  The Line Relief Ban applies in a traditional public forum.

State Defendants did not argue to the district court that "polling lines are nonpublic forums," Br. at 22, and so they have forfeited the issue. *See Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015) ("Issues raised for the first time on appeal are generally forfeited 'because the district court did not have

---

variety of conduct has been deemed expressive without offering any basis to distinguish those settings from this one. *See* Br. at 29–30.

the opportunity to consider them.'" (citation omitted)); *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *16 n.6 (11th Cir. Apr. 15, 2022) (declining to address argument not raised during preliminary injunction briefing or hearing). In any event, they are wrong. The Line Relief Ban regulates expressive conduct on the streets and sidewalks outside of polling places—an area the Supreme Court recognizes as a "quintessential public forum," where a governmental restriction on speech is permitted only if it is content neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternatives for communication. *Burson*, 504 U.S. at 196–97.

In *Burson*, a political candidate brought a First Amendment challenge against a Tennessee law prohibiting partisan campaign activity within 100 feet of the polling place entrance on election day. *Id.* at 193–94. Because the law applied in a traditional public forum and regulated expression on the basis of content, the Supreme Court applied strict scrutiny. *Id.* at 196–98. The Court determined the law to be "the rare case" that can survive that scrutiny, however, given Tennessee's compelling interest in sparing voters from direct electioneering in the final few seconds of their walk into the polling place. *Id.* at 211. This appeal, of course, does not involve direct electioneering or engagement with voters in the seconds before they prepare to cast their ballot. But *Burson*'s analysis of why strict scrutiny applies to laws purporting to protect voters from untoward influence outside of polling places—including its

29

forum analysis—remains controlling here. *See Citizens for Police Account. Pol. Comm. v. Browning*, 572 F.3d 1213, 1218 n.9 (11th Cir. 2009) (recognizing as binding plurality's view in *Burson* that area outside polling place is a traditional public forum).

None of the cases that State Defendants rely on dispute, let alone overrule, *Burson*'s recognition that the sidewalks where voters wait in line outside polling places are traditional public fora. In *Minnesota Voters Alliance v. Mansky*, the Supreme Court held that the "interior" of a polling place is a nonpublic forum, where governments have greater leeway to restrict speech. 585 U.S. at 12. But the Line Relief Ban in the Supplemental Zone does not apply in the interior of a polling place, or even in the immediate vicinity; by definition, it begins at least 150 feet *away* from a polling place. The features that *Mansky* found determinative—such as the fact that rules "strictly govern who may be present" in a polling place, "and for how long," *id.*—do not apply to city sidewalks outside polling places. All members of the public, including individuals who do not intend to vote or are not qualified to vote, are permitted to pass through or observe a voting line. Indeed, *Mansky* explicitly distinguished the interior of the polling place from "the public sidewalks and streets *surrounding* a polling place" discussed in *Burson*. *Id.*

*United States v. Kokinda* is similarly inapposite. There, the Supreme Court determined that the sidewalk near the entrance to a United States Post Office was

not a public forum because it was not a public thoroughfare, as it was "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." 497 U.S. at 728. The Supplemental Zone, in contrast, extends to public thoroughfares—indeed, because it is effectively limitless, *every* public sidewalk in the vicinity of a polling place is potentially implicated.

*Greer v. Spock*, in turn, held that publicly accessible areas of a military installation devoted primarily to basic training for new soldiers were not a public forum. The Court recognized that "[a] necessary concomitant of the basic function of a military installation has been 'the historically unquestioned power of (its) commanding officer summarily to exclude civilians from the area of his command.'" 424 U.S. at 838. There is no parallel power to exclude members of the public from areas outside polling places. And *Greer* explicitly rejected any comparison between "federal military reservations" and "municipal streets"—where polling place lines naturally extend—as "historically and constitutionally false." *Id.* at 838. Thus, none of these cases that State Defendants rely on disturb *Burson*'s recognition that the Line Relief Ban applies to a public forum.

