Nos. 23-13085 & 23-13095

# United States Court of Appeals
# for the Eleventh Circuit

IN RE: GEORGIA SENATE BILL 202

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-mi-55555 (Boulee, J.)

## RESPONSE AND REPLY BRIEF OF APPELLANTS THE REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND GEORGIA REPUBLICAN PARTY, INC.

William Bradley Carver, Sr.
Baxter D. Drennon
HALL BOOTH SMITH, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303
(404) 954-5000
BCarver@hallboothsmith.com
BDrennon@hallboothsmith.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Intervenor-Defendants*

*In re: Georgia Senate Bill 202*, Nos. 23-13085 & 23-13095

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and Circuit Rule 26.1, appellants certify that the Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee, and Georgia Republican Party, Inc. have no parent corporation, and no corporation owns 10% or more of their stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), appellants certify that the CIP contained in the previous briefs are complete, subject to the following additions:

Center for Election Confidence, Inc., *Amicus Curiae*

Constitutional Accountability Center, *Amicus Curiae*

Fuller, Stephen P., *Counsel for Amicus Curiae*

Fuller Sloan, *Counsel for Amicus Curiae*

Gans, David H., *Counsel for Amicus Curiae*

Gorod, Brianne J., *Counsel for Amicus Curiae*

Henson, Zachary D., *Counsel for Amicus Curiae*

Holtzman Vogel Baran Torchinsky & Josefiak PLLC, *Counsel for Amicus Curiae*

Honest Elections Project, *Amicus Curiae*

Jessurun, Anna K., *Counsel for Amicus Curiae*

New Disabled South, *Amicus Curiae*

Selendy Gay PLLC, *Counsel for Amicus Curiae*

Snow, Elizabeth, *Counsel for Amicus Curiae*

Stoughton, Corey, *Counsel for Amicus Curiae*

Torchinsky, Jason B., *Counsel for Amicus Curiae*

*In re: Georgia Senate Bill 202*, Nos. 23-13085 & 23-13095

Wenger, Edward M., *Counsel for Amicus Curiae*

Wydra, Elizabeth B., *Counsel for Amicus Curiae*

/s/ Gilbert C. Dickey

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................... C - 1

Table of Authorities .................................................................................................... ii

Introduction and Summary of Argument .......................................................... 1

Statement Regarding Adoption .......................................................................... 3

Argument ............................................................................................................ 3

    I.    The Court has jurisdiction over this appeal. .......................................... 3

    II.   The Plaintiffs have not shown that they are likely to prevail on the merits...... 5

        A. The Plaintiffs' interpretation of the Materiality Provision ignores Congress's words. ................................................................................... 6

        B. The Plaintiffs point to no congressional findings that preempting ordinary ballot-casting rules was necessary to combat discrimination in voting. ................................................................................... 15

        C. No precedential opinion from any appellate court supports the Plaintiffs' view. ................................................................................... 20

        D. A voter who fails to follow the rules for mailing a ballot has not been denied the right to vote. ................................................................ 23

    III.  The Plaintiffs don't justify their undue delay. .................................... 25

    IV.  The Plaintiffs don't show that the equities and public interest are served by enjoining the State's election laws.................................... 28

    V.   The Plaintiffs have not shown that the district court erred in ruling that their injuries are not traceable to the State Defendants. ................. 29

Conclusion ...................................................................................................... 32

Certificate of Compliance ............................................................................. 33

Certificate of Service ..................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
  585 U.S. 579 (2018) ................................................................................ 29

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
  557 F.3d 1177 (11th Cir. 2009) .............................................................. 26

*Arthur v. Thomas,*
  739 F.3d 611 (11th Cir. 2014) ................................................................ 25

*Ball v. Chapman,*
  289 A.3d 1 (Pa. 2023) .......................................................................... 9, 22

*Benisek v. Lamone,*
  585 U.S. 155 (2018) ................................................................................ 25

*Brnovich v. Democratic Nat'l Comm.,*
  594 U.S. 647 (2021) ...................................................................... 3, 18, 28

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) .............................................................................. 8, 9

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ................................................................................ 18

*Common Cause v. Thomsen,*
  574 F. Supp. 3d 634 (W.D. Wis. 2021) .................................................. 21

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) .............................................................. 28

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ................................................................................ 28

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.,*
  950 F.3d 790 (11th Cir. 2020) .................................................................. 5

*Democratic Nat'l Comm. v. Wis. State Legislature,*
  141 S. Ct. 28 (2020) ................................................................................ 28

*Democratic Party of Ga, Inc. v. Crittenden,*
  347 F. Supp. 3d 1324 (N.D. Ga. 2018) .................................................. 22

*Diamond v. Charles,*
  476 U.S. 54 (1986) .................................................................................... 5

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ................................................................................28

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ..................................................................................3

*Ford v. Tenn. Senate*,
    2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ..................................21

*Freeman v. Quicken Loans, Inc.*,
    566 U.S. 624 (2012) ................................................................................12

*Friedman v. Snipes*,
    345 F. Supp. 2d 1356 (S.D. Fla. 2004) ..............................................22

*Ga. Republican Party, Inc. v. Sec'y of State for Ga.*,
    No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) ...............30, 31

*Gonzalez v. Governor of Ga.*,
    978 F.3d 1266 (11th Cir. 2020) ...........................................................27

*In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*,
    864 F.2d 1559 (11th Cir. 1989) ............................................................3

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ...........................................................30

*La Union del Pueblo Entero v. Abbott*,
    705 F. Supp. 3d 725 (W.D. Tex. 2023) ..............................................20

*League of Women Voters Inc. v. Florida Secretary of State*,
    66 F.4th 905 (11th Cir. 2023) ...........................................................3, 4

*League of Women Voters of Ark. v. Thurston*,
    2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ................................21

*Liebert v. Millis*,
    2024 WL 2078216 (W.D. Wis. May 9, 2024) ...................10, 12-14, 17, 20, 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) .............................................................................5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................29

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ..............................................22

*McDonald v. Bd. of Election Comm'rs of Chi.*,
    394 U.S. 802 (1969) ................................................................................21

*McKay v. Altobello*,
    1996 WL 635987 (E.D. La. 1996) ......................................................22

*Migliori v. Cohen*,
    36 F.4th 153 (3d Cir. 2022) ....................................................... 5, 20, 22

*Minn. All. for Retired Americans Educ. Fund v. Simon*,
    2024 WL 3841815 (Minn. Ct. App. Aug. 13, 2024) ...........................20

*New Ga. Project v. Raffensperger*,
    976 F.3d 1278 (11th Cir. 2020) ................................................... 28, 29

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ..........................................................................19

*Org. for Black Struggle v. Ashcroft*,
    493 F. Supp. 3d 790 (W.D. Mo. 2020) ................................................21

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
    97 F.4th 120 (3d Cir. 2024) ...................................1, 2, 6-14, 17, 19, 20, 22, 23

*Regions Bank v. Legal Outsource PA*,
    936 F.3d 1184 (11th Cir. 2019) ................................................... 11, 17

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    589 U.S. 423 (2020) ..........................................................................26

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) ............................................................... 12, 23

*Ritter v. Migliori*,
    143 S. Ct. 297 (2022) ......................................................................5, 20