### 2. The Line Relief Ban regulates expression because of its content.

"Government regulation of speech is content based"—and thus subject to strict scrutiny—"if [the] law applies to particular speech because of the topic

31

discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. State Defendants attempt to avoid strict scrutiny by arguing that the Line Relief Ban is content-neutral because it does not regulate speech. *See* Br. at 42–44. But this argument collapses with their contention that S.B. 202 does not regulate expression, and thus fails for the reasons identified in Part I.A above.

The Supreme Court has further clarified that some laws, "though facially content neutral," are nevertheless content-based regulations of speech if they "cannot be justified without reference to the content of the regulated speech" or "were adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (cleaned up). State Defendants have all but conceded the point by arguing that the Ban is necessary to prevent Plaintiffs from *intimidating and influencing voters*. *See* Br. at 9; *see also* S.B. 202 § 2(13) (statutory preamble stating that Line Relief Ban will protect voters waiting in line from "improper interference, political pressure, or intimidation"). By grounding the Ban's rationale in concerns over the "emotive impact" that individuals engaged in line relief may have on their audience, State Defendants have eliminated any ambiguity that the Line Relief Ban "must be considered content-based." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791

(1989) ("The government's purpose is the controlling consideration" in determining whether regulation is content-based.).[8]

The fact that the Line Relief Ban regulates on the basis of content is further apparent from its plain terms, which "do[] not reach other categories of speech, such as commercial solicitation, distribution, and display." *Burson*, 504 U.S. at 197; *see Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004) (holding permitting requirement for public demonstrations was content-based because it targeted political expression while leaving "other speech untouched"). Thus, another federal court recently had no trouble concluding that a similar line relief restriction was content-based because it "uniquely target[ed] a specific category of expressive conduct (offering or providing certain items to voters) around the polling place." *Brooklyn Branch of NAACP*, 2024 WL 2846687, *14.

The same is true here: Plaintiffs remain free to hand out food and water to a person standing only inches from a voter in line, so long as the recipient is queuing to enter a bank or a supermarket—or doing anything other than waiting in line to

---

[8] Far from undermining this analysis, *First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756 (11th Cir. 2011), illustrates the principle. The regulation of "large group feedings" at issue there was content-neutral because it was justified without any reference to what message might be conveyed during those feedings. The government's interest in "spreading the burden of large group feedings throughout a greater area," *id.* at 762, was unrelated to the emotive impact of underlying expression in a way that a government's interest in preventing political influence and intimidation is not.

vote. And Plaintiffs remain free to approach voters in line to *sell* the same food and drink items that Plaintiffs are prohibited from providing as "gifts." By targeting interactions with voters based on the offeror's stated purpose, the Ban singles out expressive conduct directed at political and civic engagement. That is, it singles out expression on the basis of content.[9]

**F.      The Line Relief Ban cannot survive strict scrutiny.**

To satisfy strict scrutiny, a challenged law must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see Burson*, 504 U.S. at 198.[10] Where the restriction is based on content, it is not narrowly tailored if "a less restrictive alternative is readily available." *Boos*, 485 U.S. at 329. That is, "[a] statute

---

[9] State Defendants' detour into the debate over facial and as-applied challenges sputters from the start. First, the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Moreover, Plaintiffs need not prove that the Ban is "unconstitutional in all its applications" to establish its facial invalidity. *Contra* Br. at 18. In the First Amendment context, "[t]he showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate all enforcement of that law." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (citation omitted). The record below confirms that the Ban's "unconstitutional applications [are] realistic, not fanciful, and their number [is] substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023); *see* R. 185, R. 547, and accompanying declarations.