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ................................................... 19, 23

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) ..........................................................................18

*United States v. Amodeo*,
    916 F.3d 967 (11th Cir. 2019) ..............................................................3

*Vote.org v. Ga. State Election Bd.*,
    661 F. Supp. 3d 1329 (N.D. Ga. 2023) ................................................21

*Wolff v. Cash 4 Titles*,
    351 F.3d 1348 (11th Cir. 2003) ............................................................5

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ..........................................................26

**Statutes**

17 U.S.C. §107 ........................................................................................... 8

52 U.S.C. §10101 ................................................................... 1, 6-12, 22-24

Ga. Code §21-2-31 .................................................................................... 4

Ga. Code §21-2-33.1 ................................................................................ 31

Ga. Code §21-2-33.2 ................................................................................ 31

Ga. Code §21-2-380 ................................................................................. 27

Ga. Code §21-2-382 ................................................................................. 27

Ga. Code §21-2-384 ............................................................................ 30, 31

Ga. Code §21-2-385 ................................................................................. 27

Ga. Code §21-2-499 ................................................................................. 31

**Other Authorities**

1964 U.S.C.C.A.N. 2391 .......................................................................... 16

H.R. Rep. No. 88-914 (1963) ................................................................... 15

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ........................ 9

N.D. Sec'y of State, *Voting Basics for North Dakota*, perma.cc/QQ4Q-NNL4 .............. 10

Scalia & Garner, *Reading Law* (2012) ................................................... 7, 9

U.S. Comm'n on Civil Rights, 1963 Report of the U.S. Comm'n on Civil Rights (1963), perma.cc/RD5Q-SHCN ................................................... 15

**Rules**

Fed. R. App. P. 28(i) ................................................................................. 3

Fed. R. App. P. 28-1 ................................................................................ 29

**Constitutional Provisions**

U.S. Const. amend. XV, §2 ...................................................................... 17

U.S. Const. art. I, §4 ................................................................................ 18

U.S. Const. art. II, §1 .............................................................................. 18

## INTRODUCTION AND SUMMARY OF ARGUMENT

Ballot-casting rules are necessary for the orderly administration of an election. The birthdate requirement challenged here is one example. The voter's name, date of birth, and ID number are used to verify that the person voting is the person to whom the ballot was issued. The birthdate requirement is a simple, efficient method to help verify the voter's identity. It promotes the efficient administration of elections, public confidence, and election integrity. And there are numerous other examples of state rules adopted to ensure orderly and secure casting of ballots, from signature requirements to instructions on using the correct instrument to mark a ballot.

The Plaintiffs ask this Court to rewrite the Materiality Provision to bar any ballot-casting rule that is not relevant to a voter's qualifications. Where the Materiality Provision applies to errors that are material "in determining" whether a voter is qualified, the Plaintiffs ask this Court to apply it to any error immaterial "to" a voter's qualifications. 52 U.S.C. §10101(2)(B). Where the Materiality Provision covers errors on a paper "relating to any application, registration, or other act requisite to voting," the Plaintiffs argue that it must reach any paper "relating to voting." *Id.* And where the Materiality Provision bars a "denial of the right of any individual to vote," the Plaintiffs ask this Court to require the counting of a ballot even though a voter failed to follow the rules. *Id.* The Third Circuit rejected this rewriting of the Materiality Provision, explaining that the text is limited to the voter-qualification stage. *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 131 (3d Cir. 2024). This Court should similarly decline to "block enforcement of laws meant to protect the

integrity of the voting process due to their inescapable irrelevance in determining whether an individual meets registration requirements." *Id.* at 136.

This Court should reverse on the merits. But the equities also favor the Defendants. The Plaintiffs delayed for two years—and an entire federal election—before seeking a preliminary injunction on the birthdate requirement. That delay undermines their claims of irreparable harm. In response, the Plaintiffs rely on the district court's discretion to weigh those harms. But that discretion does not excuse legal errors. The district court erroneously weighed the litigation schedule, the *Purcell* doctrine, and the Plaintiffs' ongoing expenses in the Plaintiffs' favor, but those factors are irrelevant to whether the Plaintiffs could have moved for a preliminary injunction earlier. Although the Plaintiffs cannot show irreparable harm, the State is always harmed when its laws are enjoined. That's particularly true of election laws, which is why courts often hold that those interests prevail in election cases.

In their cross-appeal, the Plaintiffs argue that the district court erred in ruling that their injuries are not redressable by an order enjoining the State Defendants. But the State Defendants have no role in enforcing the birthdate requirement. The Plaintiffs offer other forms of relief they could have requested that might be traceable to higher-level officials. But the relief they sought and obtained was an injunction requiring the counting of ballots with missing or incorrect birthdates. The County Defendants, not the State Defendants, are the only officials who could afford that relief.

Finally, in an attempt to avoid the merits, the Plaintiffs dispute standing. But their standing arguments don't address *League of Women Voters Inc. v. Florida Secretary of State*, even though there is no material distinction between that case and this one. 66

F.4th 905, 945 (11th Cir. 2023). The Court should apply *League of Women Voters*, hold that the Defendants have standing, and reverse the district court's order enjoining enforcement Georgia law.

**STATEMENT REGARDING ADOPTION**

The Intervenor-Defendants adopt the State Defendants' response and reply brief, which addresses challenges to the gift-giving ban. *See* Fed. R. App. P. 28(i).

**ARGUMENT**

## I.    The Court has jurisdiction over this appeal.

Appellate standing is satisfied if one appellant is "aggrieved by the judgment." *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) (cleaned up); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 665 (2021). An appellant need not be bound by the decision below—or even be a party—to "appeal a judgment." *In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559, 1561 (11th Cir. 1989). The test is whether the "judgment below" causes an injury to the appellant "that could be redressed by a favorable ruling" from this Court. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 432-33 (2019) (cleaned up). Both the State Defendants and the Republican Intervenors meet that standard here. *See* ECF Nos. 90, 96.[1]

This Court recently confirmed that the State Defendants have appellate standing in *League of Women Voters*. The Court held that a state-election official "need not be bound by an injunction" for appellate standing. *League of Women Voters*, 66 F.4th at 945. Only one county election official had been enjoined. *Id.* But Florida's Secretary of State had an "obligation to uniformly administer elections according to the election code."

---

[1] The ECF numbers refer to this Court's docket No. 23-13085.

3

*Id.* And Florida's Attorney General could represent the State's "legitimate interest in the continued enforceability of its statutes." *Id.* Those holdings apply here: The injunction injures the State Defendants by hindering their uniform application of Georgia's election code. *See, e.g.*, Ga. Code §21-2-31(1) (duties of State Election Board include promulgating rules "to obtain uniformity" statewide in election administration). And the State of Georgia has a legitimate interest in the enforcement of its owns statutes.