[10] As the district court recognized, the Supreme Court sometimes refers to this standard as "exacting scrutiny." *In re: Ga. Senate Bill 202*, 622 F. Supp. 3d 1312, 1333 n.17 (N.D. Ga. 2022); *see also Burson*, 504 U.S. at 198–99 (employing "exacting scrutiny" and "strict scrutiny" interchangeably).

is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Id.* The Line Relief Ban fails this test twice over: it seeks to duplicate pre-existing prohibitions on electoral influence and intimidation through a sweeping prophylactic ban on traditionally protected forms of expression.

### 1. Georgia law already prohibited voter intimidation and improper influence.

The narrowly tailored way to prevent influence and intimidation at polling places is to proscribe influence and intimidation at polling places. Georgia has done that—since long before S.B. 202's enactment. For many years, Georgia's election laws have prohibited any person near a polling place from "solicit[ing] votes in any manner or by any means or method." O.C.G.A. § 21-2-414(a). Georgia has also long prohibited giving or offering to give "money or gifts for the purpose of . . . voting." *Id.* § 21-2-570. And it broadly prohibits the intimidation of voters. *Id.* § 21-2-567. Thus, the Line Relief Ban does not *create* a restricted zone where individuals cannot solicit votes, engage in electioneering, or bribe or intimidate voters—that zone was already in place due to laws that predate S.B. 202. Because Georgia law already provides an enforcement mechanism against improper electioneering and intimidation at the polls, the Line Relief Ban is precisely the type of "[b]road prophylactic rule[]" that is generally "suspect" and not permitted "in the area of free

35

expression." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) (citation omitted).

Again, State Defendants tie themselves in knots with contradictory arguments. In one breath they claim that the State has compelling interests in "protecting voters from political pressure and intimidation," Br. at 15—that is, from certain forms of speech and expression—while in the next they argue that the law "does not prohibit anyone from expressing messages through written or verbal speech," *Id.* at 45. This juxtaposition concedes that the chosen means are not narrowly tailored to the identified interests. If the State's interest is in suppressing certain forms of expression, then it must target that precise expression—and nothing more. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). Instead, the Ban purports to restrict intimidating or coercive expression by prohibiting individuals from approaching voters in long lines to share food or water or other support items that are not inherently (or even usually) intimidating.

### 2. The Line Relief Ban restricts expressive conduct well beyond the immediate vicinity of the polling place.

Nor is the Line Relief Ban narrowly tailored to an interest in "maintaining peace and order around the polling place." Br. at 41. By definition, the Supplemental Zone Ban applies only at a considerable distance from the polling place—it has no effect at all if the line is any less than 125 feet from the polling structure. The State's interest in mitigating disruptions to the voting process applies in full force *within the*

*polling place* where officials work to efficiently advance voters from the line to a check-in table to a ballot-marking station and then to the exit. *Mansky*, 585 U.S. at 12. But the Supreme Court has made clear that even a legitimately motivated restricted zone becomes unconstitutional at "some measurable distance from the polls." *Burson*, 504 U.S. at 210. The Supplemental Zone Ban flunks this test because it fluctuates based on the location of the voter, and therefore has no fixed line of demarcation and no limit. Thus, the Ban is insufficiently tailored to the asserted interest—it is "imprecise, and unduly burdensome." *Riley*, 487 U.S. at 800.

State Defendants never explain how a restriction can be both *geographically unbounded* and *narrowly tailored*. The closest they come is when they argue that the Buffer Zone and Supplemental Zone will "almost always overlap" because lines will rarely exceed 150 feet. Br. at 49. Putting aside that the district court found otherwise, *see* Doc. 84-1 at 180–81, this argument illustrates that the Supplemental Zone Ban is *not* narrowly tailored. If State Defendants are correct about line length, a conventional, geographically delimited buffer zone around the polling place would suffice to serve their purported interests. Any expansion beyond that is, by necessity, not narrowly tailored.