Throughout this appeal, the Plaintiffs have searched for a distinction between *League of Women Voters* and this case, but they've failed to find a difference. They first argued that at least one of the state appellants was "enjoined" in *League of Women Voters*. ECF No. 70-1 at 11. But that was wrong. *League of Women Voters*, 66 F.4th at 945 (only one county official enjoined). So they noted that *League of Women Voters* involved a permanent injunction, not a preliminary one. ECF No. 97 at 4.  They didn't explain how a permanent injunction injures state interests, but a preliminary injunction creates no injury at all. And they noted that *League of Women Voters* involved a decision that a state law was unconstitutional. *Id.* But they didn't explain how a State is less injured when a court enjoins enforcement on statutory grounds. After all, *League of Women Voters* found standing because of "a legitimate interest in the continued enforceability" of statutes. 66 F.4th at 945 (cleaned up).

Plaintiffs don't try to distinguish *League of Women Voters* in their brief. Without mentioning or citing the decision, they argue that appellate standing is lacking because "[t]he District Court did not enjoin State Defendants." NAACP Br. 24. But a party "need not be bound by an injunction" to have appellate standing. *League of Women Voters*, 66 F.4th at 945.

4

This Court need not address Republican Intervenors standing given the clarity of the State Defendants' standing. *Diamond v. Charles*, 476 U.S. 54, 64 (1986) (a party seeking the same relief can "piggy-back" on another party's standing); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (where one party has standing, a court of appeals "err[s] by inquiring into" intervenors' "independent" standing). But they are also "aggrieved by the judgment." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003) (cleaned up). Specifically, the district court's order hinders the Republican Intervenors' core mission of promoting and electing Republican candidates. *See* ECF No. 90-2 at ¶¶7, 12, 15 (Decl. of Elliot Echols). The NAACP and AME Plaintiffs rely on similar theories to support their standing to bring this lawsuit. *See* NAACP Br. 15-16. If Plaintiffs have organizational standing to challenge Georgia's law, then the Republican Intervenors have organizational standing to appeal an order enjoining that law. *See Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 794 (11th Cir. 2020).

## II.    The Plaintiffs have not shown that they are likely to prevail on the merits.

The Plaintiffs urge this Court to adopt a reading of the Materiality Provision that would bar ballot-casting rules that are immaterial to a voter's qualifications. They concede that the Third Circuit rejected this novel theory of the Materiality Provision. But they urge this Court to create a circuit split because they prefer the vacated decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022), which the Third Circuit has now firmly repudiated, *see Pa. State Conf.*, 2024 WL 3085152, at *1 (denying rehearing).

This Court should heed the Third Circuit's lessons. That Court has already explained why the Materiality Provision does not prohibit ordinary ballot-casting rules. It applies to errors "in determining" whether a voter is qualified. 52 U.S.C. §10101(a)(2)(B). And an "other act requisite to voting" covered by the Materiality Provision is an act like the "application" and "registration" paperwork that is also covered. *Id*. In other words, the Materiality Provision covers immaterial errors on "paperwork used in the voter qualification process," not "papers provided during the vote-casting stage." *Pa. State Conf.*, 97 F.4th at 133.

The Plaintiffs offer no reason to depart from this straightforward reading. Their textual arguments read the words "in determining" out of the statute. Their historical arguments all but admit that Congress never intended to apply the Materiality Provision beyond voter-qualification determinations. Their caselaw arguments advocate a circuit split based on inapplicable district court cases. And the Plaintiffs don't even address what it means to "deny" a voter the right to vote under the Materiality Provision. This Court should reject their arguments.

### A.    The Plaintiffs' interpretation of the Materiality Provision ignores Congress's words.

The Plaintiffs read key words out of the statute. Where Congress wrote "material in determining whether" a voter is qualified, the Plaintiffs read "material [to] whether" a voter is qualified. Where Congress refers to paperwork "relating to any application, registration, or other act requisite to voting," the Plaintiffs read paperwork "relating to [voting]." The Plaintiffs carve up the statute and misapply the statutory canons. The Court should reject their reasoning.

"Read as a whole and in context," the Materiality Provision "targets laws that restrict who may vote," not "how qualified voters may cast a valid ballot." *Pa. State Conf.*, 97 F.4th at 131. So the Plaintiffs start by dividing the Materiality Provision into two separate clauses. *See* NAACP Br. 28. According to Plaintiffs, the first clause supplies the prohibition: denying the right to vote because of an "error or omission" on certain papers. And the second clause supplies the condition: "if such error or omission is not material in determining whether" the person is qualified to vote. The Plaintiffs' core argument is that the Court shouldn't read the second clause to constrain the scope of the first clause. *See* NAACP Br. 39-40.

But that reading "divorces" the second clause "from everything that comes before it." *Pa. State Conf.*, 97 F.4th at 136. The second clause informs the statute's meaning no less than the first. It clarifies that the errors or omissions covered are those that occur "in determining" whether a voter is qualified. 52 U.S.C. §10101(a)(2)(B). In other words, the errors covered are those that occur when a State is assessing a voter's qualifications. *See Pa. State Conf.*, 97 F.4th at 131.

The Plaintiffs rely on an inapplicable canon to support their segmented reading. They invoke a canon called the "Presumption of Nonexclusive 'Include,'" which instructs that "the word *include* does not ordinarily introduce an exhaustive list." Scalia & Garner, *Reading Law* 133 (2012); *see* NAACP Br. 39-40 (citing Scalia & Garner, *Reading Law*). But that presumption is not relevant here because the Materiality Provision doesn't contain an "including" clause. What Plaintiffs diminish as a "subordinate clause," NAACP Br. 39, is not a "list" of items that the statute "includes." The clause is the necessary condition that triggers the statute: "if such error or omission is not

material in determining whether such individual is qualified … to vote." 52 U.S.C. §10101(a)(2)(B).

The Plaintiffs' only support for their clause-by-clause dissection of the statute is the Supreme Court's interpretation of the Copyright Act in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). But that case just shows how the Plaintiffs are misapplying the canons of construction. In *Campbell*, the Supreme Court examined the fair-use provision of the Copyright Act, which requires courts to weigh "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. §107(1). The Court held that the "including" clause means "that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character." *Campbell*, 510 U.S. at 584. The "including" examples thus could not "swallow" the primary inquiry into the "purpose and character of the use." *Id.* The language in the Copyright Act bears no resemblance to the Materiality Provision: unlike the "including" clause in the Copyright Act, the "if" clause in the Materiality Provision is a condition, not an example.

More importantly, within the "if" clause, the Plaintiffs cannot explain what work the words "in determining" do. They argue that the "words 'material in determining' qualifications refer to an 'error or omission,' which is the 'nearest reasonable referent' and is in the same subordinate clause." NAACP Br. 39. But they don't explain what the words "in determining" mean. The Third Circuit did: "Read naturally," those words "describe a process—namely, determining whether an individual is qualified to vote." *Pa. State Conf.*, 97 F.4th at 131. The Plaintiffs read the statute to apply to errors that are

not material "to" whether someone is qualified to vote. "But the text does not say the error must be immaterial 'to' whether an individual is qualified to vote. It uses the words 'in determining,' and that choice must mean something." *Id.* The Plaintiffs have not offered any explanation of that choice.