Unable to justify a geographically unconstrained polling place buffer zone, State Defendants instead suggest a number of *other ways* in which the law is tailored. That gambit fails for two reasons. First, the Ban must be narrowly tailored in all

37

relevant senses to survive scrutiny, not just a few of State Defendants' choosing. And second, none of State Defendants' arguments hold up under examination—to the contrary, they illustrate the many ways that the Ban is *not* narrowly tailored when extended to the Supplemental Zone.

### 3. State Defendants' arguments cannot justify the Supplemental Zone Ban.

State Defendants first argue that restrictions on expressive conduct impose a "negligible First Amendment burden because they 'leave open every avenue for actual speech.'" Br. at 45 (quoting *Lichtenstein v. Hargett*, 83 F.4th 575, 599 (6th Cir. 2023)). That, of course, makes a mockery of the First Amendment's protections for expressive conduct. The point of protecting expressive conduct is that it is a separate and valuable form of expression in its own right. *See FNB I*, 901 F.3d at 1240–41. Line relief illustrates as much. Providing a hungry or thirsty voter with food or water is, in most cases, a far more powerful statement of support and solidarity than a platitude such as "thank you for voting," or "I support you" would be. It is precisely the power of that expression that commands First Amendment protection. *Id.*

State Defendants next argue, improbably, that because organizations may distribute items to individuals either before they join the line or after they finish voting, the Ban is "not a blanket ban on voter handouts." Br. at 46. But the point of line relief is to give relief to voters *in line*, and the Ban is very much a blanket

prohibition on doing that. The Buffer Zone and Supplemental Zone work together to ensure that no person may *ever* approach a voter in line to provide food or water, not even when the voter affirmatively invites them to do so. Indeed, State Defendants admit as much in the very next paragraph of their brief, which asserts that the Ban "curbs discretionary enforcement" by creating a "bright line." Br. at 46. To be sure, "bright line[s]" and "blanket ban[s]" often render enforcement straightforward. But that does not render them narrowly tailored—it tends to do the opposite. Here, moreover, State Defendants' naked assertion about practical effects is entirely unsupported by record evidence—and the district court expressly found that there was no enforcement problem to be solved by implementing the Supplemental Zone. *See* Doc. 84-1 at 173.

As a practical matter, the Supplemental Zone is not likely to establish a "bright line [that] sets clear expectations for officials, organizations, and voters." Br. at 46. Whatever its other problems, the 150-foot Buffer Zone is clear to officials, voters, and third parties because it emanates from a fixed point—the edge of the polling place building—that can be visibly marked for easy monitoring and compliance. The Supplemental Zone, in contrast, is the opposite. As the voting line stretches, constricts, meanders, and winds over the course of the voting period, the Supplemental Zone moves in tandem. Unlike the Buffer Zone, which needs to be measured only once in the morning, the Supplemental Zone requires tape-measurer-

toting enforcement teams to patrol up and down both sides of the line, far from the polling place where they are needed most, to ensure that voters toiling in line walk the full 25 feet to receive relief items.

Requiring voters to make this walk further undermines the purported interest in smooth election administration. Rather than maintaining a fixed and orderly line, the Supplemental Zone Ban requires Plaintiffs to shout their offerings from 25 feet away, and for hungry and thirsty voters to leave the polling place line, potentially wait in a different line for their snack or drink, then find and attempt to return to their position in the polling place line, and negotiate any conflicts about whether their spot was properly held. This back-and-forth is likely to be especially fraught for voters in lines that persist after the official poll-closing times, as any departure from the line could jeopardize their right to vote at all. Thus, the Supplemental Zone exacerbates, rather than mitigates, election administration concerns.