In any event, the Plaintiffs' interpretation is also foreclosed by what they call the "first clause." NAACP Br. 29. That clause narrows the Materiality Provision to paperwork "relating to any application, registration, or other act requisite to voting." 52 U.S.C. §10101(a)(2)(B). The Plaintiffs don't contend that a ballot envelope is an "application" or "registration." *See* NAACP Br. 29-31. That leaves "other act requisite to voting," 52 U.S.C. §10101(a)(2)(B), which is a "catchall phrase" that covers acts "of the same general kind or class" as application and registration, Scalia & Garner, *supra*, at 199 (*ejusdem generis* canon); *see also Ball v. Chapman*, 289 A.3d 1, 38 n.11 (Pa. 2023) (Brobson, J., concurring in part, dissenting in part). Relying on dictionaries, the Plaintiffs respond that the "word 'other' does not mean one of the same," but instead means "different." NAACP Br. 29-30 (quoting *Merriam-Webster's Collegiate Dictionary* 878-879 (11th ed. 2003)). Those same dictionaries also indicate that "other" means "additional," NAACP Br. 30, a more natural meaning when the word is used to introduce the remaining parts of a list. In recognition of this natural reading, the *ejusdem generis* canon "implies the addition of *similar* after the word *other*." Scalia & Garner, *supra*, at 199. It instructs courts to read "other act requisite to voting" to refer acts that are *similar to* an "application" or "registration," not to acts that are *different from* an "application" or "registration." 52 U.S.C. §10101(a)(2)(B). And what unites those words is a "focus on qualification determinations." *Pa. State Conf.*, 97 F.4th at 132. The

Plaintiffs would turn the canon on its head by insisting the "other act requisite to voting" must be something unlike the other items included in the same list.

The Plaintiffs suggest that the Third Circuit's interpretation renders the phrase "other act requisite to voting" meaningless. NAACP Br. 31. To the contrary, the phrase "prevents government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides 'registration' or 'application.'" *Liebert v. Millis*, 2024 WL 2078216, at *15 (W.D. Wis. May 9, 2024). Nearly every State determines whether a voter is qualified at the registration stage. Legislators, judges, and lawyers thus often use a shorthand when they say the Materiality Provision governs "voter registration." That shorthand is generally accurate in Georgia, but it might not work so well in a State like North Dakota that does not have voter registration. *See* N.D. Sec'y of State, *Voting in North Dakota*, perma.cc/7JWM-CXKG. The absence of voter registration doesn't exempt North Dakota from the Materiality Provision, however, because the State still engages in "voter qualification determinations." *Pa. State Conf.*, 97 F.4th at 131. By including "other act[s] requisite to voting," 52 U.S.C. §10101(a)(2)(B), Congress ensured that the provision wouldn't depend on the eccentricities of each State. It governs paperwork that's used in determining whether a voter is qualified to vote, whether that paperwork is called a "registration," "application," or something else.

Next, the Plaintiffs dismiss the importance of statutory context. They admit that the Materiality Provision's neighbor, paragraph (a)(2)(A) "governs the standards for the substantive rules used 'in determining' qualification, and precludes state actors from applying different qualification rules for different voters in the same place." NAACP

10

Br. 41. And they admit that its other neighbor, paragraph (a)(2)(C), "bars 'employ[ing] any literacy test as a qualification for voting in any election,'" which "addresses a specific form of voter qualification." NAACP Br. 41 (emphasis omitted). The Third Circuit observed the same features, concluding that the "thrust of subsection (a)(2) in which the Materiality Provision lives thus appears clear: it governs voter qualification determinations." *Pa. State Conf.*, 97 F.4th at 131. The Plaintiffs resist that conclusion because of one word: "any." Because Congress used the word "any" twice in the Materiality Provision, the Plaintiffs claim the provision "is broader" than the subject of voter qualifications. NAACP Br. 41.

The word "any" cannot do the work that the Plaintiffs demand of it. First, their argument that "any" broadens the Materiality Provision beyond voter qualifications proves too much. The word appears throughout the other subsections—not just in the Materiality Provision. But the Plaintiffs admit that those other sections deal exclusively with voter qualifications despite their use of the word "any." Words "take color from context," *Pa. State Conf.*, 97 F.4th at 131, and the word "any" does not expand the statute beyond that context.

Second, that "any" is expansive says nothing about the content of the words it modifies. *Cf.* NAACP Br. 31, 41. The language "modified by 'any' is still defined by its ordinary meaning." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1194 (11th Cir. 2019). The Materiality Provision does not just cover "any" paperwork. It covers "any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. §10101(a)(2)(B). The words that follow "record or paper" restrict the types of paperwork at issue. The word "any" "can broaden to the maximum, but never change

in the least, the clear meaning of the phrase selected by Congress." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). It is "[e]xpansive," but not "transformative." *Id.*

Finally, the Plaintiffs fall back to the statutory definition of "vote." *See* NAACP Br. 28-29. The definition encompasses "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. §10101(e). Because the Materiality Provision covers "voting," the Plaintiffs argue that it applies to "paperwork connected to 'all action necessary to make a vote effective,'" including "casting a ballot." NAACP Br. 29 (quoting 52 U.S.C. §10101(e)). But the "Plaintiffs read the word 'requisite' out of the statute." *Liebert*, 2024 WL 2078216, at *11. They read the Materiality Provision to cover "any record or paper relating to ~~any application, registration, or other act requisite to~~ voting." Congress included those words for a reason, and "[t]he same act cannot be both 'voting' and 'something necessary for voting' at the same time." *Id.* In other words, it's "awkward to describe the act of voting as 'requisite to the act of voting.'" *Ritter v. Migliori*, 142 S. Ct. 1824, 1826 n.2 (2022) (Alito, J., dissental).

Moreover, "[e]ven the statute's definition of 'vote' distinguishes 'casting a ballot' from what precedes it in time: 'registration or other action required by State law prerequisite to voting.'" *Pa. State Conf.*, 97 F.4th at 135 (quoting 52 U.S.C. §10101(e)). The Plaintiffs argue that there's a difference between acts that are "requisite" to voting and acts that are "prerequisite" to voting. NAACP Br. 32-33. It's true that the statutory definition suggests that "registration" is a "prerequisite to voting." But that definition doesn't help the Plaintiffs. The Materiality Provision does not apply only to

"registration" or "prerequisites" to voting (the Plaintiffs' strawman). Nor does it apply to all "voting" (the Plaintiffs' argument). It occupies an intermediate space, applying to an "application, registration, or other act requisite to voting." In context, this phrase "refers to processes for determining voter qualifications." *Liebert*, 2024 WL 2078216, at *13. And Congress's choice of words "prevents government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides 'registration' or 'application.'" *Id.* at *15.

Even if the Court accepts a difference between acts "requisite" and acts "prerequisite" to voting, that distinction does not get the Plaintiffs to their preferred reading of just "voting." Their interpretation still ignores words in the statute. "The bottom line is that the definition of 'vote' does not provide the obvious answer to construing the scope of the Materiality Provision." *Id.* at *12. That conclusion is hardly surprising, given that "Congress used the words 'vote' and 'voting' in the *definition* of 'vote.'" *Id.* That circular definition does not absolve courts from construing the word "vote" in the context of each provision. And "[r]ead as a whole and in context, the text tells us the Materiality Provision targets laws that restrict who may vote. It does not preempt state requirements on how qualified voters may cast a valid ballot, regardless what (if any) purpose those rules serve." *Pa. State Conf.*, 97 F.4th at 131.