Lastly, Defendants assert that this Court and the Supreme Court have upheld buffer zones that imposed "greater burdens on First Amendment speech." Br. at 46. But the zone at issue in *Burson* was just 100 feet long. 504 U.S. at 211. The Supreme Court upheld "the minor geographic limitation" of Tennessee's ban on the direct solicitation of votes in that zone because the "*last 15 seconds* before . . . citizens enter the polling place should be their own." *Id*. at 210. Clearly, the Court was not contemplating Georgia's three-hour-plus lines. As for this Court's decision in

*Browning*, 572 F.3d at 1221, exit solicitation restrictions have little in common with line-relief restrictions. Exit solicitation restrictions limit contact with voters trying to leave the polls, and so further the state interest in quickly moving voters out of the polling location so that others may enter and vote. *Id.* at 1219–20. The Line Relief Ban in the Supplemental Zone, by contrast, limits contact with voters who are waiting far outside the polling place, and serves no efficiency purpose at all.

And because a "buffer zone runs in all directions from [a] building," any extension beyond the 100-foot zone in *Burson* has a magnified area of coverage. Georgia's Buffer Zone is already more than two times larger than the area at issue in *Burson*,[11] and so the addition of an unlimited Supplemental Zone "impairs a substantial amount of speech beyond what is required to achieve acceptable objectives." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1053–54 (6th Cir. 2015) (holding unconstitutional a 300-foot buffer zone around polling places that covered an area nine times larger than the area at issue in *Burson*); *see also Anderson v. Spear*, 356 F.3d at 661 (holding unconstitutional a 500-foot buffer zone that covered an area 25 times larger than the area at issue in *Burson*); For these reasons, the Line

---

[11] The zone approved in *Burson* covered an area of $100^2\pi$, or 31,415 square feet, while the Buffer Zone under Georgia law covers an area of $150^2\pi$, or 70,650 square feet. *See also Anderson v. Spear*, 356 F.3d 651, 661 (6th Cir. 2004) (explaining the calculations).

Relief Ban in the Supplemental Zone is unconstitutional and "must be invalidated." *Russell*, 784 F.3d at 1054 (quoting *Citizens United*, 558 U.S. at 336).

## II.    The district court did not abuse its discretion in concluding that the equitable requirements favored a preliminary injunction.

The district court properly held that Plaintiffs satisfied the other requirements for a preliminary injunction. That holding rested on findings of fact which this Court reviews for clear error—a high bar State Defendants do not even try to clear.

With respect to irreparable harm, the district court credited NGP Plaintiffs' evidence that the Line Relief Ban had chilled and would continue to chill their First Amendment-protected line-relief activities. *See* Doc. 84-1 at 178. That finding sufficed to establish irreparable harm because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (holding chilling of protected speech to be "a per se irreparable injury"). Below, State Defendants provided the district court with no plausible basis to find that a criminal ban on such activities was *not* chilling Plaintiffs, and they have identified no such basis here, either.

That the balance of equities and public interest favor an injunction followed from the same findings of fact. These two factors merge where the injunction is against the government. *Swain v. Junior*, 958 F.3d 1081, 1090–91 (11th Cir. 2020). And it is in neither the government's "legitimate interest" nor the public's to enforce

42

an unconstitutional restriction on speech. *KH Outdoor, LLC*, 458 F.3d at 1272. As in their merits arguments, State Defendants ignore the district court's findings and reasoning and litigate the equities based on factual assumptions neither found below nor supported by the record. *See* Br. at 50–51. The Court should apply the clear error standard of review to reject this gambit out of hand.

First, State Defendants suggest "that election lines will rarely, if ever, extend farther than 150 feet from the polling place." *Id.* But they rely on the same evidence that the district court expressly found did not rebut Plaintiffs' extensive evidence of long lines. *See* Doc. 84-1 at 180–81. This Court should not disturb that finding—the length of lines is an archetypal fact question, and State Defendants offer no reason to believe the district court clearly erred. Moreover, even if lines will only "rarely" extend farther than 150 feet, it does not follow that Plaintiffs are not entitled to a remedy. To the contrary, even "minimal" loss of First Amendment freedoms warrants relief. *Elrod*, 427 U.S. at 373. When such lines do arise, even if they arise only rarely, line relief will be criminalized in violation of the First Amendment.