On top of being textually unsupported, the Plaintiffs don't meaningfully dispute that their reading of the Materiality Provision would prohibit basic vote-casting rules. *See* RNC Br. 28-29. Courts have pointed out that the Plaintiffs' interpretation would preempt rules that govern "making a mark in the wrong place, marking more than one

candidate for the same office, failing to make any mark, using the wrong type of writing utensil, or even using an unauthorized ballot could all be considered 'errors or omissions' that have nothing to do with qualifications." *Liebert*, 2024 WL 2078216, at *12. The Third Circuit provided even more examples. *Pa. State Conf.*, 97 F.4th at 134.

The Plaintiffs respond by distinguishing ballot-casting rules from ballot-interpreting rules. NAACP Br. 42. They suggest that a state could still enforce rules about a voter marking more than one candidate or failing to mark a candidate at all, claiming that those are simply rules "for interpreting—not excluding—ballots," and it would be impossible to know whether the voter's decision was an "error or omission." NAACP Br. 42. But the Plaintiffs' distinction is irrelevant, since their reading would prohibit both categories of rules. Failing to mark a candidate is undoubtedly an "omission." And marking too many candidates is undoubtedly an "error." Neither pertain to whether the voter is qualified. The same goes for the plethora of rules the Plaintiffs don't care to address that have nothing to do with interpreting a ballot: instructions for how to fill out a ballot, secrecy envelopes, declarations, oaths, signatures—the list goes on. The Plaintiffs never explain how any of these rules could survive under their novel reading. Nor could they. The "upshot of [their] theory is that the Materiality Provision would preempt many such ballot-casting rules because none are related to a voter's qualification to vote." *Pa. State Conf.*, 97 F.4th at 134-35. That reading is untenable, which is why the "correct conclusion is that the Materiality Provision is concerned only with the process of determining a voter's *eligibility* to cast a ballot." *Id.* at 135.

14

**B.    The Plaintiffs point to no congressional findings that preempting ordinary ballot-casting rules was necessary to combat discrimination in voting.**

The Plaintiffs' account of the history undermines their case. They recognize that the Materiality Provision "was enacted to address discrimination in voter registration at the time." NAACP Br. 34 (citing H.R. Rep. No. 88-914, at 2391-94, 2491 (1963)). But they argue it was *also* designed to apply to "all phases of the voting process." NAACP Br. 34. Their evidence doesn't support that claim.

Start with the 1963 Commission Report, which the Plaintiffs argue shows that States engaged in "'discrimination in registration' as well as in 'polling facilities and ballot counting.'" NAACP Br. 33 (quoting U.S. Comm'n on Civil Rights, 1963 Report of the U.S. Comm'n on Civil Rights, at 17 (1963), perma.cc/RD5Q-SHCN). That's true as a historical matter, but those quotes from the Commission Report have nothing to do with the Materiality Provision. The full context makes clear that rooting out discrimination at polling facilities involved other civil rights laws: "The Justice Department has filed four voting suits in the State, but only one was aimed at discrimination in registration. Two actions have succeeded in desegregating polling facilities and ballot counting. The other was directed against intimidation of registration applicants." 1963 Report at 17 (footnotes omitted). In fact, the only discussion of "rejection for insignificant errors" in the 1963 Report is in the context of "discriminatory application of legal qualifications." *Id.* at 22.

The Plaintiffs next point out that Congress extended the Materiality Provision from federal elections to all U.S. elections. NAACP Br. 33-34. That's also true, and also irrelevant to whether the Materiality Provision applies to ballot-casting rules.

Finally, the Plaintiffs argue that "Congress's overarching purpose for the Materiality Provision was to 'end wholesale voter discrimination in many areas,'" citing the House Report. NAACP Br. 34 (quoting 1964 U.S.C.C.A.N. 2391, 2489). Again, they quote out of context. That sentence was not about the Materiality Provision: "After 5 years of experience, it is clear that *these statutes* have not been sufficient to end wholesale voter discrimination in many areas." 1964 U.S.C.C.A.N. at 2489 (emphasis added). "[T]hese statutes" refers to the 1957 and 1960 Civil Rights Acts. *Id.* Congress thus enacted a variety of amendments to combat different means of discrimination. *Id.* at 2489-91. The Materiality Provision was one method targeting voter qualifications, but "[t]he primary method by which title I is intended to assist in voting cases is through the authority granted to the Attorney General to request a three-judge court to hear voting cases." *Id.* at 2490. Congress targeted different types of discrimination with specific provisions because the broad approach of the 1957 and 1960 acts had not been entirely effective. And when the House Report speaks about the Materiality Provision, it is clear about its narrow purpose: "Section 101(a) is designed to insure nondiscriminatory practices in the registration of voters for Federal elections." *Id.* at 2394.

Armed with these three pieces of evidence, the Plaintiffs claim that "the legislative record is far from 'bare' of evidence" supporting their theory of the statute. NAACP Br. 34. But at most, those three pieces of evidence show only congressional awareness that discrimination infected the entire voting process. They don't show that the Materiality Provision was meant to cure all forms of voting discrimination, let alone that the provision preempts nondiscriminatory ballot-casting rules. If anything, the

legislative history provides a case study against "assuming that *whatever* furthers the statute's primary objective must be the law." *Regions Bank*, 936 F.3d at 1196 (cleaned up). After all, the legislative history specific to the Materiality Provision was clear that Congress had in mind what the text covers—immaterial errors on paperwork at the voter-qualification stage.

The Plaintiffs repeat this same error when they complain that not extending the Materiality Provision to ballot-casting rules would "leave states free to reject a registered voter's absentee ballot" for violation of ballot-casting rules that are immaterial to voter qualification. NAACP Br. 35. The dissent in *Pennsylvania State Conference* expressed the same concern. *See Pa. State Conf.*, 97 F.4th at 149-50 & n.19 (Shwartz, C.J., dissenting). "But not every statute is intended to cover every problem." *Liebert*, 2024 WL 2078216, at *16. That the Materiality Provision doesn't adopt the Plaintiffs' preferred policy is not reason to misconstrue the law.

The Plaintiffs' legal arguments are no better than their evidence. They argue that constitutional avoidance has no role when the text is clear. Fair enough. But that argument doesn't save their misreading of the text, which the Third Circuit said unambiguously forecloses their position. *Pa. State Conf.*, 97 F.4th at 135. The Plaintiffs argue that the Third Circuit's opinion can't make the text ambiguous, but that Court's dismantling of their interpretation does more than enough to raise some doubt that their reading is correct. NAACP Br. 43-44.

In any event, the Plaintiffs next argue that the "Fifteenth Amendment is not limited [to] matters of voter qualifications." NAACP Br. 44. But the Defendants never suggested that it is. Rather, it is Congress's power to "enforce" that amendment that is

17

limited to "appropriate legislation." U.S. Const. amend. XV, §2. That enforcement power requires "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). It's also true that the Voting Rights Act "was 'adopted to enforce' the Fifteenth Amendment."[2] NAACP Br. 44 (quoting *Brnovich*, 594 U.S. at 656). But that doesn't mean every provision of the Voting Rights Act is automatically congruent and proportional. The Supreme Court made that clear in *Shelby County v. Holder*, when it held that the preclearance coverage formula in Section 4(b) was unconstitutional. 570 U.S. 529, 557 (2013). And just as Congress made no findings that the coverage-formula was "appropriate legislation" to combat discrimination in voting, *id.* at 554, Congress made no findings that preempting ballot-casting rules unless they relate to a voter's qualification to vote was "appropriate legislation" to combat discrimination in voting.

Consider the Plaintiffs' counterfactual world: assume that Congress had passed a law preempting all ballot-casting rules that don't bear on a voter's qualifications. Congress would have to show in the congressional record that such a provision was congruent and proportional to solving racial discrimination in voting. But the Plaintiffs'

---

[2] The Plaintiffs hedge by arguing that the "Materiality Provision is also a valid exercise of Congressional power under the Elections Clause." NAACP Br. 46 n.13. Even if correct, at most that argument would save the Materiality Provision as applied to congressional elections. The Elections Clause permits Congress to preempt state laws concerning the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. And the Electors Clause permits Congress to determine the "Time" of choosing presidential electors, "and the Day on which they shall give their Votes." *Id.*, art. II, §1. Neither clause gives Congress power to preempt state rules for *state* elections, which means the Court would still have to confront the constitutional problems of applying the Plaintiffs' interpretation to state elections.

"own account of that law's historic record consists of nothing but instances of discriminatory and arbitrary practices during registration." *Pa. State Conf.*, 97 F.4th at 138. They have no findings about errors on ballots, absentee envelopes, or other ballot-casting paperwork. They have no statements about the dangers of ballot-casting rules that serve purposes other than determining a voter's qualifications. And they have no evidence that preempting nondiscriminatory ballot-casting rules would cure the discriminatory registration problems identified by Congress.

Because they lack specific evidence, the Plaintiffs rely on general claims that discrimination "injuries were extensive," and "the VRA applies 'to a broad range of voting rules, practices, and procedures." NAACP Br. 45. But if those generalizations about the VRA were enough, *Shelby County* would have upheld the portion of the VRA that it struck down. That the Civil Rights Act and Voting Rights Act *as a whole* target discrimination throughout the voting process does not prove that the Materiality Provision preempts nondiscriminatory ballot-casting rules. As this Court has already observed, the Materiality Provision "was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). Because Congress made no findings to support preemption of nondiscriminatory ballot-casting rules, applying the Materiality Provision in that manner would violate the Fifteenth Amendment. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 211 (2009). At a minimum, this Court should avoid that

constitutional problem by reading the provision the way it's always been read: as applying to "rules governing voter registration." *Pa. State Conf.*, 97 F.4th at 127.

### C.    No precedential opinion from any appellate court supports the Plaintiffs' view.

The Plaintiffs rely on vacated decisions, reversed judgments, plurality opinions, and dissents. And that's the best support they can muster, because the leading authority since the emergence of their novel theory rejects it. The Plaintiffs attempt to diminish *Pennsylvania State Conference* as an "outlier case." NAACP Br. 35. It's not.

"Until recently, the Materiality Provision received little attention from federal appellate courts. When it did, the challenged state law prescribed rules governing voter registration." *Pa. State Conf.*, 97 F.4th at 127 (collecting cases). "Some treatises," too, wrote "that the Materiality Provision is limited to the registration process." *Liebert*, 2024 WL 2078216, at *10 (collecting sources). The Third Circuit was the first appellate court to consider the Plaintiffs' novel application of the Materiality Provision to vote-casting rules. It initially adopted their theory, *Migliori*, 36 F.4th 153, but the Supreme Court vacated that decision, *Ritter*, 143 S. Ct. 297. When the Third Circuit reconsidered the issue, it rejected the Plaintiffs' atextual extension of the law. *Pa. State Conf.*, 97 F.4th at 139. The Western District of Wisconsin then rejected it, too. *Liebert*, 2024 WL 2078216, at *18. Those opinions are thorough and final.

In contrast, the Plaintiffs' scorecard is sparse—and contains no final victories. A Minnesota state court recently enjoined Minnesota's witness requirement for absentee voting, but the court of appeals granted "discretionary review" of that judgment. *Minn. All. for Retired Americans Educ. Fund v. Simon*, 2024 WL 3841815, at *1 (Minn. Ct. App.

Aug. 13, 2024). The appeal is ongoing. And last November, the Western District of Texas enjoined Texas's ID requirements for mail ballots and mail-ballot applications. *La Union del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 761 (W.D. Tex. 2023). That decision is also on appeal. *See United States v. Paxton*, No. 23-50885 (5th Cir.). Aside from those two appealed cases, the district court's preliminary injunction in this case remains the only decision finding that the Materiality Provision preempts ballot-casting rules. *See Liebert*, 2024 WL 2078216, at *11 (collecting cases).

The Plaintiffs argue that their theory has a longer pedigree, but the cases they cite don't bear that out. The earliest case they cite is *Ford v. Tennessee Senate*, a 2006 case in which the district court declared that a state law violated the Materiality Provision because it required voters to sign both "an application" and "the poll book" to gain access to the polling booth. 2006 WL 8435145, at *14 (W.D. Tenn. Feb. 1, 2006). There are many reasons to doubt whether that judgment was correct—the court, for example, raised the bar of materiality from "helpful" to "essential." *Id.* at 10. But the point here is that the case still concerned a rule that determined whether a voter was "qualified" or "disqualified" to vote—not the rules for casting a ballot. *Id.*

Other recent district court cases address the rules for absentee-ballot *applications*. *See, e.g., Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1340 (N.D. Ga. 2023); *League of Women Voters of Ark. v. Thurston*, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021); *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020). Again, there are reasons to doubt these decisions: a voter who is denied the opportunity to vote by mail has not been denied the right "to vote." *See McDonald v. Bd. of Election Comm'rs of Chi.*,

394 U.S. 802, 807 (1969) ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots…."). But even those cases had a better textual hook to the Materiality Provision: an absentee-ballot application is at least arguably an "application" that is "requisite to voting," if only to a particular form of voting. 52 U.S.C. §10101(a)(2)(B).

The remaining two cases from 2018 just assumed with no discussion that the Materiality Provision applies to mail ballots. *See Democratic Party of Ga, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1339 (N.D. Ga. 2018); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018). And that's just when plaintiffs started testing out this new theory. Before 2018, the Plaintiffs' application of the Materiality Provision to ballot-casting rules appears nowhere in the caselaw. One judge observed that "[n]othing in my review of the case law in this jurisdiction or in other jurisdictions indicates that [the Materiality Provision] was intended to apply to the counting of ballots by individuals already deemed qualified to vote." *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004). The Plaintiffs say that *Friedman* was "out of step with how courts in this Circuit have construed the Materiality Provision," but they cite no earlier or contemporary cases supporting that claim. NAACP Br. 36 n.10. *Friedman* is also corroborated by another court that concluded that "the jurisprudence appears to demonstrate that [§10101] is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay v. Altobello*, 1996 WL 635987, at *1 (E.D. La. 1996). The Plaintiffs' new theory departs from that uniform jurisprudence.

At bottom, the Plaintiffs' caselaw is a foundation of sand. They rely on vacated decisions. *See Migliori*, 36 F.4th at 164. They rely on plurality opinions. *See Ball*, 289 A.3d at 25-28 (plurality op.). They rely on dissents. *See Pa. State Conf.*, 97 F.4th at 139 (Shwartz, J., dissenting). And they rely on scattershot district court cases from recent years that are primarily reversed, appealed, or simply didn't address the issue in this case. Those cases should not distract this Court from the Third Circuit's careful analysis. The birthdate requirement "does not cross over to a determination of *who* is qualified to vote, and the Materiality Provision likewise does not cross over to *how* a State regulates its vote-casting process." *Pa. State Conf.*, 97 F.4th at 139.

> ### D. A voter who fails to follow the rules for mailing a ballot has not been denied the right to vote.

The district court's injunction is wrong for "[y]et a separate reason." *Id.* at 133. Even if the Materiality Provision applied to ballots, a state official does not "deny" a person's "right … to vote" by not counting a ballot that doesn't comply with the rules. 52 U.S.C. §10101(a)(2)(B). A person is denied the right to vote under the Materiality Provision only if that person is erroneously deemed not "qualified under State law to vote." *Id.* So "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).

The Plaintiffs return to the broad definition of "voting." But that says nothing about what it means to *deny* the right to vote. The Materiality Provision "forbids the practice of *disqualifying potential voters* for their failure to provide information irrelevant

to determining their eligibility to vote." *Schwier*, 340 F.3d at 1294 (emphasis added). So "the phrase 'deny the right ... to vote' in the Materiality Provision must be understood as denying an individual the opportunity to access the ballot in the first instance—not as denying the right to cast a defective ballot." *Pa. State Conf.*, 97 F.4th at 134.

The Plaintiffs reading would require this Court to treat any enforcement of a ballot-casting rule as a denial of the right to vote. But they fail to provide any support for that expansive reading of "denial." Nor can they save this expansive interpretation by asserting that "[h]aving rules for how votes are counted is not the same as using immaterial paperwork requirements as obstacles to the franchise." NAACP Br. 42. That response is no better than "trust us, that's different." As explained, their own theory would deem enforcement of any rule that is not material to a voter's qualifications as a denial of the right to vote. *See supra* Section II.A.

The Plaintiffs' reading also ignores statutory context. The original remedy under the 1960 Civil Rights Act was that courts would cure discriminatory practices voter-by-voter. A voter could file an application with the court, which could then issue an "order declaring" the person "qualified to vote" upon a finding that the person was "denied under color of law the opportunity to register to vote or otherwise to qualify to vote," or was "found not qualified to vote." 52 U.S.C. §10101(e). Once the court found the person "qualified to vote," *id.*, the voter could then go vote in accordance with the rules of the State. Nothing about that process permitted a voter deemed "qualified to vote" to exempt themselves from neutral rules about casting a ballot.

### III.    The Plaintiffs don't justify their undue delay.

The Plaintiffs don't dispute that they could have moved for a preliminary injunction years before they did. They don't dispute that they experienced an entire federal election under rules that they now claim cause irreparable harm. Instead, they point out that "delay only '*militates against* a finding of irreparable harm.'" NAACP Br. 49 (quoting Doc. 613 at 33).[3] Because the district court evaluated the Plaintiffs' delay "in light of the delayed discovery schedule and the prudential principles of *Purcell v. Gonzalez*," the Plaintiffs argue the court didn't abuse its discretion. NAACP Br. 49-50. But "[a]n error of law constitutes an abuse of discretion." *Arthur v. Thomas*, 739 F.3d 611, 628 (11th Cir. 2014) (cleaned up). And the district court committed several legal errors.

Start with discovery. The Supreme Court has held that "delay[s]" of "the completion of … discovery … d[id] not change the fact that plaintiffs could have sought a preliminary injunction much earlier." *Benisek v. Lamone*, 585 U.S. 155, 160 (2018). The parties' discovery schedule is irrelevant to whether the Plaintiffs are suffering irreparable harm, particularly for a purely legal question such as this one. The Plaintiffs try to excuse the district court's failure to even cite *Benisek*, arguing that the case is "distinguishable" because it involved redistricting on a years-long schedule. NAACP Br. 51 n.16. But that's beside the point. *Benisek* lays down the principle that discovery doesn't excuse delay in election cases. 585 U.S. at 160. The district court applied the exact opposite rule. And the court necessarily abuses its discretion when it

---

[3] Doc. cites refer to the record in the consolidated district court docket, No. 1:21-mi-55555.

"has applied the wrong legal standard." *Arthur*, 739 F.3d at 628. Delay is measured from the time the Plaintiffs learn of their injury, not when they complete discovery, or when it is "apparent that they would not reach trial before the 2024 elections," or some other mid-suit event. NAACP Br. 49 n.14.

The court also misapplied the imminence requirement by reasoning that "[h]ad Plaintiffs filed their motions earlier, their prospective harms would not have been imminent." Doc. 613 at 33. But the "imminence requirement" turns on whether the Plaintiffs will suffer injury at a "'fixed period of time in the future,'" not with the relative proximity of a certainly impending injury. *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194 (11th Cir. 2009) (citation omitted). Allowing Plaintiffs to wait for a *known event* to get closer inverts the notion of reasonable diligence. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). The Plaintiffs don't address this contradiction in the district court's reasoning.

The district court also erred by ruling that the *Purcell* doctrine excuses delay in election cases. The court reasoned that had the Plaintiffs "filed any later, their relief may have been barred by *Purcell*." Doc. 613 at 33. But that doesn't explain why they couldn't have filed earlier. *Purcell* bars federal courts from changing the rules for an impending election. It doesn't bar courts from providing *any relief* around the time of an election. *Purcell* explains why the Plaintiffs couldn't obtain relief for the 2022 election cycle. It doesn't explain their failure to ask for any relief for future elections for over two years.

The Plaintiffs complain of an "about-face" on *Purcell*. NAACP Br. 50 n.15. But that argument, like the district court's reasoning, rests on the false premise that *Purcell* and reasonable diligence are competing principles. *Purcell* instructs that federal courts

"should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). It has nothing to do with when the Plaintiffs are injured, when they learn of their injury, or when they file suit. The district court created a new equitable rule that a Plaintiff *must* be allowed a window to obtain a preliminary injunction before an election. That rule contradicts both *Purcell* and principles of reasonable diligence.

The Plaintiffs' other arguments don't show irreparable harm. They begin by pointing out "'continued diversion of resources' away from Plaintiffs' other priorities." NAACP Br. 48 (quoting Doc. 613 at 31). But that is exactly the kind of alleged injury—an ongoing injury accruing throughout litigation—that is most undermined by a years-long delay. The fact that Plaintiffs willingly incurred two years of resource diversion before moving for preliminary injunctive relief is strong evidence of delay that the district court failed to acknowledge.

The Plaintiffs next argue that "missing the opportunity to vote in an election is an irreparable harm for the purposes of a preliminary injunction." NAACP Br. 48 (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020)). But the birthdate requirement—and ballot-casting rules in general—don't deprive anyone of the opportunity to vote. Georgians can vote early in person for at least a month before election day. Ga. Code §21-2-385(d)(1). They can vote early by absentee ballot with no excuse, and they can submit that ballot by mailing it, delivering it to the county registrar or absentee ballot clerk, or dropping it in one of the designated drop boxes. *Id.* §§21-2-380, 21-2-382, 21-2-385. Requiring voters to follow the rules for casting a ballot doesn't deprive them of these opportunities to vote.

27

The district court erred not merely in measuring the timeline and circumstances of the case. It evaluated improper criteria, considered irrelevant facts, applied the wrong legal standard, and invented new rules. Those errors warrant reversal.

## IV. The Plaintiffs don't show that the equities and public interest are served by enjoining the State's election laws.

The States' interests in enforcing election laws are numerous and strong. The Supreme Court has said so. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). This Court has said so. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020). But the Plaintiffs don't respond to those precedents. Instead, they echo the district court that there was no "'evidence that absentee ballots rejected for failure to comply with the Birthdate Requirement were fraudulent ballots' or otherwise invalid." NAACP Br. 52 (quoting Doc. 613 at 35). But this Court has "decline[d] to impose that burden on Georgia" to "prove specific instances of voter fraud" to justify its election rules. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).

In addition, "prevention of fraud is not the only legitimate interest served by" Georgia's rules. *Brnovich*, 594 U.S. at 686. Those interests include enforcing state law, conducting a fair and orderly election, and preserving public confidence. Neither the Plaintiffs nor the district court addressed these interests, but they are "weighty," and they "warrant judicial respect." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurral).

The Plaintiffs default to vague claims that the birthdate requirement denies some of their members "the opportunity to vote." NAACP Br. 52. But if those members

have any doubt about their ability to fill in their birthdate on the absentee envelope, they can "take advantage of any of the other avenues that Georgia has made available to ensure that voters are able to cast their ballots." *New Ga. Project*, 976 F.3d at 1283-84. The possibility that some number of voters will make mistakes—which is true of every election rule—does not outweigh the State's or the public's numerous strong interests in enforcing those rules.

In other words, the fact that election rules affect voters is not a public-interest trump card. "When the district court bars 'the State from conducting this year's elections pursuant to a statute enacted by the Legislature,' unless the statute is unconstitutional, an injunction would 'seriously and irreparably harm the State.'" *New Ga. Project*, 976 F.3d at 1283 (quoting *Abbott v. Perez*, 585 U.S. 579, 602-03 (2018)). The district court and the Plaintiffs don't account for the State's interests, but this Court and the Supreme Court often hold that those interests prevail in election cases.

## V.     The Plaintiffs have not shown that the district court erred in ruling that their injuries are not traceable to the State Defendants.

Article III requires a plaintiff to show injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Even assuming that the Plaintiffs suffer an injury in fact, they have not established that the district court erred in holding that those injuries are not traceable to the State Defendants, or that those injuries would be redressed by an order enjoining those Defendants. The Plaintiffs try to avoid argument on the issue by claiming that the Defendants "abandoned" it. NAACP Br. 54. But the Plaintiffs are the ones who "filed a cross-appeal challenging the District Court's failure to extend the preliminary injunction order to the State Defendants." NAACP Br. 7.

Because they claim that the district court erred in dismissing the State Defendants, they are the ones responsible for raising the issue. That's the whole point of a cross appeal. *See* Fed. R. App. P. 28-1.

The district court did not err in refusing to enjoin the State Defendants. "[C]ounty officials," not the State Defendants, "are responsible for accepting or rejecting absentee ballots." Doc. 613 at 16. The Plaintiffs allege that the district court erred only with regard to the Secretary of State and the State Election Board.

Start with the Secretary. "[T]he Secretary's position as 'the chief election officer of the state,' with 'general supervision and administration of the election laws,' does not make" election laws traceable to him by default. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (citations omitted); *see also Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, No. 20-14741, 2020 WL 7488181, at *2 (11th Cir. Dec. 21, 2020) (In Georgia, "just as in *Jacobson*, the absentee ballot statute puts the duty to 'compare the signature' and accept or reject a ballot on the 'registrar or clerk'—not the Secretary of State.").

The Plaintiffs argue that *Jacobson* doesn't apply because "Georgia law charges the Secretary of State with prescribing the 'form and substance' of the outer envelope statewide." NAACP Br. 58 (quoting Ga. Code §21-2-384(b)). Even if that were a relevant distinction, the Plaintiffs never asked for that relief. They sought an order to enjoin all Defendants "from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement," and to require "the Secretary of State to count such ballots and refuse certification of election results until all such ballots have been counted." Doc. 613 at 15. Even if they had asked for a change to the envelope, the

request would have been overbroad: under the Plaintiffs' theory of the Materiality Provision, a State could still include a space on the outer envelope for the voter's birthdate, so long as county officials don't reject the ballot for "errors" or "omissions" regarding that information. The Materiality Provision says nothing about the "form and substance" of envelopes or ballots, even under the Plaintiffs' reading. Ga. Code §21-2-384(b).

Next, the Plaintiffs argue that state law "requires the Secretary to order counties to correct errors, such as the exclusion of ballots rejected on grounds of Birthdate Requirement noncompliance, and to recertify results." NAACP Br. 61 (citing Ga. Code §21-2-499(a)). But that's just the same uniformity argument repackaged as a certification argument. The fact that the Secretary certifies election results says nothing about whether a missing or incorrect birthdate is a valid "error" that must be rejected. And this Court has already applied *Jacobson* to Georgia, reasoning that plaintiffs cannot obtain relief against the Georgia Secretary where "there is no allegation that the Secretary controls the local supervisors or has control over the signature verification process." *Ga. Republican Party*, 2020 WL 7488181, at *2. The Plaintiffs here likewise have not shown that the Secretary "has control over" the birthdate verification process. *Id.*

Finally, the Plaintiffs argue that their injuries are traceable to the State Election Board. They claim that the Board could "take remedial action against counties and election officials that do not comply with election requirements" and that the Board can suspend and replace county superintendents. NAACP Br. 61 (citing Ga. Code §§21-2-33.1(a), 21-2-33.2(c)). Again, the Plaintiffs didn't request that relief. Even if they had, this Court has pointed out that Georgia's "election board members" are not proper

defendants when they "do not conduct" the verification process at issue and "are not the election officials that review" absentee ballots. *Ga. Republican Party*, 2020 WL 7488181, at *2.

## CONCLUSION

This Court should reverse the district court's preliminary injunction.

Dated: October 30, 2024

Respectfully submitted,

*/s/ Gilbert C. Dickey*

William Bradley Carver, Sr.
Baxter D. Drennon
HALL BOOTH SMITH, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303
(404) 954-5000
BCarver@hallboothsmith.com
BDrennon@hallboothsmith.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Rule 28.1(e)(2)(A) of the Federal Rules of Appellate Procedure because it contains 9,301 words as counted by the word-processing system used to prepare the document.

*/s/ Gilbert C. Dickey*

**CERTIFICATE OF SERVICE**

I certify that on October 30, 2024, I served this brief by electronically filing it with this Court's ECF system, which will serve everyone requiring notice.

*/s/ Gilbert C. Dickey*