Second, State Defendants suggest that Plaintiffs unreasonably delayed in renewing their preliminary injunction motions. But they acknowledge this Court's instruction that delay is "not necessarily fatal" to a preliminary injunction request. Br. at 51 (quoting *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016)). And they ignore the district court's finding that Plaintiffs' timing in

renewing their motion was entirely reasonable in the circumstances of the case—as the district court pointed out, both State Defendants and Intervenor Defendants had previously argued that fall 2022 was *too early* to seek an injunction for 2024. Doc. 84-1 at 182 n.18. Given the need to satisfy both the imminence requirement and *Purcell,* Plaintiffs were reasonable in renewing their request 18 months before the next general election. *See id.* at 180–81 (recognizing voting lines tend to be longest in presidential election years). Again, State Defendants do not come close to showing clearly erroneous findings or an abuse of discretion.

Finally, State Defendants invoke vague concerns about "voter harassment, intimidation, or coercion" and "voter confusion," Br. at 52–53, none of which can be reconciled with the terms of the Ban in question. The State has never claimed an interest in prohibiting individuals from approaching queuing voters, and the Ban does not prevent voters from being approached against their will. As Defendants admit again and again, the Supplemental Zone Ban does not restrict face-to-face encounters. *See* R. 547-3 at 21:14–21, 23:12–24:4 [SA-331, -333–34]; *see also* R. 547-4 at 15:22–16:9 [SA-351–52] (stating it was not a violation of any law for someone to approach a voter in line as long as they were not engaging in any conduct identified in O.C.G.A. § 21-2-414). Indeed, the district court made express finding about whether the Supplemental Zone ban was motivated by and solved for such harms—it answered no on both counts. Doc. 84–1 at 173 (crediting testimony that

county officials "have not received complaints about line relief activities in the Supplemental Zone"). Thus, the Ban does not actually address State Defendants' purported concerns—it simply prevents people from sharing food and water with voters in long lines. And yet again State Defendants provide no basis to disturb the district court's careful factfinding.

In any event, these vague concerns are insufficient to tip the balance of harms. State Defendants are not free to violate the First Amendment whenever they can identify some amorphous possibility of voter confusion. Simply put, Georgia has no "legitimate interest" in enforcing a law that violates the First Amendment, *KH Outdoor, LLC*, 458 F.3d at 1272; therefore, the district court was correct to grant a preliminary injunction against the enforcement of the Line Relief Ban.

## CONCLUSION

For the foregoing reasons, NGP Plaintiffs respectfully request this Court affirm the preliminary injunction entered below.

Respectfully submitted this 30th day of August, 2024.

| | |
|---|---|
| Adam M. Sparks | ***/s/ Uzoma N. Nkwonta*** |
| Georgia Bar No. 341578 | Uzoma N. Nkwonta |
| **KREVOLIN & HORST, LLC** | Jacob D. Shelly |
| 1201 W. Peachtree St., NW | Melinda K. Johnson |
| One Atlantic Center, Suite 3250 | Tina Meng Morrison |
| Atlanta, GA 30309 | Marcos Mocine-McQueen |
| Telephone: (404) 888-9700 | Samuel T. Ward-Packard |
| sparks@khlawfirm.com | **ELIAS LAW GROUP LLP** |
| | 250 Massachusetts Ave NW, Suite 400 |
| | Washington, D.C. 20001 |
| | Telephone: (202) 968-4490 |
| | unkwonta@elias.law |
| | jshelly@elias.law |
| | mjohnson@elias.law |
| | tmengmorrison@elias.law |
| | mmcqueen@elias.law |
| | swardpackard@elias.law |

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,097 words as counted by the word processing system used to prepare the document.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25-3, I certify that on this 30th day of August, 2024, I electronically filed a copy of the foregoing document through the Court's ECF system, which will automatically deliver a copy upon all counsel of record.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta